## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| OPTIMA SPECIALTY STEEL, INC., *et al.*,[1] | Case No. 16-12789 (_____) |
| Debtors. | (Joint Administration Requested) |

### DECLARATION OF MORDECHAI KORF IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST DAY RELIEF

I, **MORDECHAI KORF**, hereby declare, under penalty of perjury, as follows:

1.　　I am the Chief Executive Officer ("**CEO**") and Chairman of the Board of Directors of Optima Specialty Steel, Inc. ("**OSS**"), and its wholly-owned subsidiaries Michigan Seamless Tube LLC ("**MST**"),[2] Niagara LaSalle Corporation ("**Niagara**" ), KES Acquisition Company d/b/a Kentucky Electric Steel ("**KES**"), and Corey Steel Company ("**Corey,**" and together with OSS, KES, Niagara and MST, the "**Debtors**").  I perform my duties out of the Debtors' corporate headquarters located at 200 S. Biscayne Blvd., Suite 5500, Miami, Florida 33131.

2.　　I co-founded OSS in 2008 and became CEO of OSS and its subsidiaries in 2013. Since becoming CEO, I have been responsible for the management oversight of the Debtors and am familiar with the day-to-day operations, business, and financial affairs of the Debtors.  I have

---

[1]　　The Debtors in these Chapter 11 Cases, along with the business addresses and the last four (4) digits of each Debtor's federal tax identification number, if applicable, are:  Optima Specialty Steel, Inc., 200 S. Biscayne Blvd., Suite 5500, Miami, FL 33131-2310 (0641); Michigan Seamless Tube LLC, 400 McMunn Street, South Lyon, MI 48178 (3850); Niagara LaSalle Corporation, 1412 150th Street, Hammond, IN 46327 (0059); KES Acquisition Company d/b/a Kentucky Electric Steel, 2704 South Big Run Road, Ashland, KY 41102 (2858); and The Corey Steel Company, 2800 South 61st Court, Cicero, IL 60804 (0255).

[2]　My title with MST is President.

extensive experience in the metals industry, including more than 10 years of steel industry experience.

3.        I submit this declaration (the "**Declaration**") to assist the Court, as well as creditors and other parties in interest, in understanding the circumstances that compelled the commencement of these chapter 11 cases (the "**Chapter 11 Cases**") and also in support of: (a) the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") filed on the date hereof (the "**Petition Date**"); and (b) the relief that the Debtors have requested from the Court in the form of various motions and applications filed on or about the Petition Date and described herein (collectively, the "**First Day Motions**").

4.        Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and the Debtors' advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

5.        Part I of this Declaration provides a brief overview of the Debtors and a summary of these Chapter 11 Cases.  Part II of this Declaration describes in more detail the Debtors' business, the developments which led to the Debtors' chapter 11 filings, and the Debtors' goals in these Chapter 11 Cases.  Part III sets forth the relevant details of the various First Day Motions.

## I.  INTRODUCTION

6.     The Debtors are leading independent manufacturers of specialty steel products. These steel products include (i) special bar quality and merchant bar quality hot rolled steel bars ("**HRSB**"), (ii) value-added precision-tolerance, cold drawn seamless tubes, and (iii) high quality engineered cold finished steel bars ("**CFSB**").   The Debtors' products are utilized across a diversified range of end markets, including transportation (e.g. automotive), energy (e.g. oil and gas shale extraction), agriculture, power generation, yellow goods/construction equipment, railroad car, industrial chain manufacturing, and trailer support beam flanges.

7.     All of the Debtors' manufacturing facilities are located in the United States, and each of the Debtors' operating units have operated in the steel industry for more than 50 years. In the aggregate, the Debtors have more than one thousand customers in the United States. These customers span many industries including transportation, energy, agriculture and power generation.  The Debtors collectively employ more than 900 people.

8.     OSS was formed in 2008 to invest in the U.S. steel industry and shortly thereafter acquired MST.  Since that initial acquisition, OSS grew its steel operations through strategic acquisitions intended to enhance operations and take advantage of synergies and create efficiencies within the business.  These strategic acquisitions, which are discussed in greater detail below, included OSS's purchase of Niagara in 2011, KES in 2013 and Corey in 2015. Each of these acquisitions further cemented OSS's position as an industry leader in the niche U.S. specialty steel space.

9.     While the Debtors' operations remain strong and financially stable, the Debtors have been negatively impacted by certain macroeconomic forces afflicting the steel and broader metals industry over the past few years.  Specifically, the Debtors operate in a highly competitive

industry and the Debtors' position within that market has been impacted by low oil prices, a strong U.S. Dollar, excess capacity and slowing growth in other parts of the world, and a decrease in demand for products from U.S. specialty steel producers.  These external factors, coupled with the Debtors' significant debt load arising in part from leveraged acquisitions, resulted in the Debtors' financial performance falling below expectations in 2015 and 2016.

10.     In early 2016, the Debtors began exploring opportunities to cut costs and restructure their business to address the challenging economic environment and their leveraged capital structure.  By mid-2016, and after discussions with multiple banks, institutional investors and parent-company Optima Acquisitions, LLC, the Debtors retained a debt advisory firm to assist with restructuring the Debtors' pre-petition debt load.  That process revealed that there is substantial interest in providing financing to the Debtors both from third-parties and from the Debtors' current stakeholders.  However, despite the tireless efforts of the debt placement professionals, the Debtors were unable to successfully negotiate a transaction acceptable to those parties nor did any of the financing proposals provide terms that would have allowed the Debtors business to grow and prosper in the future.

11.     After carefully exploring other options and exhausting their out-of-court alternatives, and with debt maturities looming on December 15, 2016 in connection with approximately $171.7 million of senior secured notes (including accrued interest) and December 30, 2016 in connection with $87.5 million of senior unsecured notes (including accrued interest), the Debtors determined that only a chapter 11 filing would provide them the breathing room necessary to continue rationalizing operations and address their balance sheet while continuing to operate their business in the ordinary course.  The Debtors believe that these Chapters 11 Cases will maximize the value of their enterprise and not disrupt their ongoing business.  The Debtors'

goal is to negotiate a plan of reorganization that will enable them to exit bankruptcy with a stronger balance sheet and improved operations while protecting jobs and preserving relationships with key constituencies, including customers, suppliers and vendors.

## II. BACKGROUND

A.    **The Debtors' Business**

      *i.    The Debtors*

12.    The Debtors are leading domestic manufacturers and processors of cold drawn seamless pressure and mechanical tubes, special bar quality and merchant bar quality HRSB, and specialty, highly engineered CFSB.  The Debtors focus on niche applications within the broader steel supply chain and their products are sold at prices that reflect a spread over the cost of raw material that reflects of the value added by their manufacturing processes. The Debtors' processing operations require substantial technical expertise and specialized equipment to manufacture high quality engineered steel products, which include pressure-carbon, pressure-alloy, mechanical-carbon and mechanical-alloy tubing and specialty cold finished steel bars.

13.    Through their seven manufacturing and processing facilities in five different states, the Debtors' operating units have the capacity to roll approximately 250,000 tons of HRSB, produce over 50,000 tons of cold drawn seamless pressure and mechanical tube products, and process nearly 700,000 tons of CFSB.

14.    The majority of the Debtors' sales involve products specified to meet specific and sometimes unique customer demands, which creates strong customer relationships and recurring revenues.  The Debtors' products encompass (a) special bar quality and merchant bar quality HRSB produced by KES, (b) pressure-carbon, pressure-alloy, mechanical-carbon and mechanical-alloy tubing produced by MST, and (c) quench and tempered bars, Custom Cut®

bars and blanks, free machining bars, Stressproof® steel bars, Fatigue-Proof® steel bars, e.t.d.®

150® bars, and other CFSB products produced by Niagara and CSC.

15.     These products are sold directly to original equipment manufacturers and to

distributors, often referred to as metal service centers, which then resell the products in smaller

quantities to end users.  The Debtors have over one thousand customers in the United States in

the transportation, energy, agriculture and power generation industries.  The Debtors also sell

limited quantities of product to customers in countries other than the United States.

16.     The Debtors' business is fundamentally sound.  They intend to continue to

operate in the ordinary course throughout these Chapter 11 Cases and maintain their strong

business relationships with existing customers, suppliers and other vendors.  As of the Petition

Date, and in the short-term, the Debtors have sufficient cash to operate in the ordinary course

during these Chapter 11 Cases without an immediate need for post-petition debtor-in-possession

financing.  However, with the retirement of their working capital facility on November 30, 2016

(the ABL Facility described below), the Debtors anticipate a need for debtor-in-possession

financing by mid or early January 2017.  Securing debtor-in-possession financing is the primary

focus of the Debtors at the outset of these Chapter 11 Cases.  Certain Secured Noteholders

(defined below) and other third parties have indicated an interest in providing such financing,

and the Debtors have also received indications of interest from their equityholders.

17.     The Debtors have formed a special committee comprised of two independent

directors (the "**Special Committee**") to review, evaluate and make key decisions regarding the

restructuring of the Debtors' business, assets, liabilities, and interests during these Chapter 11

Cases (the "**Restructuring Process**").  The independent directors are John H. Goodish and

Menachem M. Mayberg.  Mr. Mayberg is a practicing attorney in Miami, Florida.  Mr. Goodish

has deep steel-industry experience having worked in the industry for forty years including serving as Chief Operating Officer and Executive Vice President of United States Steel Corp. from June 1, 2005 to December 31, 2010.

18.     The Debtors have also retained Miller Buckfire & Co., LLC ("**Miller Buckfire**") to provide investment banking services to the Debtors in these Chapter 11 Cases.  The Debtors intend to file an application with the Court to approve the retention of Miller Buckfire as their investment bankers.

ii.     *The Strategic Acquisitions*

19.     OSS has made three strategic acquisitions since 2011 that were designed to achieve cost synergies and other efficiencies between and among the Debtors' operating units. These purchases have elevated the Debtors into one of the leading and largest specialty steel producers in the United States.  Below is a brief discussion of those acquisitions.

**a.     Niagara LaSalle Corporation**

20.     On December 5, 2011, OSS acquired Niagara for a total consideration of $236.1 million.  In order to fund the acquisition, OSS obtained $168.0 million in proceeds from the issuance of the Secured Notes (as defined below) and received an additional contribution to capital from its corporate parent and indirect shareholders of $85,000,000.  Niagara is the largest independent CFSB producer in North America and through various corporate iterations has been in business for over 100 years.  Niagara operates facilities in Hammond, Indiana, South Holland, Illinois, Warren, Michigan and Midlothian, Texas.

21.     The Niagara acquisition increased the Debtors' manufacturing scale and raw material consumption, particularly in purchases and consumption of SBQ steel, which is the main

raw material for all OSS production processes.  As a result of this increased scale, management expected to achieve cost synergies by negotiating more favorable terms with suppliers.

### b.    Kentucky Electric Steel

22.    On February 5, 2013, OSS completed the acquisition of KES for total net consideration of $110.6 million.  KES is a value-added manufacturer of special bar quality and merchant bar quality HRSB, and operates a single 450,000 square foot facility in Ashland, Kentucky.  KES' operations date back over 50 years and it was (and continues to be) a supplier to Niagara.  The KES acquisition solidified OSS's position in the specialty steel industry, strengthened relationships with customers and suppliers, and was part of the Company's long-term strategy of building a leading specialty steel producer.

23.    In order to fund the KES acquisition, OSS issued $35.0 million of unsecured debt, received an additional contribution of capital from its corporate parent and indirect shareholders of $20.0 million, and drew $15.0 million on its revolving credit facility.  The remaining purchase price was funded with cash on hand.

### c.    Corey Steel Company

24.    OSS completed its acquisition of Corey on January 29, 2015 for a net purchase price of $43.5 million.  Corey has been in the metals processing business since 1924 and today is a leading North American CFSB producer operating from a single 380,000 square foot facility located in Cicero, Illinois.  Corey's facility is relatively new, highly automated and houses what is perhaps the most modern set of continuous  coil-to-bar CFSB drawing lines in North America. The addition of Corey provides the Debtors with further operational and commercial scale, as well as cost and logistics synergy opportunities.  Corey's products are distributed to customers

in a diverse range of industries primarily located in the U.S., including automotive, hydraulic, fluid power, agriculture, construction, appliance, electrical, and oil and gas.

25.    OSS issued $85 million of unsecured debt (as discussed below) to finance the Corey acquisition. Proceeds from that debt issuance were also used to redeem the $35 million principal amount of unsecured notes issued in 2013 in connection with the acquisition of KES.

*iii.*    *Debtors' Prepetition Capital Structure*

26.    To finance its strategic acquisitions, working capital, and other needs, OSS raised debt financing in addition to its shareholder contributions. As of the Petition Date, the Debtors had outstanding debt obligations in the aggregate amount of over $259 million, including accrued and unpaid interest, consisting primarily of their obligations under the Senior Secured Notes and the Senior Unsecured Notes (each as defined below, and collectively, the "**Notes**").

**a.    Secured Claims**

(1)    Issuance of 12.5% Senior Secured Notes

27.    On December 5, 2011, in connection with its acquisition of Niagara, OSS issued $175 million aggregate principal amount of 12.5% senior secured notes due December 15, 2016 (the "**Secured Notes**") to various holders that may trade from time to time (the "**Secured Noteholders**"). The Secured Notes were priced at 96.0% of par resulting in a yield to maturity of 13.62% with interest payable semi-annually in arrears on June 15 and December 15 of each year. Until the maturity date, interest was timely paid under the Secured Notes.

28.    In connection with the issuance of the Secured Notes, OSS and its existing and future subsidiaries and Wilmington Trust, National Association as trustee and noteholder collateral agent, entered into an indenture dated December 5, 2011, which governs the Secured Notes. The Secured Notes are fully guaranteed, on a senior secured basis, by each of the

Debtors' operating units.  The Secured Notes and related guarantees are secured by substantially all of the Debtors' assets, subject to permitted liens  and specified excluded assets.

29.     In addition to making all interest payments timely under the Secured Notes until the filing of these Chapter 11 Cases, the Debtors' made an excess cash flow payment in 2015 in the amount of $13.3 million.  The approximate amount currently outstanding under the Secured Notes is $171.7 million, which includes interest in the approximate amount of $10 million through the Petition Date.

**b.      Unsecured Noteholder Claims**

(1)     Issuance of 12.0% Senior Unsecured Notes

30.     On January 29, 2015, in connection with the acquisition of Corey, OSS issued $85 million of senior unsecured notes at 100% of face value, bearing interest at 12.0% per annum, payable semi-annually in arrears on March 15 and September 15 of each year (the "**Unsecured Notes**").  The Unsecured Notes mature on the earlier of December 30, 2016, or 15 days after the maturity date of the Secured Notes.  Until the commencement of these Chapter 11 Cases, interest payments due under the Unsecured Notes were paid timely.

31.     In connection with the issuance of the Unsecured Notes, OSS and its existing and future subsidiaries and Wilmington Trust, National Association as trustee, entered into an indenture dated January 29, 2015, which governs the Unsecured Notes.  The Unsecured Notes are fully guaranteed by each of the Debtors' operating units.

32.     The Unsecured Notes are currently held solely by DDJ Capital Management, LLC (the "**Unsecured Noteholder,**" and together with the Secured Noteholders, the "**Noteholders**").  The approximate amount currently outstanding under the Unsecured Notes is $87.5 million, which includes accrued interest in the approximate amount of $2.5 million as of the Petition Date.

### c.   Unsecured Claims and Equity

33.     The Debtors have general unsecured claims which include, among others, trade claims, litigation claims and environmental claims.   As of the Petition Date, the general unsecured claims (excluding the Unsecured Notes) were in excess of $37.0 million.

34.     OSS is wholly-owned by Optima Acquisitions, LLC, a privately owned U.S.-based investment firm.  The equity of Optima Acquisitions, LLC, is owned directly or indirectly by three individuals: Mordechai Korf (33%), Gennadiy Bogolyubov (33%) and Igor Kolomoyskyy (33%).

### d.   Retired ABL Facility

35.     In addition to the Notes, the Debtors had a prepetition asset based revolving credit facility with PNC Bank, N.A., as lender and agent (the "**ABL Facility**") that matured on November 30, 2016.   Unable to secure a further extension of the ABL Facility maturity date from PNC Bank, the Debtors paid all outstanding amounts thereunder and retired the ABL Facility on November 30, 2016.

## B.   Events Leading up to these Chapter 11 Cases

36.     A summary of the key events that precipitated these Chapter 11 Cases is provided below.

### i.   *Macroeconomic and Industry Challenges*

37.     Since late 2014, North American steel companies have been impacted by reduced demand from domestic energy producers, weakened iron ore and steel scrap pricing, and weaker demand from the mining and agricultural sectors that support the sale of heavy equipment. Moreover, a strong U.S. Dollar has encouraged steel consumers to look for product from offshore producers.

38.     More specifically, the industrial manufacturing sector has been weakened by the impact of low oil prices and slowing growth in other parts of the world, particularly China.  Low oil prices resulted in a shutdown of more than half the oil and gas rigs in North America, which has resulted in a commensurate decrease in demand for products from the steel and equipment producers, such as the Debtors, supplying the extraction industry.   The global manufacturing slowdown that has persisted for the past two years has led to significant excess capacity in the metals and mining industries.   Excess capacity in Asia and around the world has also led to falling prices and efforts to reduce inventories throughout the supply chain. The impact on the United States has been magnified by the relative strength of the U.S. Dollar, which reduces the cost of imported steel.

39.     Continued strength in North American automotive production, modest support from the construction industry, and consumption of seamless tubes in the power generation industry continue to bolster the Debtors' sales, but have not been able to offset the pressures exerted from the commodity elements of the steel pricing cycle that negatively impacted the Debtors' and the industry's financial results in 2015 and 2016, and the reduction in demand cited above.

40.     Falling steel prices have also discouraged the Debtors' distribution-oriented customer base from holding inventory as both metal service centers and original equipment manufacturers seek to avoid or minimize inventory holding losses.  Shorter lead times resulting from available capacity at the primary producing mills also lessens the need for inventory throughout the supply chain.   These inventory reductions, at both metal service centers and original equipment manufacturers, tend to exacerbate the volume decreases that result from weaker end user demand.  The impact on the Debtor should moderate as pricing stabilizes and

customers begin to normalize inventory levels relative to sales, and potentially replenish depleted inventories.

41.     These challenging macroeconomic conditions led to the Debtors' financial performance falling below their expectations in 2015 and 2016.

   ii.     _Maturing Notes_

42.     As described above, the Debtors' Secured Notes are scheduled to mature on December 15, 2016 with the maturity of the Unsecured Notes following shortly thereafter on or about December 30, 2016. As of the Petition Date, the Debtors have been unable to secure replacement financing.

43.     On August 8, 2016, the Debtors retained Lampert Debt Advisors ("**Lampert**"), a debt placement advisory firm, to source debt financing to refinance the maturing Notes and assist in the restructuring of the Debtors' balance sheet. The Debtors, with the assistance of Lampert, devoted several months to extensive negotiations with existing debt holders, shareholders and potential new lenders. The Debtors and their stakeholders considered various proposals for the refinancing comprised of new senior secured debt plus a substantial infusion of new debt and equity capital by the equityholders. While those detailed negotiations made substantial and substantive progress for several months, they ultimately failed to result in a binding term sheet or any definitive agreement. With the refinancing negotiations breaking down in December 2016 and the maturity of the Secured Notes looming on December 15, 2016, the Debtors were left with little choice but to seek Chapter 11 relief to facilitate a restructuring.

44.     The Debtors believe that they will benefit from the breathing space afforded by the Bankruptcy Code, which will enable them to negotiate with the Noteholders without the threat of an impending default under the credit documents and without disruption to their

business operations.  In addition, the bankruptcy process will also provide the Debtors with an opportunity to stabilize the business over the next few months as the steel industry continues to recover.

**C.      Debtors' Goals in These Chapter 11 Cases**

45.      The Debtors sought Chapter 11 protection to preserve a fundamentally sound business during a period of macroeconomic and industry stress compounded by the coincident maturity of the Notes.  Although there will be no undue delay in the Chapter 11 Cases, the Debtors do intend to take the full measure of the "breathing room" Chapter 11 is intended to provide.  The Debtors will use this period to assess strategic options, address operational issues and consider proposals for restructuring their balance sheet.  Therefore, the Debtors intend to continue their operations in the ordinary course of business and, after consideration of the Debtors' strategic options, to propose a chapter 11 plan that will permit them to reorganize and emerge from Chapter 11.

**III.  FIRST DAY MOTIONS**

46.      Concurrently with and shortly after the filing of these cases (the "**Chapter 11 Cases**"), the Debtors will be filing a number of First Day Motions.[3]  The Debtors anticipate that the Bankruptcy Court will conduct a hearing within a business day or two after the commencement of the Chapter 11 Cases (the "**First Day Hearing**"), during which the Bankruptcy Court will entertain the arguments of counsel with respect to the relief sought in each of the First Day Motions.

47.      Generally, the First Day Motions have been designed to meet the immediate goals of (i) establishing procedures for the efficient administration of these Chapter 11 Cases;

---

[3] Capitalized terms used in Part III but not otherwise defined in this Declaration shall have the meanings ascribed to them in the relevant First Day Motion.

(ii) continuing the Debtors' operations during these Chapter 11 Cases with as little disruption and loss of productivity as possible; and (iii) maintaining the confidence and support of the Debtors' key constituencies.   I have reviewed each of the First Day Motions, including the exhibits, attached thereto, and believe that the relief sought in each of the First Day Motions is narrowly tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve success in these Chapter 11 Cases.

48.     The First Day Motions are summarized below:

**A.     Motion of the Debtors for Entry of an Order Authorizing and Directing the Joint Administration of the Debtors' Chapter 11 Cases for Procedural Purposes Only**

49.     By this motion, the Debtors request the joint administration of the Chapter 11 Cases for procedural purposes only.   Specifically, the Debtors request that the Court maintain one file and one docket for the Chapter 11 Cases under the Optima Specialty Steel, Inc. case and also request that the caption of each of the Chapter 11 Cases be modified to reflect the joint administration of the Chapter 11 Cases.   Additionally, the Debtors request that the Court authorize the Debtors to use a combined service list for the jointly administered Chapter 11 Cases for purposes of noticing creditors of the Debtors' estates.

50.     Michigan Seamless Tube LLC, KES Acquisition Company d/b/a Kentucky Electric Steel, Niagara LaSalle Corporation and Corey Steel Company are wholly-owned subsidiaries of OSS, such that the Debtors constitute "affiliates" of one another within the meaning of section 101(2) of the Bankruptcy Code.   Joint administration of the Chapter 11 Cases will avoid the unnecessary administrative burden on the Court and parties-in-interest in these Chapter 11 Cases.

51.     Joint administration will permit the Clerk to use a single general docket for the Debtors' Chapter 11 Cases and to combine notices to creditors and other parties-in-interest of the

Debtors' respective estates.  Joint administration will protect parties-in-interest by ensuring that such parties-in-interest in each of the Debtors' respective Chapter 11 Cases will be apprised of the various matters before the Court in each of the Chapter 11 Cases.

52.     I understand that if the Court approves joint administration of the Debtors' Chapter 11 Cases, the Debtors will be able to reduce fees and costs resulting from the administration of these Chapter 11 Cases and ease the onerous administrative burden of having to file multiple documents.  I have also been advised that joint administration will ease the administrative burden for the Court and all parties to the Chapter 11 Cases and obviate the need for duplicative notices, motions, applications and orders, thereby saving time and expense for the Debtors and their estates.

53.     Based on the foregoing, I believe that joint administration of the Chapter 11 Cases is in the best interests of the Debtors, their estates and all parties-in-interest, and should be granted in all respects.

**B.     Motion of the Debtors for Entry of an Order Authorizing Debtors to File a Consolidated Master List of Creditors**

54.     By this Motion, the Debtors seek entry of an order authorizing the Debtors to file a consolidated master list of creditors in lieu of filing separate lists for each Debtor.

55.     The Debtors submit that permitting them to file a consolidated list of creditors, rather than filing a separate creditor matrix for each Debtor, is warranted.  Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and would result in duplicate mailings.

**C.**     **Motion of the Debtors for Entry of Interim and Final Orders Authorizing (A) The Debtors to Pay All or A Portion of the Prepetition Claims of Certain Critical Vendors and Foreign Vendors and (B) Financial Institutions to Honor and Process <u>Related Checks and Transfers</u>**

56.     By this Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors, in their sole discretion, and subject in all respects to the terms and conditions provided in the interim and final orders, to pay (i) critical vendors and service providers (the "**Critical Vendors**," whose claims are the "**Critical Vendor Claims**") and foreign vendors and service providers located outside of the United States (the "**Foreign Vendors**," whose claims are "**Foreign Vendor Claims**"; Critical Vendor and Foreign Vendors, collectively, the "**Vendor Claimants**," whose claims are "**Vendor Claims**"), collectively not to exceed an aggregate amount of $2,500,000 on an interim basis and $5,000,000 on a final basis (for both interim and final periods, the "**Critical Vendor Claims Cap**"), and (ii) certain prepetition mechanics' liens in an amount not to exceed $200,000 on an interim basis and $300,000 on a final basis; (b) authorizing financial institutions to honor and process checks or electronic transfers used by the Debtors to pay the foregoing; and (c) granting any additional relief as is necessary to effectuate the foregoing.

**I.     Critical Vendors**

57.     The Debtors' business depends on, among other things, the Debtors' ability to retain their vendors and service providers and to maintain their reputation and customer loyalty within the specialty steel products industry.  To operate efficiently their business, the Debtors rely significantly on third parties who supply the Debtors with essential goods and services.

58.     The Debtors have thoroughly reviewed their business relationships and identified the Critical Vendors, the loss of whose particular goods or services would cause immediate and irreparable harm to the Debtors' business.  To identify the Critical Vendors, the Debtors

reviewed their accounts payable and prepetition vendor lists to identify those creditors most essential to the Debtors' operations pursuant to the following criteria:  (a) which suppliers were sole source or limited source suppliers, without whom the Debtors could not continue to operate without disruption, (b) the Debtors' ability to find alternative sources of supply and the potential disruption or lost revenues while a new supplier was resourced, (c) whether a supplier is a customer-required supplier where the Debtors are required by their customers to utilize the component parts of such supplier, (d) which suppliers would be prohibitively expensive to replace, (e) which suppliers would present an unacceptable risk to the Debtors' operations given the volume of essential services or products that such suppliers provide, (f) the extent to which suppliers may have an administrative expense claim pursuant to section 503(b)(9) of the Bankruptcy Code; and (g) whether a vendor meeting the foregoing criteria is able or likely to refuse to ship product to the Debtors postpetition if its prepetition balances are not paid, considering, for example, whether the particular vendor is under a contractual obligation to perform.

59.    Under these criteria, the Critical Vendors generally fall into one or more of three categories:

"**Component and Raw Materials Suppliers**":  The Debtors rely on these vendors to provide components and raw materials used in manufacturing the Debtors' specialty steel products. They often supply unique and high-quality materials without which the Debtors cannot produce their specialty steel products with the quality and specifications that the Debtors' customers require. In some cases, Component and Raw Materials Suppliers are sole-source providers for raw materials that are essential elements of the Debtors' products. In other cases, the Component and Raw Materials Suppliers are the only source capable of shipping the volume of raw materials the Debtors require and cannot be replaced by smaller suppliers at a competitive price (or at all).

"**Parts and Equipment Suppliers**":  Other Critical Vendors provide specialized parts, supplies, and technical equipment essential to the Debtors' operations. These Parts and Equipment Suppliers provide the Debtors with supplies and equipment specifically tailored to meet the Debtors' business needs and to comply with various regulations.

Locating and agreeing to terms with replacement vendors (if such replacements are available) would involve extensive testing and modifications at the Debtors' manufacturing facilities, resulting in needless delay and costs.

"**Service Vendors**":  The Debtors use a variety of vendors to provide services, ranging from repair work to information technology services, to their facilities and to their inventory. In many instances, the Service Vendors are the only vendors able to provide these necessary services on favorable terms, if at all. In other cases, Service Vendors are in possession of inventory undergoing further specialty processing and refinement or of parts undergoing repair. Any loss of these vendors during this critical time following the commencement of these chapter 11 cases, and any delay in obtaining finished inventory or repaired parts, will impair the Debtors' efforts to preserve and maximize the value of their estates and to successfully reorganize.

60.     If the Critical Vendors are not paid, their resulting unwillingness to continue to provide products or services would cause an interruption of the Debtors' operations.  Such an interruption would cause the Debtors irreparable harm, which would jeopardize the Debtors' ability to continue to operate their business in the ordinary course.  Paying the Critical Vendors would permit the Debtors to maintain the value of the business, maximizing value for the benefit of creditors and stakeholders.  Therefore, the Debtors seek authorization to pay Critical Vendor Claims to ensure the Debtors' continued receipt of goods and services and favorable credit terms from the Critical Vendors.

61.     The Debtors estimate that, as of the Petition Date, the aggregate amount of the pre-petition accounts payable is approximately $25,000,000, of which approximately all will be due and owing within thirty days after the Petition Date.

### II.     Foreign Vendors

62.     In the ordinary course of business, the Debtors incur various obligations to foreign vendors, suppliers and other entities.  The Debtors rely on these Foreign Vendors to supply various goods and services, such as raw materials and steel components, that are crucial to the Debtors' ongoing operations.

63.     Many of the Foreign Vendors who supply these essential goods and services may argue that they are not subject to the jurisdiction of this Court or the provisions of the Bankruptcy Code that would otherwise protect the Debtors' assets and business operations, and take actions that would disrupt the Debtors' business operations.

64.     Moreover, there is a risk that Foreign Vendors could sue the Debtors in foreign courts and attempt to recover prepetition amounts owed to them if the Foreign Vendor Claims remain unpaid. If the Foreign Vendors were successful in obtaining judgments against the Debtors, the Foreign Vendors could seek to exercise post-judgment remedies, including seeking to attach the Debtors' foreign assets or withholding vital supplies from the Debtors.  The Debtors would have no practical ability to remedy this situation (absent payment of amounts sought) and their business operations would be irreparably harmed to the detriment of their estate and their creditors.

65.     The Debtors are making every effort to avoid interruptions in their supply chain and the adverse effects that even a temporary disruption in the supply chain could have on their business in order to maximize the value of their assets.  In connection therewith, the Debtors must have the ability to continue to fund the Foreign Vendors on an uninterrupted basis.

66.     The Debtors estimate that, as of the Petition Date, the aggregate amount of the Foreign Vendor Claims is approximately $2,400,000, all of which approximately will be due and owing within thirty days after the Petition Date.

### III.     Vendor Claims Cap, Customary Trade Terms and Vendor Agreements

67.     The Debtors seek the authority to pay, in their sole discretion and business judgment, all or a portion of the Vendor Claims.  The Debtors estimate the maximum amount needed to pay the Vendor Claims is in the amount of the Vendor Claims Cap—i.e., $5.0 million.

Of this amount, the Debtors estimate the maximum amount needed to pay Vendor Claims before the final hearing is $2.5 million.  The Vendor Claims Cap represents the Debtors' best estimate as to how much must be paid to such creditors to continue an uninterrupted supply of critical goods and services. The Debtors may pay less than the requested amount.

68.     If authorized to pay the Vendor Claims, the Debtors will use commercially reasonable efforts to require the applicable Vendors Claimants to provide favorable trade terms consistent with historical practice.  The Debtors therefore request authority but not direction to condition payment on such Vendor Claimant's agreement to continue providing supplies or services to the Debtors in accordance with each Vendor Claimant's agreement to (i) accept such payment in satisfaction of all or a part of its Vendor Claim, and (ii) continue to provide supplies or services to the Debtors during these Chapter 11 Cases on (a) the most favorable trade terms, practices, and programs (including, but not limited to, credit limits, rebates, discounts, pricing, timing of payments, and availability, and other applicable terms and programs) in place during the twelve months before the Petition Date or (b) such other favorable terms as the Debtors and the Vendor Claimant may mutually agree on ((a) and (b) together, "**Customary Trade Terms**").

69.     To ensure each Vendor Claimant's agreement to continue providing supplies or services on Customary Trade Terms for the duration of these Chapter 11 Cases, the Debtors seek authority, in their sole discretion and business judgment, to execute vendor agreements, substantially similar to the form of the letter attached as Exhibit A to the Motion (each a "**Vendor Agreement**").  Such Vendor Agreements, once agreed to and accepted by a Vendor Claimant, will be a legally binding contract between the parties governing their commercial trade relationship.

70.     However, the Debtors propose that their inability to enter into a Vendor Agreement shall not preclude them from paying a Vendor Claim when, in the exercise of their reasonable business judgment, such payment is necessary to the Debtors' operations.

71.     If a Vendor Claimant accepts payment and does not (a) continue supplying goods or services to the Debtors in accordance with Customary Trade Terms, or as otherwise set forth in a Vendor Agreement, or (b) waive and release any lien on property of the Debtors or any of their customers, to the extent its Vendor Claim is satisfied or otherwise, within fifteen days of receipt of payment, then, so long as the Vendor Claimant receives notice and opportunity for a hearing, the Debtors may take any and all appropriate steps to cause such Critical Vendor to repay payments made to it on account of its prepetition claim to the extent that such payments exceed the postpetition amounts then owing to such Vendor Claimant.

72.     Maintaining the products and services provided by the Critical Vendors and Foreign Vendors is vital to the Debtors' continuing business operations and the success of these Chapter 11 Cases.  As such, the Debtors submit that the amount of the Vendor Claims Cap pales in comparison to the likely damage to the Debtors' business should the relief requested herein not be granted, resulting in an impediment to a successful reorganization.

**IV.    Mechanics' Liens**

73.     The Debtors rely on mechanics, processors, and other parties ("**Mechanics**") to repair, process, and store parts, goods, and other property of the Debtors necessary to the Debtors' business and relationships with their customers.  As a result of the commencement of these Chapter 11 Cases, certain Mechanics who hold the Debtors' goods may refuse to release such goods pending receipt of payment for their prepetition services.  Moreover, pursuant to applicable non-bankruptcy law, certain Mechanics may assert liens against the Debtors' assets in

their control and possession to the extent the Debtors do not pay for the services rendered by such claimants ("**Mechanics' Liens**"). I understand that pursuant to section 363 of the Bankruptcy Code, certain Mechanics may assert demands to adequate protection as lien claimants. In consideration of the key role that the Mechanics play in the Debtors' business, any delay in repair, processing, and shipments could irreparably harm the Debtors' reorganization efforts.

**D.      Motion of the Debtors for Entry of Interim and Final Orders Authorizing (A) The Debtors to Pay All Shipper Charges and (B) Financial Institutions to Honor and Process Related Checks and Transfers**

74.      As part of their business operations, the Debtors rely on a variety of service providers, common carriers, shippers, and truckers (collectively, the "**Shippers**") to transport and deliver finished products, as well as raw materials, supplies, and other goods (collectively, the "**Goods**") critical to the Debtors' manufacturing process. It is essential to the Debtors' business that the Debtors' maintain their supply and distribution system without interruption.

75.      The services provided by the Shippers, including the timely, reliable delivery of Goods to the Debtors, as well as the delivery of the Debtors' finished products to customers, are necessary to enable the Debtors to conduct business in an efficient manner. As the Debtors' customers depend on the timely delivery of the Debtors' products and the Debtors' ability to make timely deliveries depends on the receipt of Goods, the Debtors' inability to access such items would be detrimental to their business and deteriorate the value of their estates.

76.      For the viability of the Debtors' continuing business and the value of the Debtors' estates, the Debtors need to maintain a reliable and efficient supply and distribution system. Because the Debtors are dependent on third parties to carry out various distribution functions, it is essential that the filing of these Chapter 11 Cases not provide an excuse for any third party to

cease performing timely services.  For example, if the Debtors are unable to ship their products to customers on a timely basis, the Debtors' business will suffer irreparable damage.  At the very least, the Debtors will likely suffer a significant loss of credibility and customer goodwill, thereby causing substantial harm to the Debtors' business.

77.     Moreover, I understand that under the laws of some states, a Shipper may have a lien on the goods in its possession that secures the prompt satisfaction of charges or expenses incurred in connection with the transportation of the goods.  In addition, I understand that pursuant to section 363(e) of the Bankruptcy Code, a Shipper, as a bailee, may be entitled to adequate protection of a valid possessory lien.

78.     By this Motion, the Debtors seek to prevent the breakdown of their operations, including, but not limited to, their shipping network.  The Debtors expect that, as of the Petition Date, certain of the Shippers will have outstanding invoices or will have accrued, but not yet billed, charges for Goods that were delivered to the Debtors prior to the Petition Date (the "**Shipping Charges**").  If the Debtors do not pay the Shipping Charges, the Shippers may argue that they are entitled to possessory liens for transportation on the Goods or products in their possession and may refuse to deliver or release such Goods or products before their claims have been satisfied and their liens redeemed.

79.     As a result, the Debtors seek authority to pay certain of the Shipping Charges, as the Debtors determine, in their business judgment, subject to requirements imposed on the Debtors under any order regarding the Debtors' postpetition financing and use of cash collateral, are necessary or appropriate to induce the Shippers to continue to transport and deliver the Goods and products.

80.     The Debtors' business is shipping intensive.  The potential injury to the Debtors if Goods and products are not released is likely to exceed the amount of such Shipping Charges.  Therefore, it is necessary and essential for the value of their estates that the Debtors are permitted to make payments on account of certain Shipping Charges.  The Debtors estimate that they owe approximately $1,500,000 for Shipping Charges as of the Petition Date.  Of this amount, the Debtors are requesting authority to pay approximately $1,000,000 prior to the final hearing on the relief requested herein.

81.     The Debtors seek authority to make payments to the Shippers in the amounts and to the extent necessary to satisfy non-disputed prepetition Shipping Charges and to satisfy potential asserted or actual possessory liens, if any, on the Goods or products that may be held by such Shippers pending the payment of such charges.  The Debtors represent that they will only pay Shipping Charges where they believe, in their business judgment, benefits to their estates and creditors from making such payments would exceed (a) the costs that their estates would incur by bringing an action to compel the turnover of such goods and (b) the delays associated with such actions.

82.     The Debtors propose to condition the payment of Shipping Charges on the agreement of the Shippers to provide services to the Debtors on the most favorable trade terms that such Shipper offered to the Debtors in the twelve months prior to the Petition Date (the "**Customary Trade Terms**"), or such other terms as may be agreed upon between the parties. Subject to objection rights of the Shippers, if any Shipper accepts payment on account of the Shipping Charges and does not continue to provide postpetition services to the Debtors on Customary Trade Terms, I understand that any payments made to such Shipper hereunder may be deemed an avoidable postpetition transfer under section 549 of the Bankruptcy Code and may

be recoverable by the Debtors.  In addition, the Debtors request that upon any refusal by a third

party to release Goods or products being held as security for such party's unsatisfied prepetition

claim, the Debtors shall be entitled to seek an expedited hearing, on no fewer than five (5) days'

notice, to compel the release of such property.

83.     The Debtors submit that the total amount to be paid to the Shippers if the

requested relief is granted is minimal compared to the importance and necessity of the Shippers

and the losses the Debtors may suffer if their operations are disrupted.  Moreover, the Debtors do

not believe there are viable, timely alternatives to the Shippers that they have used prior to the

Petition Date.

**E.     Motion of the Debtors for Entry of an Order (A) Establishing Procedures for Asserting, Resolving, and Satisfying Reclamation Claims and (B) Granting Related Relief**

84.     By this Motion, the Debtors request entry of an order (a) establishing the

Reclamation Procedures as the sole and exclusive method for asserting, processing, and

satisfying reclamation claims against the Debtors ("**Reclamation Claims**"), and (b) granting

related relief.

85.     Before the Petition Date and in the ordinary course of the Debtors' business, the

Debtors purchased a variety of goods, components, raw materials, parts, machinery, equipment,

and other property (collectively, the "**Goods**") on varying credit terms for use in their operations.

As of the Petition Date, the Debtors are in possession of certain Goods delivered by various

vendors, suppliers, or other sellers of Goods (the "**Sellers**") for which the Debtors have neither

been invoiced nor made payment.

86.     As a result of these Chapter 11 Cases, the Debtors anticipate that Sellers will

likely assert Reclamation Claims against the Debtors.  The Debtors also anticipate that some

Sellers may attempt to interfere with the delivery of Goods to the Debtors or repossess delivered Goods from the Debtors' manufacturing facilities.  Any such actions by Sellers may result in claim-by-claim litigation, or may disrupt the Debtors' operations, potentially in a manner negatively affecting enterprise value or the Debtors' reorganization efforts.

**I.      Reclamation Procedures**

87.     To avoid harm to the Debtors' efforts to reorganize arising from any piecemeal litigation or delays and disruptions in the delivery or use of the Goods, the Debtors propose the reclamation procedures as set forth in the Motion for asserting, processing, and satisfying Reclamation Claims (the "**Reclamation Procedures**").

88.     The Debtors propose that, except to the extent a Seller has received payment on account of its prepetition claim pursuant to another order of the Court, the Reclamation Procedures be the sole and exclusive method for asserting, processing, and satisfying Reclamation Claims.  Accordingly, the Debtors request that all Sellers be prohibits from seeking any other means for the resolution or other satisfaction of Reclamation Claims, including, without limitation, (i) commencing adversary proceedings or contested matters against the Debtors in connection with any Reclamation Claim except as the Reclamation Procedures permit; (ii) seeking to regain possession of any Goods except as the Reclamation Procedures permit; or (iii) interfering with the delivery of any Goods to the Debtors or the retention of any Goods by the Debtors.

**F.**   **Motion of the Debtors for Entry of an Order Authorizing the Debtors to (A) Maintain Existing Insurance Policies, Pay All Policy Premiums and Consultant Fees Arising Thereunder and Renew or Enter Into New Policies, and (B) Continue Insurance Premium Financing Programs, Pay Insurance Premium Financing Obligations Arising In Connection Therewith and Renew or Enter Into New <u>Premium Financing Arrangements</u>**

89.     In the ordinary course of the Debtors' business, the Debtors maintain numerous insurance policies with various insurance companies (collectively, the "**Insurance Companies**") providing coverage for, inter alia, general liability, excess liability, automobiles, property, executive risk, and workers' compensation (collectively, the "**Policies**").  Although the Debtors believe that no prepetition amounts are due and owing to the Insurance Companies, the Debtors request authorization, in consultation with the ad hoc group of a majority of the unaffiliated holders of the Secured Notes (the "**Secured Noteholder Group**"), to pay any such amounts and to proceed in the ordinary course of business to maintain the Policies, including authorization to renew the Policies and pay premiums associated with any renewals.

90.     The Policies are essential to continue to operate the Debtors' business.  Any other alternative would likely require considerable additional cash expenditures and would be detrimental to the Debtors' efforts to preserve and maximize the value of their estates.  Moreover, the Operating and Reporting Guidelines Issued for Debtor in Possession and Trustees by the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee Operating Guidelines**") require the Debtors to maintain insurance coverage through the pendency of their Chapter 11 Cases.  Accordingly, it is in the best interest of the Debtors' estates to permit the Debtors to honor their obligations under their current Policies (including the payment of any related broker fees).

91.     The Debtors have determined in their business judgment that it is economically advantageous to finance the payment of premiums for certain of the Policies.  Accordingly, in

28

the ordinary course of the Debtors' business, the Debtors finance the premiums on certain of the Policies pursuant to a premium financing agreement (the "**PFA**") with BankDirect Capital Finance ("**BankDirect**").

92.    A total of $2,844,152.96 of the Debtors' insurance premiums is financed by the PFA.  The PFA requires monthly installment payments of $275,936.22 due on the first (1st) day of each month beginning on September 1, 2016 and continuing for a period of 9 months, ending on May 1, 2017.   The annual interest rate under the PFA is 3.84%.   The terms of the PFA provide that the Debtors pay BankDirect monthly installments in exchange for BankDirect's agreement to pay the annual insurance premiums, after adjustment for any down payment paid by the Debtors, to certain of the Insurance Companies.

93.    Pursuant to the PFA, the Debtors' obligations to BankDirect are collateralized by a security interest in the Policies financed through the PFA.  Additionally, pursuant to the PFA, upon an event of default, the Debtors appoint BankDirect as the Debtors' Attorney-in-Fact and grant BankDirect the authority to cancel the Policies covered by the PFA.

94.    The Debtors propose to pay any prepetition premiums related to the Policies to the extent that the Debtors might discover and determine, in consultation with the Secured Noteholder Group, that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment to the coverage, benefits, or proceeds provided under the Policies.  The Debtors seek this authority out of an abundance of caution, in recognition of the critical necessity of keeping the Policies in effect, and out of concern that if the necessity for such a payment arises in the future, the amount of time it takes the Debtors to seek and obtain the Court's authority for such a payment may have irreversible adverse consequences for the Debtors' coverage under the Policies.

95.     If the Debtors are unable to make payments under the PFA, BankDirect may be permitted to terminate the Policies to recoup losses.  Furthermore, if the Debtors cease making payments on the Policies, the Insurance Companies may not allow the Debtors to renew these Policies at the current rates in the future.  The Debtors would then be required to obtain replacement insurance on an expedited basis and at great cost to their estates.  Even if BankDirect or the Insurance Companies were not permitted to terminate the Policies, any interruption of payments would have a severe adverse effect on the Debtors' ability to extend the current Policies or acquire new insurance coverage in the future.

**G.    Motion of the Debtors for Entry of Interim and Final Orders Authorizing (A) the Debtors to Pay Prepetition Sales, Franchise and Similar Taxes in the Ordinary Course of Business, and (B) Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto**

96.     In connection with the normal operations of their business, the Debtors pay an assortment of use, franchise, and other taxes (collectively, the "**Taxes**") to various federal, state, and local taxing authorities (collectively, the "**Taxing Authorities**") and pay various regulatory fees (the "**Regulatory Fees**" and together with the Taxes, the "**Taxes and Fees**") to certain federal, state, local and foreign regulatory authorities (collectively, the "**Regulatory Authorities**," and together with the Taxing Authorities, the "**Taxing and Regulatory Authorities**").  These Taxes and Fees include, without limitation, the following:

"**Use Taxes**":  In the normal course of their business, certain of the Debtors incur use taxes ("**Use Taxes**") on account of the purchase of various raw materials, supplies, or other goods used in the Debtors' business.  The Use Taxes typically arise pursuant to purchases the Debtors make from out-of-state-vendors that do not collect state sales tax on such out-of-state purchases.  The Use Taxes are typically equivalent to the amount of sales tax that would have been charged on the purchase of such goods if the purchase had occurred within the state where the vendor is located.  The Debtors estimate that they owe approximately $10,000, in accrued and unpaid Use Taxes as of the Petition Date.

"**Franchise Taxe**s":  Certain of the Debtors pay franchise taxes (the "**Franchise Taxes**") to various Taxing Authorities to maintain the right to operate their business in the

applicable taxing jurisdiction. Franchise Taxes vary by jurisdiction and may be based on a flat fee, net operating income, gross receipts or capital employed. Certain states impose personal liability on officers of entities that fail to pay Franchise Taxes. In addition, certain jurisdictions, including Delaware, will refuse to qualify a company to do business in a state or issue certificates of good standing or other documents necessary to do business in such jurisdiction if Franchise Taxes have not been paid. The Debtors estimate that they have fully funded all incurred prepetition Franchise Taxes as of the Petition Date. However, out of an abundance of caution, the Debtors' request authority to pay any prepetition Franchise Taxes determined to be outstanding as of the Petition Date.

"**Gross Receipts and Excise Taxes**": In the normal course of their business, the Debtors incur gross receipts and excise taxes (the "**Gross Receipts and Excise Taxes**") in the states of Washington, Ohio, and Texas. The Gross Receipts and Excise Taxes are assessed in those states based upon the Debtors' gross proceeds and sales. The Debtors pay most of the Gross Receipts and Excise Taxes on a quarterly basis, and estimate that they owe approximately $30,000 in prepetition Gross Receipts and Excise Taxes as of the Petition Date.

"**Property Taxes**": The Debtors incur real and personal property taxes (the "**Property Taxes**") in many jurisdictions in which they operate in the ordinary course of business. The Debtors typically pay Property Taxes on either an annual or semi-annual basis. Failure to pay the Property Taxes can result in the attachment of statutory liens on property that is critical to the Debtors' operations. Additionally, the failure to pay the Property Taxes may result in the imposition of penalties and interest that may exceed 20% per annum. The Debtors estimate that they owe approximately $1,400,000 of Property Taxes as of the Petition Date, of which, they estimate that $250,000 will come due prior to a hearing to authorize the relief requested herein on a final basis.

"**Regulatory Fees**": The Debtors incur certain regulatory fees ("**Regulatory Fees**") consisting of amounts owed to federal, state and local governments, which require the Debtors to obtain business licenses and to pay corresponding license and permit fees. The requirements for a company to obtain a business license and the manner that the Regulatory Fees are computed vary greatly according to the various federal, state and local government laws and regulations. While the Debtors believe that they will not owe any Regulatory Fees as of the Petition Date, out of an abundance of caution, the Debtors request authority to pay any prepetition Regulatory Fees determined to be outstanding as of the Petition Date.

97.    By this Motion, the Debtors seek the authority to pay prepetition Taxes and Fees owed to the Taxing and Regulatory Authorities, provided that the aggregate amount of such payments shall not exceed $1,440,000. Of this amount, the Debtors are requesting authority to pay approximately $290,000, on an interim basis, prior to the final hearing on the relief requested

herein.   In addition, the Debtors also seek authorization to honor (i) all checks that remain uncashed prior to the Petition Date or that are otherwise returned by a Taxing or Regulatory Authority, as well as (ii) those Taxes and Fees subsequently determined upon audit to be owed for periods prior to the Petition Date, with those payments in part (iii) subject to a fourteen day notice period to Secured Noteholder Group.

98.     To the extent any check issued or electronic transfer initiated prior to the Petition Date to satisfy any prepetition obligation on account of Taxes or Fees has not cleared the banks as of the Petition Date, the Debtors request the Court to authorize the banks, when requested by the Debtors, in their sole discretion, to receive, process, honor, and pay such checks or electronic transfers, provided that there are sufficient funds available in the applicable accounts to make such payments.   The Debtors also seek authorization to issue replacement checks or to provide for other means of payment to the Taxing and Regulatory Authorities, to the extent necessary to pay such outstanding Taxes and Fees owing for periods prior to the Petition Date, as well as those Taxes and Fees subsequently determined upon audit to be owed for periods prior to the Petition Date subject to the notice requirement to the Secured Noteholder Group.

99.     The payment of prepetition Taxes and Fees will help the Debtors avoid serious disruption to their operations that would result from the failure to pay such Taxes and Fees, including the distraction and adverse effect on morale that could result from liability for nonpayment imposed upon the Debtors' directors and officers.   Furthermore, nonpayment of these obligations may cause Taxing and Regulatory Authorities to take precipitous action, which could include filing liens, interfering with or withdrawing concessions, preventing the Debtors from conducting business in applicable jurisdictions, and seeking to lift the automatic stay, all of

which could disrupt the Debtors' day-to-day operations and impose significant costs on the Debtors' estates and destroy the going concern value of the Debtors' business.

**H.    Motion of the Debtors for Entry of Interim and Final Orders Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (A) Prohibiting Utilities From Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate <u>Assurance of Payment</u>**

100.    In connection with the operation of their business and management of their estates, the Debtors obtain electricity, gas, waste management, internet, cable, telephone and other similar services (collectively, the "**Utility Services**") from a number of utility companies (collectively, the "**Utility Providers**").

101.    By this motion, the Debtors request a determination that their Utility Providers have been provided with adequate assurance of future payment and that the Debtors are not required to provide any additional adequate assurance.  Additionally, the Debtors request the Court approve the Debtors' proposed adequate assurance procedures.  Lastly, the Debtors request the Court prohibit the Utility Providers from altering, refusing or discontinuing the provision of Utility Services due to outstanding prepetition amounts.

102.    In the ordinary course of business, the Debtors regularly incur utility expenses for Utility Services provided by various Utility Providers.  The Debtors have a long and established payment history with most or all of the Utility Providers.  The Debtors' aggregate average monthly cost for utility services is approximately $954,000.

103.    The Utility Services are essential to the preservation of the Debtors' estates and assets, and therefore, to the success of these Chapter 11 Cases.  Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' ability to preserve and maximize the value of their respective estates could be severely and irreparably harmed.  For

example, a lack of electricity and gas would render the Debtors' steel manufacturing and processing facilities inoperable, effectively shutting down a large portion of the Debtors' business operations.  Indeed, any interruption of the Utility Services would disrupt the Debtors' ability to operate and maintain their business and would thereby negatively affect the Debtors' customer relationships, revenues and profits.  Such a result could seriously jeopardize the Debtors' reorganization efforts and, ultimately, their value and constituent recoveries.  It is therefore critical that the Utility Services continue uninterrupted.

104.    The Debtors intend to pay all postpetition obligations and expect that revenues generated from their business operations will be sufficient to pay all undisputed postpetition obligations owed to the Utility Providers in a timely manner.  To provide adequate assurance of payment for future services to the Utility Providers the Debtors propose to deposit an initial sum equal to the Debtors' estimated average cost for two (2) weeks of Utility Services (the "**Adequate Assurance Deposit**"), into a segregated account (the "**Adequate Assurance Account**"); provided, however, that no Adequate Assurance Deposit shall be made for any Utility Provider that already holds a deposit or prepayment equal to or greater than two weeks of Utility Services.  Because the Debtors' aggregate monthly cost for Utility Services is approximately $954,000, the Debtors propose that the Adequate Assurance Deposit should be approximately $445,000.

105.    The Debtors further propose to maintain the Adequate Assurance Account with a minimum balance equal to the Debtors' estimated average two-week cost of Utility Services through the Final Hearing on the Motion.  Thereafter, in consultation with the Secured Noteholder Group, the Debtors propose to adjust the amount in the Adequate Assurance Account to reflect the following factors: (i) the termination of Utility Services by the Debtors regardless

of any Additional Assurance Requests (as defined below) and (ii) agreements with the Utility Providers.   These adjustments will permit the Debtors to maintain the Adequate Assurance Account with an amount  that consistently provides the Utility Providers that do not otherwise hold deposits or security for their Utility Services with a two-week deposit on account of such services.

106.    The Debtors submit that the Adequate Assurance Deposit, taken together with the facts and circumstances of the Chapter 11 Cases (together, the "**Proposed Adequate Assurance**"), constitutes sufficient adequate assurance to the Utility Providers.  As a result, the Debtors are objectively likely to continue paying, and be able to continue paying, their obligations to the Utility Providers postpetition.  Moreover, the Debtors are seeking approval of use of cash collateral that the Debtors believe will provide more than adequate liquidity to meet their case needs during these Chapter 11 Cases.

107.    These protections ensure that all Utility Providers will have adequate assurance of payment throughout the pendency of these Chapter 11 Cases, and the Debtors believe that no other or further assurance is necessary. However, if any Utility Provider believes adequate assurance is required beyond the protections described herein, the Debtors propose that such Utility Provider request such assurance pursuant to the detailed "Adequate Assurance Procedures" set forth in the Motion.

I.    **Motion of the Debtors for Entry of an Order (A) Authorizing Debtors to Pay (i) All Prepetition Employee Obligations, and (ii) Prepetition Withholding Obligations, and (B) Directing Banks to Honor Related Transfers**

108.    In order to enable the Debtors to maintain morale during this critical time, retain their current Employees and Independent Service Providers and minimize the personal hardship such Employees and Independent Service Providers may suffer if prepetition employee-related obligations are not paid when due or honored as expected, the Debtors, by this Motion, seek

authority, in their sole discretion, to pay and honor, as the case may be, (a) all prepetition claims of Employees, including, but not limited to, claims for Wages, PTO, as applicable, and certain costs and disbursements related to the foregoing, up to the statutory priority amount of $12,850 per Employee, (b) any claims or payments pursuant to the Employee Benefit Plans up to the statutory priority amount of $12,850 per Employee, (c) all Benefits Withholding Obligations (collectively, the "**Employee Obligations**"), (d) Reimbursable Expenses, and (e) any prepetition claims for Independent Service Providers, up to the statutory cap. *Provided, however*, the Debtors do not seek by this Motion to authorize (1) the payment of any amounts in satisfaction of bonus or severance obligations, which are subject to section 503(c) of the Bankruptcy Code; (2) the payment of any amounts owing to any retired or former employees under any supplemental executive retirement plan or otherwise, or (3) authorize the Debtors to cash out unpaid vacation or leave time upon termination of an employee, unless applicable state law requires such payment.

### I.    Employees

109.    The Debtors operate in several different locations throughout the United States, including, but not limited to:  Florida, Illinois, Indiana, Kentucky, Michigan and Texas.

110.    As of the Petition Date, the Debtors' collective workforce comprises approximately 909 employees (the "**Employees**").  Of these Employees, approximately 252 are full-time salaried employees, approximately 654 are full-time hourly employees, and approximately 3 are part-time hourly employees.  In addition, approximately 570 of the Employees are represented by a union under one of six different collective bargaining

agreements (together, the "**CBAs**") that certain of the Debtors have with various different unions.[4]

## II.    Wages, Commissions and Payroll Obligations

### a.    *Wages*

111.    All Employees are paid wages or salary (collectively, the "**Wages**") in arrears either (i) semi-monthly on or about the 15th day of the month and on or about the last business day of each month; (ii) bi-weekly, every other Tuesday or Friday; or (iii) weekly on Friday.  The date on which Employees get paid varies by location and type of Employee.

112.    The Debtors' average gross payroll is approximately $4.5[5] million per month, excluding the Debtors' portion of the Payroll Taxes (as defined below).  As of the Petition Date, the Debtors estimate that they owe Employees an aggregate of approximately $400,000 in accrued Wages earned prior to the Petition Date, and that no Employee is owed in excess of the statutory cap under section 507(a)(4) of the Bankruptcy Code on account of such Wages.

113.    By way of this Motion, the Debtors request the authority, in the ordinary course of business, to pay Wages accrued pre-petition to their Employees, up to the statutory

---

[4] (i) Agreement between Niagara LaSalle Corporation and Progressive Steel Workers of Hammond, Inc. dated July 19, 2014; (ii) Collective Bargaining Agreement by and between Teamsters Local Union No. 731 affiliated with the International Brotherhood of Teamsters and Teamsters Joint Council No. 25 and Niagara LaSalle Corporation South Holland Maintenance Department, dated April 13, 2011 (iii) Collective Bargaining Agreement by and between Teamsters Local Union No. 731 affiliated with the International Brotherhood of Teamsters and Teamsters Joint Council No. 25 and Niagara LaSalle South Holland Production Employees, dated September 15, 2012; (iv) Agreement between Michigan Seamless Tube LLC and United Steelworkers AFL-CIO-CLC on behalf of its Local Union 1900, effective November 1, 2012; (v) Agreement Between KES Acquisition Company and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, dated December 16, 2012; and (vi) Agreement between The Corey Steel Company and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union on behalf of Local 9777, effective November 1, 2014.

[5]  This amount does not include any payments me, as I do *not* take a salary from the Debtors.

priority amount of $12,850 per Employee, and to continue to otherwise pay Employees in the ordinary course of business.

      *b.*    <u>*Commissions*</u>

114.    In addition to the Wages, a few Employees are eligible to receive commissions (the "**Commissions**").  The amount of Commissions payable to these few eligible Employees constitute a significant portion of such Employee's total earnings.  The Debtors estimate that, as of the Petition Date, approximately $16,000 in Commissions have accrued and are owed to certain of the Employees and Independent Service Providers.

115.    By this Motion, the Debtors request the authority to pay eligible Employees up to $16,000 on account of the Commissions earned prior to the Petition Date not to exceed the statutory priority amount of $12,850 per Employee, and to continue to otherwise pay Commissions to eligible Employees in the ordinary course of business.

      *c.*    <u>*Payroll Obligations*</u>

116.    As employers, the Debtors are required by law to withhold federal, state and local taxes from Wages for remittance to appropriate tax authorities (the "**Employee Taxes**").  In addition to the Employee Taxes, the Debtors are required to pay, from their own funds, social security and Medicare taxes and pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts for state and federal unemployment insurance (together with the Employee Taxes, the "**Payroll Taxes**") and remit the same to the appropriate authorities (collectively, the "**Taxing Authorities**").

117.    In the aggregate, the Debtors estimate that Payroll Taxes total approximately $1.2 million per month, based on actual monthly Payroll Taxes paid during calendar year 2016.  As of the Petition Date, based on historical data, the Debtors estimate that they likely have not yet

turned over to the Taxing Authorities approximately $200,000 in Payroll Taxes for the most recent payroll period up to the Petition Date. The Debtors hereby seek authority, in their sole discretion, to continue remitting the Payroll Taxes to the appropriate Taxing Authorities as needed, including, without limitation, with respect to the most recent payroll period up to the Petition Date, and any prior period.

<em>c.      Costs Incidental to Payroll</em>

118.    Finally, the Debtors also incur costs incidental to Employee Wages, such as payments to parties for charges associated with the administration of the Wages and for other costs incident to the provision thereof (collectively, the "**Processing Costs**"). Based on historical data, the Debtors estimate that they incur approximately $170,000 in annual Processing Costs, a fraction of which remains unpaid as of the Petition Date. Payment of the unpaid Processing Costs is justified because the failure to pay any such amounts might disrupt the services of third-party providers that are essential to the timely payment of Employees. By paying these Processing Costs, the Debtors will likely avoid even temporary disruptions of such services, ensuring that the Employees obtain all of their compensation without interruption. Accordingly, the Debtors hereby seek authority, but not direction, to continue remitting the Processing Costs to the appropriate third parties.

119.    The Debtors (other than MST) process payroll through Ceridian HCM, Inc. MST processes its own salary and hourly payrolls, but uses third-party software through Kronos International for payroll processing and ADP, LLC for master tax and withholding, and remittance calculations.

### III.       Vacation Time and Sick/Personal Days

120.       The Debtors provide eligible Employees with paid time off ("**PTO**") each year to use for any reason, such as for vacation, personal time, or observance of religious holidays, personal illness, personal injury or the illness or injury of dependents or family members.

121.       Employees accrue PTO at different rates depending on (i) years of service, (ii) type of Employee and, (iii) whether they are represented by a union and subject to a CBA.  In general, PTO earned in a given calendar year is used in the following calendar year, and any unused vacation at the end of that calendar year is not paid out and may not be carried over to the following calendar year, except where required by applicable law.

122.       Generally, salaried Employees earn between 7 days and 28 days of PTO depending on their years of service, with 28 days generally allocated after 15 years of employment.  Hourly Employees earn between 7 days and 28 days of PTO depending on their years of employment with the respective Debtor.  The Debtors do not pay for accrued, but unused, PTO in connection with employee departures unless otherwise required by applicable law or specific agreement.  As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid PTO is approximately $3.1 million.  This amount, however, is not a current cash payment obligation, as Employees are not entitled to cash payment for accrued and unused PTO, unless otherwise required by applicable law or specific agreement.

123.       By this Motion, the Debtors request authority to continue to honor their PTO policies in the ordinary course of business and to honor all prepetition obligations up to the statutory cap related thereto in a manner consistent with their prepetition practices, including paying where required by law.

IV.    **Employee Benefit Plans**

124.    The Debtors have established certain benefit plans and policies for eligible Employees that provide, among other benefits, medical, prescription drug, dental and vision plans, workers' compensation insurance, life insurance, disability insurance, retirement plans, incentive plans, profit sharing plans, and other benefits which are described in more detail below (collectively, the "**Employee Benefit Plans**").   A brief description of the Employee Benefit Plans is provided below:

a.    *Medical/Dental/Vision Plans*

125.    The Debtors offer Employees comprehensive medical and prescription drug coverage through a combination of PPO and high deductible plans that are administered by either United HealthCare ("**UHC**") or Blue Cross Blue Shield ("**BCBS**") (collectively, the "**Medical Plans**").[6]

126.    The BCBS Medical Plans are fully funded plans.   The premiums for the BCBS Medical Plans are paid monthly by the Debtors for the upcoming month.

127.    The UHC Medical Plans are self-insured and require the Debtors to pay for costs arising under such plans, including claim payments and associated administrative costs.   Claims are normally paid one or two months in arrears.   The Debtors pay Service fees of approximately $27,000 per month to UHC by or before the 15th of the following month.   The Debtors also maintain a minimum deposit balance with UHC of $293,000 for claim payments.

128.    In connection with the UHC Medical Plans, the Debtors purchase stop-loss insurance (the "**Stop Loss Coverage**") from PartnerRe America Insurance Company that

---

[6]   The Debtors also nominally subsidize certain benefits to approximately 65 former Employees after their termination, retirement, or disability leave, including (without limitation) benefits provided under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("**COBRA**").

provides additional protection against catastrophic claim accumulation above a predetermined threshold.  The Debtors pay approximately $460,000 per year in premiums for the Stop Loss Coverage.

129.    The Employees are also offered vision and dental plans through various providers (the "**Vision and Dental Plans,**" and together with the Medical Plans, the "**Employee Health Plans**").  The Vision and Dental Plans are comprised of both fully funded and self-insured plans. The funding for the fully funded plans varies by location and employee group and ranges from being employer funded, employee funded and shared between employer and employee.  For those Vision and Dental Plans that employees fund at least in part, the Debtors withhold the premiums from the Employees' paychecks and remit those funds directly to the Vision and Dental Plans providers.  The Debtors fund the self-insured Vision and Dental Plans and pay the costs arising from those plans, including claim payments and associated administrative costs. Participating Employees pay a monthly premium, which the Debtors deduct from the participating Employees' paychecks.

130.    Nearly all of the Employees participate in the Employee Health Plans.  On average, the Debtors incur approximately $13.1 million per year in connection with the Employee Health Plans.  As of the Petition Date, the Debtors estimate that there are $1.0 million in accrued and unpaid costs for the Employee Health Plans.

131.    By this Motion, the Debtors seek authority to (a) continue to provide the Employee Health Plans for their Employees in the ordinary course of business, (b) continue to honor obligations under such benefit programs, including any premiums and administrative fees and (c) pay all such amounts owed under the Employee Health Plans to the extent that they remain unpaid on the Petition Date.

Case 16-12789-KJC    Doc 4    Filed 12/15/16    Page 43 of 62

b.     _Health Savings Account_

132.    The Debtors offer only a limited number of Employees the option to setup either a Health Savings Account or a Health Reimbursement Account (collectively, the "**Health Savings and Reimbursement Accounts**").   Given the scant Employee participation, the cost to the Debtors associated with the Health Savings and Reimbursement Accounts is nominal.  As of the Petition Date, the Debtors believe that there are no accrued and unpaid costs associated with the Health Savings and Reimbursement Accounts.  By this Motion, the Debtors seek authority to continue their prepetition practices with respect to the Health Savings and Reimbursement Accounts.

c.     _Other Insurance Plans_

133.    The Debtors offer Employees disability insurance, including short-term disability insurance and long-term disability insurance (the "**Disability Insurance Plans**").  The short-term disability insurance covers employees either in a range of coverage from 60% to 100% of earnings or for established dollar limits for periods typically covering 26 weeks.  The long-term disability covers employees typically within a range of 60-66% of earnings for periods covering either payments up to a certain amount or for a period of 1 to 3 years, depending on years of service.  For both short-term and long-term disability insurance, payments are typically capped at ranges between 60% to 100% of earnings and/or maximum payout amounts.

134.    Eligible full-time Employees are also offered a basic life insurance benefit through either Mutual of Omaha, Hartford Insurance Group or Dearborn National, which includes an accidental death and dismemberment benefit (the "**Life Insurance Plans**").

135.    On average, the Debtors incur an aggregate monthly cost of approximately $275,000 in connection with the Disability Insurance Plans and Life Insurance Plans.  As of the

Petition Date, the Debtors believe that there are no accrued and unpaid monthly premiums in connection with the Disability Insurance Plans and the Life Insurance Plans.

136.    By this Motion, the Debtors seek authority to pay, in their sole discretion, any and all prepetition amounts owed on account of the Disability Insurance Plans and Life Insurance Plans, and to continue their prepetition practices with respect to such benefits.

d.    *Workers Compensation Insurance*

137.    Under applicable law, the Debtors are required to maintain workers' compensation insurance programs to provide their Employees with workers' compensation insurance coverage for claims arising from or related to their employment with the Debtors and to satisfy the Debtors' obligations arising under or related to these programs (collectively, the "**Workers' Compensation Programs**").   The Workers' Compensation Programs cover all Employees and coverage is provided through workers' compensation insurance policies with AIG and Liberty Mutual.  The Debtors pay an aggregate annual premium of approximately $1.85 million.[7]

138.    It is critical that the Debtors be permitted to continue their workers' compensation insurance and pay their premiums for workers' compensation coverage, as not doing so would almost certainly be more costly.  In addition, failure to maintain this insurance in the various states in which the Debtors do business could result in the institution of administrative or legal proceedings against the Debtors and their officers and directors and an inability of the Debtors to continue as a going concern.   By this Motion, the Debtors request authority, in their sole

---

[7]    A portion of the premiums under these policies is financed with BankDirect Capital Finance ("**BankDirect**"). The payment of amounts owed under these policies and the premium finance arrangement with BankDirect is addressed in the Debtors' contemporaneously filed *Motion of the Debtors for Entry of an Order Authorizing the Debtors to (A) Maintain Existing Insurance Policies, Pay All Policy Premiums and Consultant Fees Arising Thereunder and Renew or Enter Into New Policies, and (B) Continue Insurance Premium Financing Programs, Pay Insurance Premium Financing Obligations Arising in Connection Therewith and Renew or Enter into New Premium Financing Arrangements.*

discretion, to maintain and continue their prepetition practices with respect to the Workers' Compensation Programs, including, among other things, allowing workers' compensation claimants, to the extent they hold valid claims, to proceed with their claims under the Workers' Compensation Programs.

V.     **Retirement Plans**

a.     _401(k)_

139.    The Debtors maintain retirement savings plans for the benefit of eligible Employees in accordance with the requirements of section 401(k) of the Internal Revenue Code (the "**401(k) Plans**").

140.    The 401(k) Plans is administered by Fidelity Investments.  Employees may contribute to the 401(k) Plans each year through salary deferrals up to the IRS limit.  The Debtors also provide matching contributions up to certain limits and remit those to Fidelity Investments together with the amounts contributed by Employees through payroll withholdings. As of the Petition Date, the Debtors have contributed approximately $1.6 million to the 401(k) Plans for 2016 and only a nominal amount has accrued but not yet been funded.  The Debtors also incur approximately $25,000 annually in administrative costs on account of the 401(k) Plans.

141.    In addition to matching Employee 401(k) Plans contributions, in the ordinary course of business, some of the Debtors make additional annual discretionary employer contributions to the 401(k) Plans.  The discretionary component for 2016 has not been paid or funded or paid at this time, is estimated to be less than $500,000, and is typically funded in January.  These discretionary contributions are a critical and expected component of those Employees' total compensation.  The Debtors believe that the discretionary 401(k) Plans

contributions are ordinary course obligations arising postpetition such that no Court authorization is required to permit their payment. Nevertheless, in the interests of transparency and full disclosure, the Debtors seek Court authorization to remit the post-petition contributions in the ordinary course.

142.    Employee contributions to the 401(k) Plans for 2016 are expected to be approximately $2.8 million and those contributions fully vest immediately and cannot be forfeited. The majority of Employees participate and contribute to the 401(k) Plans.

143.    By this Motion, the Debtors seek authority, in their discretion, to continue to honor their obligations with respect to the 401(k) Plans, including the post-petition payment of discretionary contributions, in the ordinary course of business.

> b.    *Pension Plans*

144.    The Debtors make contributions to a single employer defined benefit pension plan on behalf of certain eligible Employees (the "**Single Employer Plan**"). As of December 31, 2015, the Single Employer Plan actuary reported that the aggregate fair value of the assets held in trust under the Single Employer Plan is approximately $28.2 million. There are currently no obligations due to the Single Employer Plan. The Single Employer Plan covers 430 people, including 56 active Employees (17 salaried and 39 hourly) and 374 retired former employees. The Single Employer Plan is fully funded in accordance with the requirements under the Pension Protection Act and, as such, the Debtors did not make any contributions to the Single Employer Plan in 2016. Despite the current fully funded status, the value of the plan assets and/or the benefit requirements may result in an underfunding of the Single Employer Plan, which would require future post-petition contributions by the Debtors.

145.     Pursuant to one of the CBAs, debtor Michigan Steel Tube LLC ("**MST**") is obligated to make contributions to the Steelworkers Pension Trust, which is a multi-employer pension plan, on behalf of employees represented by Local Union 1900 of the United Steelworkers AFL-CIO (the **"Multi-Employer Plan**," and together with the Single Employer Plan, the "**Pension Plans**").

146.     The Pension Plans provide pension and disability pension benefits to qualifying represented and non-represented Employees retiring from a participating employer.  The Debtors estimate that their aggregate annual contributions under the Pension Plans (the "**Pension Plan Obligations**") are approximately $90,000, which relates solely to the Multi-Employer Plan.   As of the Petition Date, the Debtors believe they owe approximately $5,000 to the Multi-Employer Plan.

147.     The Debtors believe that postpetition contributions to the Pension Plans may be required by applicable law and are obligations arising postpetition such that no Court authorization is required to permit their payment.  Nevertheless, in the interests of transparency and full disclosure, the Debtors seek Court authorization to remit the post-petition Pension Plan Contributions in the ordinary course.

148.     Additionally, the Debtors incur annual expenses related to the administration of the Pension Plans.  The Debtors estimate these costs to be approximately $30,000 per year (the "**Pension Plan Expenses**").  The Debtors seek authorization to pay any accrued but unpaid Pension Plan Expenses.

c.    *Incentive Plans*

149.    To incentivize all Employees[8] to achieve their highest and best performance for the company (and attract and retain Employees), in the ordinary course of their business, each of the operating Debtors has established some form of incentive plan that is available to eligible Employees.    The incentive plans are carefully calibrated to ensure that eligible Employees are rewarded for their efforts toward the Debtors' financial performance and productivity, as well as their contributions to the Debtors' achievement of maximum workplace safety and environmental compliance (the "**General Incentive Plans**"). [9]

150.    One of the Debtors' operating units, Kentucky Electric Steel ("**KES**"), offers its Employees a unique incentive plan keyed to product output at KES' manufacturing facility (the "**KES Incentive Plan**").    Under the KES Incentive Plans, KES makes incentive disbursements to its Employees every two weeks, which disbursements vary based on KES' output and performance during that two-week period.    Total payments made year-to-date under the KES Incentive Plan are approximately $900,000.

151.    Pursuant to this Motion, the Debtors seek to continue the General Incentive Plans and KES Incentive Plan for eligible Employees (collectively, the "**Incentive Plans**").    The Debtors seek this relief to ensure that eligible Employees are rewarded for their contributions to improve the Debtors' operations.    The Incentive Plans are a key component of Employee compensation and provide substantial value to the Debtor's estate because they encourage

---

[8] I do not participate in, or receive any distributions under, the Incentive Plans.

[9] One of the Debtors' units, MST, also provides a small incentive plan for 11 sales-related employees designed to increase sales. To the extent one of these employees achieves the relevant incentive metric in a given month, MST makes the incentive payments on or before the 15th of the next month.  MST has paid approximately $1,500 per month during 2016, and has accrued but unpaid incentives of less than $1,000 at the date of filing.  The Debtors seek approval, in their discretion, to honor and pay these amounts in connection with approval of the Incentive Plans.

Employees to achieve certain performance targets.  In addition, if the Incentive Plans were discontinued, Employee morale would suffer, Employees might seek employment elsewhere and the Debtors' business operations would suffer greatly.

152.    The Debtors typically make distributions to Employees under the Incentive Plans in the ordinary course of their business in February or March of the following calendar year.  The aggregate amount paid to Employees under the Incentive Plans for calendar year 2015 was approximately $3.35 million.  Assuming the Debtors' achieve the requisite metrics for the Incentive Plans during calendar year 2016, the Debtors estimate that up to approximately $4.0 million would be payable to eligible Employees in February or March 2017 in connection with the Incentive Plans.

153.    The Debtors believe that postpetition disbursements in connection with the Incentive Plans are ordinary course obligations arising postpetition such that no Court authorization is required to permit their payment.  Nevertheless, in the interests of transparency and full disclosure, the Debtors seek Court authorization, in their discretion, to remit the post-petition Incentive Plan payments at the appropriate time and in the ordinary course of the Debtors' business.

     d.    *Profit Sharing Plans*

154.    In the ordinary course of business, the Debtors offer certain Employees[10] the opportunity to participate in profit sharing plans (the "**Profit Sharing Plans**").  Under the Profit Sharing Plans, certain eligible Employees may receive a profit sharing payment if the Debtors reach certain profitability thresholds in the prior year.  The Debtors seek authority in this Motion

---

[10] I do not participate in, or receive any distributions under, the Profit Sharing Plan.

to continue, in their sole discretion and in the ordinary course of business, the Profit Sharing Plans for Employees for calendar year 2016.

155.   The Debtors' believe that the Profit Sharing Plans are a key component of Employee compensation and Employee morale.  If the Profit Sharing Plans were discontinued, Employees might seek employment elsewhere and the Debtors' business operations would suffer greatly.

156.   The Debtors typically make distributions to Employees under the Profit Sharing Plans in either February or March of the following calendar year.  The aggregate amount paid by the Debtors under the Profit Sharing Plans for calendar year 2015 was approximately $0.76 million.  Assuming the Debtors' achieve the requisite financial metrics for the Profit Sharing Plans during calendar year 2016, the Debtors estimate that up to approximately $2.8 million would be payable to the eligible Employees in February or March 2017 in connection with the Profit Sharing Plans.

157.   The Debtors believe that no pre-petition amounts remain outstanding on account of the Profit Sharing Plans and that any postpetition disbursements made in connection with the Profit Sharing Plans are ordinary course obligations of the Debtors arising postpetition such that no Court authorization is required to permit their payment.  Nevertheless, in the interests of transparency and full disclosure, the Debtors seek Court authorization, in their discretion, to make distributions under the Profit Sharing Plans at the appropriate time and in the ordinary course of the Debtors' business.

VI.    **Reimbursable Business Expenses**

158.   Business expenses incurred by Employees in the course of employment and in furtherance of the Debtors' business are generally paid directly by the Employee and then

charged to the Debtors in accordance with the Debtors' reimbursement policy.  The Debtors reimburse Employees for certain ordinary course expenses incurred within the scope of the Employees' employment, including travel, lodging, transportation, meals and other miscellaneous expenses (collectively, the "**Business Expenses**").  The Debtors' average weekly Business Expenses ranges from $10,000 to $20,000.

159.    Although the Debtors encouraged the submission of expense reports for Business Expenses prior to the Petition Date, the Debtors anticipate that some Employees will have not yet submitted their recent expense reports for accrued and unpaid Business Expenses.

160.    In addition, in connection with certain Business Expenses, the Debtors provide select employees with corporate credit cards issued by American Express and purchase cards issued by Fifth Third Bank (collectively, the "**Expense Cards,**" and together with the Business Expenses, the "**Reimbursable Expenses**").  The Debtors pay American Express and Fifth Third Bank directly for the Business Expenses charged by Employees using the Expense Cards.

161.    As of the Petition Date, the Debtors estimate that there is a total of approximately $200,000 in Reimbursable Expenses that have been incurred either directly by the Employees or by the Employees through the Expenses Cards and that remain unpaid.

162.    Failing to reimburse employees for Reimbursable Expenses could have a negative effect on Employee morale and would cause those employees with outstanding Reimbursable Expenses to suffer undue hardship.  In addition, failing to pay the Expense Cards could result in American Express or Fifth Third Bank denying further charges and use of their Expense Cards, which could have dire consequences on the ongoing operations of the Debtors. In this scenario, Employees would be required to pay for Business Expenses themselves and submit receipts to the Debtors for reimbursement.  Such a result would burden the Debtors'

auditing department and require significant additional time and expense to process reimbursement requests from Employees.  Furthermore, this would require certain Employees to pay for business related expenses, some of which would be significant, from their own personal funds.  Such drastic changes in operations could adversely affect and jeopardize the Debtors' reorganization efforts.

163.    Accordingly, the Debtors seek authority, in their sole discretion (i) to continue their prepetition practices with respect to the Reimbursable Expenses and use of Expense Cards in the ordinary course of business, (ii) to continue to limit the Reimbursable Expenses and use of Expense Cards as they deem appropriate in their business judgment, and (iii) to pay all prepetition amounts outstanding in connection with the Reimbursable Expenses and Expense Cards.

**VII.    Benefits Withholding Obligations**

164.    As part of the relief requested herein, the Debtors seek authorization to pay the Payroll Taxes and all other withholdings such as contributions to savings, retirement or pension plans, insurance contributions and charitable contributions, if any (collectively, the "**Benefits Withholding Obligations**").

165.    The Debtors routinely withhold from Employee paychecks the Benefits Withholding Obligations, and are required to transmit these amounts to third parties.  The Debtors believe that such withheld funds, to the extent that they remain in the Debtors' possession, constitute moneys held in trust and therefore, are not property of the Debtors' estates. Thus, whether or not such funds are prepetition amounts, the Debtors believe that directing such funds to the appropriate parties does not require Court approval.  Nevertheless, in the interests of transparency and full disclosure, the Debtors seek authority to pay any outstanding amounts

owed for Benefits Withholding Obligations, in the ordinary course of business, including those incurred prior to the Petition Date.

### VIII.   Independent Service Providers

166.    In addition to the Employees, the Debtors contract with a limited number of independent contractors (the "**Independent Service Providers**") who provide services that are essential to the Debtors' ongoing business operations.   These services include production workers, and general corporate and administrative functions such as finance and accounting support.  The Independent Service Providers are critical to the Debtors' operations, and they rely – in some instances exclusively – on the Debtors for their individual income.

167.    The aggregate amount owing to the Independent Services Providers, as of the Petition Date, is less than $50,000 and no amount owing to an Individual Service Provider exceeds the statutory cap on priority wages.  The Independent Service Providers are paid through the Debtors' respective accounts payable and not through the Debtors' payroll.  Nonetheless, if the Debtors are unable to pay the Independent Service Providers, the Debtors will lose the services, continuity and institutional knowledge of the Independent Service Providers, and the Debtors' business operations will be severely and irreparably compromised.

### J.    Motion of the Debtors for Entry of Interim and Final Orders Authorizing the Debtors to Maintain Customer Programs and Honor Prepetition Obligations Related Thereto

168.    By this motion, the Debtors seek to honor certain prepetition obligations to customers and to otherwise continue certain prepetition customer practices offered in the ordinary course of their prepetition operations.

169.    The viability of the Debtors' business and the Debtors' ability to maximize the value for stakeholders in these Chapter 11 Cases are dependent in large part upon the patronage

and loyalty of their customers.  Before the Petition Date, the Debtors, in the ordinary course of their business, maintained programs, including customer rebate programs, to generate goodwill, meet competitive market programs and ensure Customer and commercial public satisfaction (collectively, the "**Customer Programs**").

170.    The Customer Programs are fundamental to the continued success of the Debtors' business because, by design, the Customer Programs encourage repeat business and ensure customer satisfaction, thereby retaining current customers, attracting new customers and ultimately increasing the Debtors' revenue.

171.    In the Debtors' industries, customer loyalty is of critical importance.  Accordingly it is vital that the Debtors not alienate their customer base following the commencement of these Chapter 11 Cases.   If the Debtors were unable to offer the Customer Programs, they would be at a significant disadvantage compared to their competitors.   Therefore, the ability to continue to provide the Customer Programs is vital to the Debtors' ongoing relationship with their current and future customers, and their ability to emerge from chapter 11 protection with a strong market share and customer base.  These efforts would be thwarted if the relief requested therein is not granted.  For these reasons, permitting the Debtors to continue to honor the Customer Programs is justified and essential to the Debtors' continued operations.

172.    The Debtors' creditors also will benefit from the relief sought therein.   If the Debtors are prohibited from honoring and maintaining the Customer Programs consistent with their past business practices, then the customers' lost confidence in the Debtors will damage the Debtors' business to an extent that far exceeds the cost associated with honoring and continuing such practices.   Approval of the Customer Programs will protect the Debtors' goodwill and going concern value during the chapter 11 process.

173.    As of the Petition Date, the Debtors accrued approximately $500,000 in obligations to Customers on account of the Customer Programs, all of which is attributable to the Rebate Programs.  With respect to the Rebate Programs, a very significant portion of all of the Debtors' obligations will never be paid to Customers in cash, but rather will be offered as credits against future purchases by such Customers of the Debtors' products.

**K.    Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks, (B) Authorizing the Continued Use of Cash Management System, (C) Waiving Certain Investment and Deposit Guidelines and (D) Granting <u>Administrative Expense Status to Postpetition Intercompany Claims</u>**

174.    By this Motion, the Debtors seek an order: (a) authorizing but not directing, the maintenance of Bank Accounts and continued use of existing Business Forms; (b) authorizing, but not directing, continued use of the Cash Management System; (c) waiving certain of the investment and deposit Guidelines set forth by the United States Trustee for the District of Delaware; (d) granting administrative expense status to postpetition intercompany claims and permitting only those Intercompany Transfers that comply with the terms and conditions provided in the interim and final orders; and (e) providing any additional relief required in order to effectuate the foregoing.

**I.    The Debtors' Bank Accounts and Cash Management System**

175.    Before the commencement of the Chapter 11 Cases, and in the ordinary course of business, the Debtors implemented a cash management system (the "**Cash Management System**").    The Cash Management System is comprised primarily of ten bank accounts (collectively, the "**Bank Accounts**") at PNC Bank N.A. ("**PNC**") opened and maintained by the Debtors before the Petition Date in the ordinary course of business.    As described in the First Day Declaration, the Debtors retired an asset based revolving credit facility with PNC on

November 30, 2016.  As a result, the Debtors intend to transfer their banking relationship to Wintrust Bank ("**Wintrust**").  The description of the Cash Management System and Bank Accounts is as of the Petition Date.

176.    The Debtors' Cash Management System implements a straightforward collection, concentration and disbursement system.  Debtor Optima Specialty Steel, Inc. ("**OSS**") maintains the Debtors' main sweep and funding account (the "**Concentration Account**"), and each of the four operating Debtors have a lockbox, a collection account, and a disbursement account.  The Cash Management System facilitates reporting, monitors collection and disbursements of funds, reduces administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and presentment information, and administers the various Bank Accounts required to effect the collection, disbursement and movement of cash.

177.    Customer payments are received daily by the four operating Debtors.  These payments are made via wire, ACH and check, with checks sent to the lockboxes.  All customer payments are deposited into the collection accounts.  The collection accounts are zero balance accounts, and they are swept daily into the Concentration Account.

178.    Payments by the operating Debtors are made from the disbursement accounts. These are controlled disbursement accounts funded from the Concentration Account.  Each Debtor typically has a weekly disbursement run which are primarily processed by check, ACH or wire, although the Debtors have been unable to disburse funds via ACH after PNC discontinued the Debtors' ability to make ACH transfer following the retirement of PNC's revolver.  If circumstances require, ad hoc payments can be made out of sequence with the weekly cycle.

179.    In addition, because Debtor Michigan Seamless Tube, LLC administers its own payroll, it has a separate payroll account for payroll checks.  This payroll account is also a controlled disbursement account funded from the Concentration Account.

180.    At the corporate level, OSS receives and pays corporate level receipts and disbursements directly into and out of the Concentration Account.  Examples of these corporate level receipts and disbursements including tax refunds and payments, rent for the corporate headquarters, professional fees, payment of corporate payroll funding, and insurance premiums.

181.    Finally, the Debtors' operating units maintain petty cash at each of their facilities.  The aggregate current balance of the petty cash is $6,200.  The Debtors replenish the petty cash from time to time in an amount that does not exceed the current balance.

182.    The Debtors reconcile cash receipts periodically, and perform a reconciliation of all of the deposits and debits in the Cash Management System once a month.

183.    The Debtors' transition into chapter 11 will be significantly less disruptive if the Bank Accounts are maintained following the commencement of the Chapter 11 Cases with the same account numbers and, where applicable, automated relationship.  The Debtors further request authority to deposit funds in and withdraw funds from all such accounts postpetition, subject to the same access rights and limitations existing prior to the Petition Date, including, but not limited to, checks, wire transfers, ACH, electronic funds transfers and other debits and to treat the Bank Accounts for all purposes as debtor-in-possession accounts.

## II.    Existing Business Forms and Checks

184.    In the ordinary course of business, the Debtors use pre-printed check stock with the relevant Debtor's name printed thereon.  In addition, the Debtors maintain pre-printed correspondence and business forms, including, but not limited to, letterhead, envelopes, promotional materials and other business forms (collectively, along with the Debtors' checks, the

"**Business Forms**").   To minimize administrative expense and delay, the Debtors request authority to continue to use their Business Forms substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtors' "Debtor-in-Possession" status.

### III.   Intercompany Transactions

185.   In the ordinary course of business, the Debtors engage in transactions relating to the business relationships, and certain shared management, general, administrative, and/or other similar shared services, amongst each other that give rise to intercompany claims (the "**Intercompany Transactions**").   The Intercompany Transactions include the purchase and sale of product between and among the various operating Debtors and allocation of corporate overhead by OSS to the operating Debtors.   The Intercompany Transactions also include intercompany loans among the various Debtors and cash sweeps between the Concentration Account and the accounts of the operating Debtors.

186.   These Intercompany Transactions reduce administrative costs and ensure the orderly and efficient operation of the Debtors' enterprise.   Accordingly, the Debtors engaged in the Intercompany Transactions on a regular basis prepetition and believe such transactions are common for enterprises like the Debtors.   Consistent with an orderly and efficient operation of the Debtors' enterprise, the Debtors maintained records of the Intercompany Transactions prepetition, would effectuate book transfers to true up the intercompany activity on a bi-monthly basis and reconciled all Intercompany Transactions monthly.   Consistent with these prepetition practices, the Debtors will continue to maintain records of all Intercompany Transactions postpetition and reconcile them monthly.

IV.     **Purchase Cards, Corporate Charge Cards and Fuel Cards**

187.    The Debtors provide purchasing cards (the "**Purchase Cards**") to approximately forty employees to purchase goods and services that are used to operate the Debtors' business, and corporate charge cards to approximately twenty-six employees to use for the purchase of goods and services and charge other reimbursable expenses, such as travel expenses (the "**Corporate Charge Cards**").  The Purchase Cards are issued by Fifth Third Bank, and the Corporate Charge Cards are issued by American Express. In addition, the Debtors have approximately fifteen fuel charge cards (the "**Fuel Cards**") which are issued by either BP Business Solutions MasterCard and operated by FleetCor Technologies Operating Company, LLC or Citibank (South Dakota), N.A. or by Shell Fleet.  The Fuel Cards are used by employees for authorized and approved fuel and related travel expenses.  The Debtors pay Fifth Third Bank, American Express, FleetCor and Shell Fleet directly for the business charges and fees incurred in connection with the Purchase Cards, the Corporate Charge Cards and the Fuel Cards.   The Debtors seek authority to continue using their Purchase Cards, Corporate Charge Cards and the Fuel Cards in the ordinary course of business, and to continue to limit the Purchase Card, the Corporate Charge Cards and the Fuel Cards credit use as they deem appropriate in their business judgment.

L.      **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition Use of Cash Collateral, (II) Granting Adequate Protection to the Secured Parties, (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(B), (IV) Granting Related Relief**

188.    The Debtors' need to use Cash Collateral on an interim basis is urgent and necessary to avoid immediate and irreparable harm to the Debtors, their estates, their creditors and other parties-in-interest, and to enable the Debtors to continue operations and to administer and preserve the value of their estates.  The ability of the Debtors to finance their operations,

maintain business relationships with their vendors, suppliers and customers, pay their employees and otherwise finance their operations requires the use of Cash Collateral. Without authority to use Cash Collateral, the Debtors, their estates and their creditors would suffer immediate and irreparable harm. The Debtors do not have sufficient available sources of working capital and financing to operate their business or maintain their properties in the ordinary course of business without the authorized use of Cash Collateral. The Debtors, therefore, request authority to use Cash Collateral, subject to the terms and conditions set forth in the Cash Collateral Orders.

189.    The proposed Interim Order provides certain adequate protection to the Secured Noteholders to protect against any diminution in value arising from the Debtors' use of Cash Collateral or the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code. Prior to the Final Hearing, the Debtors further propose to make distributions pursuant to a budget annexed to the Interim Order (the "**Budget**") subject to certain permitted variances.

190.    Access to Cash Collateral on an interim basis, and ultimately on a final basis, will provide the Debtors with the liquidity necessary to operate their business in the ordinary course during the initial weeks of these Cases while the Debtors negotiate the terms of post-petition debtor-in-possession financing. The Debtors anticipate a need for debtor-in-possession financing by mid-January 2017. Certain Secured Noteholders have indicated an interest in providing such financing and the Debtors have also received indications of interest from its equityholders. Without the immediate access to liquidity contemplated by this Motion, the Debtors' ability to negotiate debtor-in-possession financing and navigate through the chapter 11 process will be jeopardized, all to the detriment of the Debtors' stakeholders. As a result, the Debtors have an immediate need to use Cash Collateral.

**M.** **Debtors' Application for Entry of an Order Authorizing Debtors to Employ and Retain Garden City Group, LLC as Claims and Noticing Agent *Nunc Pro Tunc* to the Petition Date Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(a) and LBR 2002-1(f)**

191.    By this Application, the Debtors seek entry of an order authorizing the employment and retention of Garden City Group, LLC ("**GCG**") as the "Claims and Noticing Agent" in these Chapter 11 Cases.  I understand that the Debtors and their advisors obtained and reviewed engagement proposals from three court-approved claims and noticing agents to ensure selection of a Claims and Noticing Agent through a competitive process.

192.    Following that review, and in consideration of the number of anticipated notice parties, the nature of the Debtors' business, and GCG's competitive and reasonable rates given their quality of services and expertise, the Debtors selected GCG to act as the Debtors' Claims and Noticing Agent.  I believe that the retention of GCG as Claims and Noticing Agent is necessary and in the best interest of the estates.  GCG will relieve the burdens associated with claims and noticing services, allowing the Debtors to devote their attention and resources to maximize value for their stakeholders and facilitate the orderly administration of these Chapter 11 Cases.

193.    The Debtors and their advisors reviewed GCG's engagement letter and description of services that GCG will render in these Chapter 11 Cases, GCG's compensations and other terms of the engagement.  Based on that review, the Debtors believe that all parties in interest will benefit as a result of GCG's experience and cost-effective methods.

[*Remainder of page intentionally left blank.*]

## IV.    CONCLUSION

For the reasons described herein and in the First Day Motions, I believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if this Bankruptcy Court grants the relief requested in each of the First Day Motions and respectfully request the Bankruptcy Court to do so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  December 15, 2016

_____

Mordechai Korf
Chief Executive Officer of the Debtors