## Exhibit A

**Engagement Agreement**



## BANKRUPTCY ADMINISTRATION AGREEMENT

This Bankruptcy Administration Agreement, dated as of December 10, 2016, is between Garden City Group, LLC, a Delaware limited liability company (the "Company"), and Optima Specialty Steel, Inc. and certain of its subsidiaries and affiliates (collectively, the "Clients").

The Clients desire to retain the Company to perform certain noticing, claims processing, solicitation and other administrative services for the Clients in their chapter 11 cases anticipated to be filed in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and the Company desires to be so retained, in accordance with the terms and conditions of this Agreement.

In consideration of the mutual covenants herein contained, the parties hereby agree as follows:

1.      Services.  The Company agrees to provide the services necessary to perform the tasks specified in the pricing schedule that has been supplied to the Clients.  Such services are hereinafter referred to as "Services."  The Clients agree and understand that none of the Services constitute legal advice.

2.      Payment for Services; Expenses.

2.1.      Compensation.  As full compensation for the Services to be provided by the Company, the Clients agree to pay the Company its fees as outlined in the pricing schedule that has been supplied to the Clients and is attached hereto as Exhibit A, after taking into account additional agreed upon discounts (subject to Bankruptcy Court approval in the event of an unresolved dispute).  In some instances, these fees include commissions and/or markups.  Billing rates may be adjusted from time to time by the Company in its reasonable discretion, although billing rates generally are changed on an annual basis.  Clients and the Company intend that all fees and expenses incurred in connection with Services rendered by the Company pre-petition be paid in advance of or contemporaneously with the rendering of such Services.  All such payments shall be made by wire transfer.  Clients agree to pay, by wire transfer, the Company a retainer of $15,000 (which may be replenished from time to time), to be applied as follows: (a) first against the contemporaneous and subsequent fees and expenses incurred by the Clients in connection with Services rendered by the Company pre-petition; and (b) with respect to the portion of the retainer that remains outstanding, if any, after the petitions are filed, first against any outstanding pre-petition fees and expenses incurred by the Clients in connection with the Services (and the retainer will thereafter be replenished to the original retainer amount to the extent necessary), and then against the final bill that will be rendered by the Company to the Clients for the post-petition fees and expenses incurred by the Clients in connection with the Services.

2.2.      Expenses.  In addition to the compensation set forth in Section 2.1, the Clients shall reimburse the Company for all out-of-pocket expenses reasonably incurred by the Company in connection with the performance of the Services (subject to Bankruptcy Court determination in the event of an unresolved dispute).  The out-of-pocket expenses will be billed on the expense (non-fee) portion of the Company's invoice to the Clients and may include, but are not limited to, postage, banking fees, brokerage fees, costs of messenger and delivery service, travel, filing fees, staff overtime meal expenses and other similar expenses.  In some cases, the Company may receive a rebate at the end of a year from a vendor.  The Clients and the Company intend to satisfy all expenses incurred in connection with pre-petition Services from advance retainers or contemporaneous payments.  All such payments shall be made by wire transfer.

2.3.    Billing and Payment.  Except as provided in Section 2.2, or specifically set forth below in this Section 2.3, the Company shall bill the Clients for its fees and expenses for Services performed under 28 U.S.C. § 156(c) on a monthly basis, and the Clients shall pay the Company within thirty (30) days of its receipt of each such bill in the ordinary course of business (subject to Bankruptcy Court approval in the event of an unresolved dispute).  With respect to pre-petition invoices, the same will show application of advance and contemporaneous payments against subsequent and contemporaneous fees and expenses and state an advance amount to replenish the retainer.  With respect to post-petition invoices, for Services performed outside the scope of 28 U.S.C. § 156(c), the Company shall apply for compensation and reimbursement of expenses in accordance with the procedures set forth in 11 U.S.C. §§ 330 and 331, the applicable Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the District of Delaware, any applicable orders of the Bankruptcy Court, the guidelines established by the United States Trustee for the District of Delaware and such other procedures that have been, or may be, fixed by order of the Bankruptcy Court.  Unless otherwise agreed to in writing, (i) postage expense, and certain other expenses, and (ii) fees for print notice and media publication (including any markups and/or commissions charged by GCG and included in those fees) must be paid within three (3) business days of the date of GCG's invoice.  Each of the Clients is jointly and severally liable for the Company's fees and expenses.

3.    Term and Termination.

3.1.    Term.  The term of this Agreement shall commence on the date hereof and shall continue until performance in full of the Services, unless earlier terminated as set forth herein.

3.2.    Termination.

(a)    In the event of any material breach of this Agreement by either party hereto, either party may apply to the Bankruptcy Court for an order allowing termination of the Agreement.  Grounds for termination include: (i) failure to cure a material breach within thirty (30) days after receipt of written notice by the non-breaching party or (ii) in the case of any breach which requires more than thirty (30) days to effect a cure, failure to commence and continue, in good faith, efforts to cure such breach, provided that such cure shall be effected no later than ninety (90) days after receipt of written notice of such breach.  Waiver of any such default or material breach by either party hereto shall not be construed as limiting any right of termination for a subsequent default or material breach.

(b)    The Company shall be entitled to an administrative claim for all fees and expenses outstanding at the time of termination (subject to Bankruptcy Court approval in the event of an unresolved dispute).

(c)    In accordance with the Bankruptcy Court's Local Rules, procedures and/or directives, or in the absence thereof, as soon as practicable (i) following the entry of a final decree closing the chapter 11 case, or (ii) following the conversion of the chapter 11 case to chapter 7, the Company shall forward all original proofs of claim to the Federal Archives Record Administration.  For all other documents in the Company's actual or constructive possession (including, but not limited to, letters, e-mails, facsimiles, other correspondence and all undeliverable and/or returned mail), the Company shall retain paper copies and electronic copies for one (1) year (i) following the entry of a final decree closing the chapter 11 case, or (ii) following the conversion of the chapter 11 case to chapter 7. Following the one (1) year retention period, the Company shall have the right to destroy all such documents.  This provision shall not affect the Company's normal course business processes for archives and back-up tapes.

2

4.      Independent Contractor.  It is understood and agreed that the Company, through itself or any of its agents, shall perform the Services as an independent contractor.  Neither the Company nor any of its employees shall be deemed to be an employee of the Clients.  Neither the Company nor any of its employees shall be entitled to any benefits provided by the Clients to their employees, and the Clients will make no deductions from any of the payments due to the Company hereunder for state or federal tax purposes.  The Company agrees that the Company shall be responsible for any and all taxes and other payments due on payments received hereunder by the Company from the Clients.  Nothing in this Agreement requires the Clients to use the Company for any future work relating to the Services, and, in the event the Clients decide to use another party for such future work, the Company agrees to cooperate fully with the Clients to ensure a smooth transition to the new party.

5.      Accuracy of Client Supplied Information.  The Clients are responsible for the accuracy of all programs, data and other information they submit to the Company (including all information for the preparation of Schedules of Assets and Liabilities ("Schedules") and Statements of Financial Affairs ("Statements")) and for the output of such information.  The Company may undertake to place such data and information into certain systems and programs, including in connection with the generation of Schedules and Statements.  The Company does not verify information provided by the Clients and, with respect to Schedules and Statements preparation, all decisions are at the sole discretion and direction of the Clients.  All Schedules and Statements filed on behalf of, or by, the Clients are reviewed and ultimately approved by the Clients, and the Company bears no responsibility for the accuracy or contents therein.

6.      Confidential Information.

6.1.      Confidentiality.  In connection with this Agreement, each of the Clients and the Company (as the case may be, the "Disclosing Party") may disclose to the Company or the Clients (as the case may be, the "Receiving Party") certain information (a) that is marked or otherwise identified in writing as confidential or proprietary information of the Disclosing Party ("Confidential Information") prior to or upon receipt by the Receiving Party; or (b) which the Receiving Party reasonably should recognize from the circumstances surrounding the disclosure to be Confidential Information.  The Receiving Party (x) shall hold all Confidential Information in confidence and will use such information only for the purposes of fulfilling the Receiving Party's obligations hereunder, and for no other purpose, and (y) shall not disclose, provide, disseminate or otherwise make available any Confidential Information to any third party other than for the purposes of fulfilling the Receiving Party's obligations hereunder, in either case, without the express prior written permission of the Disclosing Party.  Notwithstanding the foregoing, the Receiving Party may disclose Confidential Information pursuant to a validly issued subpoena or order of a court of competent jurisdiction, provided, however, that the Receiving Party must provide the Disclosing Party with prompt written notice of such subpoena or court order so that the Disclosing Party may seek a protective order or other appropriate remedy, and the Receiving Party shall reasonably cooperate with the Disclosing Party's efforts to obtain same.

6.2.      Protection of Intellectual Property.  The Clients acknowledge that the Company's intellectual property, including, without limitation, the Company's inventions (whether or not patentable), processes, trade secrets and know how are of ultimate importance to the Company.  Accordingly, the Clients agree to use their best efforts to protect such intellectual property, and shall not, either during the term of this Agreement, or subsequent to its termination, utilize, reveal or disclose any of such intellectual property.  The Clients understand that the software programs and other materials furnished by the Company pursuant to this Agreement, and/or developed during the course of this Agreement by the Company, are the sole property of the Company.  The term "program" shall include, without limitation, data processing programs, check printing programs, specifications, applications, routines, sub-routines, procedural manuals and documentation.  The Clients further agree that any ideas, concepts, know-how or

3

techniques relating to the claims management software used or developed by the Company during the course of this Agreement shall be the exclusive property of the Company.

   6.3. Scope. The foregoing obligations in Sections 6.1 and 6.2 shall not apply to (a) information that is or becomes generally known or available by publication, commercial use or otherwise through no fault of the Receiving Party; (b) information that is known by the Receiving Party prior to the time of disclosure by the Disclosing Party to the Receiving Party; (c) information that is obtained from a third party who, to the Receiving Party's knowledge, has the right to make such disclosure without restriction; (d) any disclosure required by applicable law; or (e) information that is released for publication by the Disclosing Party in writing. The obligations set forth under Sections 6.1 and 6.2 shall survive the termination of this Agreement.

   7. Indemnification. The Clients, jointly and severally, hereby indemnify and hold harmless the Company and its directors, officers, employees, affiliates and agents against any losses incurred by the Company arising out of, in connection with or related to (a) any gross negligence or willful misconduct by the Clients, their employees, agents or representatives, or any misrepresentations made by such persons to third parties in connection with the Company's acts or omissions in connection with its rendering of the Services; (b) any breach of this Agreement by any of the Clients; or (c) any erroneous instructions or information provided to the Company by any of the Clients for use in providing the Services. Notwithstanding any provision in the Application (as defined herein) or the Agreement to the contrary, the Clients have no obligation to indemnify the Company or provide contribution or reimbursement to the Company for any claim or expense that is either (a) judicially determined (the determination having become final) to have arisen from the Company's gross negligence or willful misconduct or (b) settled prior to a judicial determination as to the Company's gross negligence or willful misconduct, but determined by the Bankruptcy Court, after notice and a hearing, to be a claim or expense for which the Company should not receive indemnity, contribution or reimbursement under the terms of the Application and this Agreement, as modified by Bankruptcy Court order (each, an "Order"). If, before the earlier of (a) the entry of an Order confirming a chapter 11 plan in these chapter 11 cases (that Order having become a final order no longer subject to appeal), and (b) the entry of an Order closing these chapter 11 cases, the Company believes that it is entitled to the payment of any amounts by the Clients on account of the Clients' indemnification, contribution and/or reimbursement obligations under this Agreement (as modified by an Order), including without limitation the advancement of defense costs, the Company must file an application therefor in the Bankruptcy Court, and the Clients may not pay any such amounts to the Company before the entry of an Order approving the payment.

   8. Jurisdiction. This Agreement is subject to the approval of the Bankruptcy Court, and the Bankruptcy Court shall retain jurisdiction over all matters regarding this Agreement.

   9. Force Majeure. Whenever performance by the Company of any of its obligations hereunder is substantially prevented by reason of any act of God, strike, lock-out or other industrial or transportational disturbance, fire, lack of materials, law, regulation or ordinance, war or war conditions or by reason of any other matter beyond the Company's reasonable control, then such performance shall be excused and this Agreement shall be deemed suspended during the continuation of such prevention and for a reasonable time thereafter.

   10. Notice. Any notice or other communication required or permitted hereunder shall be in writing and shall be delivered personally, or sent by registered mail, postage prepaid or overnight courier. Any such notice shall be deemed given when so delivered personally, or, if mailed, five (5) days after the date of deposit in the United States mail, or, if sent by overnight courier, one (1) business day after delivery to such courier, as follows: if to the Company, to Garden City Group, LLC, 1985 Marcus Avenue, Suite 200, Lake Success, New York 11042, Attention: Kenneth Cutshaw, Chief Executive

Officer; and if to the Clients, to Paul J. Kennan, Jr., Esq., Greenberg Traurig, LLP, 333 SE 2nd Avenue Suite 4400 Miami, Florida 33131.

11.    Governing Law.  This contract will be governed by and construed in accordance with the laws of the State of New York (without reference to its conflict of laws provisions).

12.    Severability.  All clauses and covenants contained in this Agreement are severable and in the event any of them are held to be invalid by any court having competent jurisdiction, such clause or covenant shall be valid and enforced to the maximum extent as to which it may be valid and enforceable, and this Agreement will be interpreted as if such invalid clauses or covenants were not contained herein.

13.    Assignment.  This Agreement and the rights and obligations of the Company and the Clients hereunder shall bind and inure to the benefit of any successors or assigns thereto.

14.    General.  This Agreement supersedes and replaces any existing agreement entered into by the Company and the Clients relating generally to the same subject matter, and may be modified only in a writing signed by the Company and the Clients.  The paragraph headings in this Agreement are included only for convenience, do not in any manner modify or limit any of the provisions of this Agreement and may not be used in the interpretation of this Agreement.  Failure to enforce any provision of this Agreement shall not constitute a waiver of any term hereof.  This Agreement contains the entire agreement between the parties with respect to the subject matter hereof.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one in the same instrument.  The Clients shall file an application with the Bankruptcy Court seeking approval of this Agreement (the "Application").  If an order is entered approving such Application (the "Retention Order"), any discrepancies between this Agreement, the Application and the Retention Order shall be controlled by the Application and the Retention Order.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year set forth above.

*Optima Specialty Steel, Inc.*

By:_____
Name:
Title:

*Garden City Group, LLC*

By_____
Name: Angela Ferrante
Title: Senior Vice President, Operations



**EXHIBIT A**



# GCG Pricing

| **Services** | **Fees (Unit/Hourly)** |
|---|---|

**Set-Up Creditor File**

Set-up fee ........................................................................................................Waived

Electronic import of creditor data .................................................................No per creditor charge

Assist with production of Schedules and Statements of Financial Affairs ..........................Standard hourly rates

**Noticing**

Notice printing / copies ...................................................................................$0.10 per page
(volume discounts apply)

Electronic noticing (e-mail) ............................................................................$50 per 1,000

Facsimile noticing (domestic facsimile) ..........................................................$0.10 per page

Personalization/labels.....................................................................................$0.05 each

Legal publication of notice..............................................................................Quote

Processing undeliverables ...............................................................................$0.25 each

**Document Management**

Sort and prep mail (including handling remails)...............................................Standard hourly rates

Document scanning..........................................................................................$0.12 per image

Monthly document storage  (paper) ................................................................$1.50 per box
(electronic)...........................................................$0.02 per image
(waived for first three months)

**Claims Administration**

Association of claimant name and address to database.....................................$0.15 per claim

Claim acknowledgement postcards..................................................................$0.10 each

Processing of claims, including non-conforming claims,
supervisory review and application of message codes.......................................Standard hourly rates

**Public Securities / Balloting / Solicitation and Tabulation**

Solicitation and Balloting (including coordination with nominees and Broadridge
and processing of master ballots, tabulation, verification and certification of vote)............Standard hourly rates

**Web Site**

Creating customized, interactive web site (including e-mail box for creditors) ..................Standard hourly rates

Monthly maintenance fee.................................................................................$200 per month

Providing updates to website ..........................................................................Standard hourly rates

| Services | Fees (Unit/Hourly) |
|---|---|

**Contact Services**

Case-specific voice-mail box for creditors..........................................................................No charge

Interactive Voice Response ("IVR")...................................................................................$1,900 set up
$0.39 per minute

Customer Service Representatives .....................................................................................$0.95 per minute

Monthly maintenance charge .............................................................................................$100 per month

Management of Call Center (including handling of claimant
communications, call backs, e-mails, and other correspondences) .....................................Standard hourly rates

**Miscellaneous Expenses**

Travel .................................................................................................................................At cost

Postage, courier, etc .........................................................................................................At cost

Copying, facsimile ............................................................................................................$0.10 per page

### Hourly Billing Rates[*]

| Title | Standard Hourly Rates |
|---|---|
| Administrative, Mailroom and Claims Control | $45-$55 |
| Project Administrators | $70-$85 |
| Project Supervisors | $95-$110 |
| Graphic Support & Technology Staff | $100-$200 |
| Project Managers and Senior Project Managers | $125-$175 |
| Directors and Asst. Vice Presidents | $200-$295 |
| Vice Presidents and above | $295* |

[*] For this engagement, GCG agrees to provide discounted hourly rates as reflected in the chart above and to cap its highest hourly rate at $295. Expert services provided by Angela Ferrante and Craig Johnson, the latter in connection with solicitation (including of public securities) and tabulation will be at a rate of $310 per hour.  Any additional services not covered by this proposal will be charged at GCG hourly rates including any outsourced work performed under GCG supervision and controls. GCG will not charge overtime for any of its hourly rates.

## Exhibit B

**Johnson Affidavit**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| OPTIMA SPECIALTY STEEL, INC., <u>et al.</u>[1] | Case No. 16-12789 (___) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF CRAIG E. JOHNSON IN SUPPORT OF
THE APPLICATION OF THE DEBTORS FOR ENTRY OF AN
ORDER AUTHORIZING DEBTORS TO EMPLOY AND RETAIN
GARDEN CITY GROUP, LLC AS CLAIMS AND NOTICING AGENT
*NUNC PRO TUNC* TO THE PETITION DATE PURSUANT TO
<u>28 U.S.C. § 156(C ), 11 U.S.C. 105(a) AND LOCAL RULE 2002-1(f)</u>**

Craig E. Johnson, being duly sworn, deposes and states:

1.      I am an Assistant Vice President, Operations of Garden City Group, LLC ("**GCG**"), and I am authorized to make and submit this declaration on behalf of GCG (the "**Declaration**").  The statements contained herein are based upon personal knowledge.  GCG submits this Declaration in support of the application (the "**Section 156(c) Application**")[2] of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") for entry of an order authorizing the employment and retention of GCG as the Debtors' claims and noticing agent ("**Claims and Noticing Agent**") in the Debtors' chapter 11 cases (the "**Chapter 11**

---

[1]   The Debtors in these Chapter 11 Cases, along with the business addresses and the last four (4) digits of each Debtor's federal tax identification number, if applicable, are as follows:  Optima Specialty Steel, Inc., 200 S. Biscayne Blvd., Suite 5500, Miami, FL 33131-2310 (0641); Michigan Seamless Tube LLC, 400 McMunn Street, South Lyon, MI 48178 (3850); Niagara LaSalle Corporation, 1412 150th Street, Hammond, IN 46327 (0059); KES Acquisition Company d/b/a Kentucky Electric Steel, 2704 South Big Run Road, Ashland, KY 41102 (2858); and The Corey Steel Company, 2800 South 61st Court, Cicero, IL 60804 (0255).

[2]   Capitalized terms utilized but not otherwise defined herein shall have the meanings ascribed to such terms in the Section 156(c) Application or the *Declaration of Mordechai Korf in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* (the "**First Day Declaration**") filed in these Chapter 11 Cases.

Cases") *nunc pro tunc* to the Petition Date pursuant to section 156(c) of title 28 of the United States Code, section 105(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), and rule 2002-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**") and to approve the assumption of the Bankruptcy Administration Agreement, dated as December 10, 2016 (the "**Engagement Agreement**"), and as further modified to reflect agreed-upon discounts provided by GCG to the Company.[1] The Engagement Agreement is attached to the Section 156(c) Application as **Exhibit A**.

2.      GCG is one of the country's leading chapter 11 administrators with expertise in noticing, claims processing, balloting administration, and distribution.  GCG is well-qualified to provide experienced claims and noticing services in connection with these Chapter 11 Cases. GCG is or was retained as the claims and noticing agent in a number of large chapter 11 cases in the District of Delaware including, but not limited to, the following:  In re UCI International, LLC, et al., No Case No. 16-11354 (MFW) (Bankr. D. Del. June 6, 2016); In re American Apparel, Inc., et al., No. 15-12055 (BLS) (Bankr. D. Del. October 6, 2015); In re Samson Resources Corporation, et al., No. 15-11934 (CSS) ( Bankr. D. Del. Sept. 18, 2015); In re Quicksilver Res. Inc., No. 15-10585 (LSS) (Bankr. D. Del. March 17, 2015); In re ProNerve Holdings, LLC, No.- 10373 (KJC) (Bankr. D. Del., Feb. 24, 2015; In re AmCad Holdings, LLC, No. 14-12168 (MFW) (Bankr. D. Del. Sept. 19, 2014); In re ZCO Liquidating Corp. (f/k/a OCZ Tech. Grp., Inc.), No. 13-13126 (PJW) (Bankr. D. Del. Dec. 2, 2013); In re Savient Pharm., Inc., No. 13- 12680 (MFW) (Bankr. D. Del. Oct. 14, 2013).[2]

---

[1]  GCG has agreed to provide the modified pricing schedule, reflecting further agreed-upon discounts to be provided by GCG to the Debtors, to the Office of the United States Trustee (the "U.S. Trustee"), counsel for any official committee appointed in these Chapter 11 Cases, and any other party in interest upon  request.

[2]  Because of the voluminous nature of the cases referenced herein, orders granting GCG's retention are not attached to the Section 156(c) Application.  Copies of such orders, however, are available on request.

3.      The Debtors selected GCG to serve as the Claims and Noticing Agent as set forth in more detail in the Section 156(c) Application.  To the best of my knowledge, neither GCG nor any of its professional personnel have any relationship with the Debtors that would impair GCG's ability to serve as Claims and Noticing Agent.

4.      GCG may have (or may have had) relationships with some of the Debtors' creditors and may provide (or may have provided) professional services to entities or persons that may be creditors or parties in interest in these Chapter 11 Cases.  These relationships and the services provided are, however, in matters completely unrelated to these Chapter 11 Cases and relate to GCG's role as a class action settlement claims administrator[1] or bankruptcy administrator.

5.      GCG has working relationships with certain of the professionals retained by the Debtors and other parties herein but such relationships are completely unrelated to these Chapter 11 Cases.  GCG has represented, and will continue to represent, clients in matters unrelated to these Chapter 11 Cases, and has had, and will continue to have, relationships in the ordinary course of its business with certain vendors and professionals in connection with matters unrelated to these Chapter 11 Cases.

6.      In addition, GCG personnel may have relationships with some of the Debtors' creditors; however, such relationships are of a personal, financial nature and completely unrelated to these Chapter 11 Cases.

7.      Since 1999, GCG has been a wholly owned subsidiary of Crawford & Company.  Ernst & Young LLP, the Debtors' proposed financial advisor, serves as Crawford's auditor in matters completely unrelated to these Chapter 11 Cases.  I am otherwise advised that Crawford

---

[1] GCG's assistance in the cases where GCG acts as a class action settlement claims administrator has been primarily related to the design and dissemination of legal notice and other administrative functions in class actions.

& Company has no material relationship with the Debtors, and while it may have rendered services to certain creditors, received services from certain creditors, or have a vendor relationship with some creditors, such relationships were (or are) in no way connected to GCG's retention by the Debtors in these Chapter 11 Cases.

8.      GCG is a "disinterested person" as that term is defined in Bankruptcy Code section 101(14), in that GCG and its professional personnel:

       (a)      are not creditors, equity security holders, or insiders of the Debtors;

       (b)      are not, and were not, within two years before the date of the filing of these Chapter 11 Cases, directors, officers, or employees of the Debtors; and

       (c)      do not have an interest materially adverse to the interests of the Debtors' estates or any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors.

9.      GCG has not been retained to assist any entity or person other than the Debtors on matters relating to, or in connection with, these Chapter 11 Cases.  If GCG's proposed retention is approved by this Court, GCG will not accept any engagement or perform any service for any entity or person other than the Debtors in these Chapter 11 Cases; provided, however, that contemporaneous with the filing of the Section 156(c) Application or shortly thereafter, the Debtors intend to file a separate application to retain GCG pursuant to Bankruptcy Code section 327 to provide additional services outside the scope of 28 U.S.C. §156(c).

10.      GCG represents, among other things, that:

       (a)      it will not consider itself employed by the United States government and shall not seek any compensation from the United States government in its capacity as Claims and Noticing Agent;

(b)    by accepting employment in these Chapter 11 Cases, GCG waives any right to receive compensation from the United States government;

(c)    in its capacity as Claims and Noticing Agent, GCG will not be an agent of the United States and will not act on behalf of the United States; and

(d)    GCG will not employ any past or present employees of the Debtors in connection with its work as Claims and Noticing Agent.

11.    Subject to Court approval, the Debtors have agreed to compensate GCG for professional services rendered pursuant to 28 U.S.C. §156(c) in connection with these Chapter 11 Cases according to the terms and conditions of the Engagement Agreement.  Payments are to be based upon the submission of a billing statement by GCG to the Debtors after the end of each calendar month, which includes a detailed listing of services and expenses.  GCG has received a $25,000 retainer from the Debtors and will apply same first against all prepetition fees and expenses and then hold the balance of the retainer as security of payment of GCG's final invoice for services rendered and expenses incurred in performing the Claims and Noticing Services.

12.    GCG will comply with all requests of the Clerk of the Court and the guidelines promulgated by the Judicial Conference of the United States for the implementation of 28 U.S.C. § 156(c).

*[remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed on this 15th day of December, 2016

<div style="margin-left:50%">

_____/s/*Craig E. Johnson*_____
Craig E. Johnson
Assistant Vice President, Operations
Garden City Group, LLC

</div>

## **Exhibit C**

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| OPTIMA SPECIALTY STEEL, INC., *et al.*,[1] | Case No. 16-12789 (_____) |
| Debtors. | (Joint Administration Requested) |
| | **Ref. Docket No. ____** |

**ORDER AUTHORIZING RETENTION AND APPOINTMENT OF GARDEN CITY GROUP, LLC AS CLAIMS AND NOTICING AGENT UNDER 28 U.S.C. § 156(c), 11 U.S.C. § 105(a) AND LOCAL RULE 2002-1(f)**

Upon the application (the "**Application**")[1] of the above-captioned debtors and debtors-in-possession (the "**Debtors**"), for an order authorizing the retention and appointment of Garden City Group, LLC, ("**GCG**"), as the Claims and Noticing Agent, under 28 U.S.C. §156(c), Section 105(a) of the Bankruptcy Code and Local Rule 2002-1(f) and to, among other things, (i) distribute required notices to parties in interest, (ii) receive, maintain, docket and otherwise administer the proofs of claim filed in the Debtors' cases, and (iii) provide such other administrative services – as required by the Debtors – that would fall within the purview of services to be provided by the Clerk's Office; and upon the affidavit of Craig E. Johnson submitted in support of the Application; and the Debtors having estimated that there are in excess of several thousand creditors in these cases, many of which are expected to file proofs of claim, and it appearing that the receiving, docketing and maintaining of proofs of claim would be unduly time consuming and burdensome for the Clerk; and the Court being authorized under 28

---

[1]  The Debtors in these Chapter 11 Cases, along with the business addresses and the last four (4) digits of each Debtor's federal tax identification number, if applicable, are:  Optima Specialty Steel, Inc., 200 S. Biscayne Blvd., Suite 5500, Miami, FL 33131-2310 (0641); Michigan Seamless Tube LLC, 400 McMunn Street, South Lyon, MI 48178 (3850); Niagara LaSalle Corporation, 1412 150th Street, Hammond, IN 46327 (0059); KES Acquisition Company d/b/a Kentucky Electric Steel, 2704 South Big Run Road, Ashland, KY 41102 (2858); and The Corey Steel Company, 2800 South 61st Court, Cicero, IL 60804 (0255).

U.S.C. §156(c) to utilize, at the Debtors' expense, outside agents and facilities to provide notices to parties in chapter 11 cases and to receive, docket, maintain, photocopy and transmit proofs of claim; and the Court being satisfied that GCG has the capability and experience to provide such services and that GCG does not hold an interest adverse to the Debtors or the estates respecting the matters upon which it is to be engaged; and good and sufficient notice of the Application having been given; and no other or further notice being required; and it appearing that the employment of the GCG is in the best interests of the Debtors, the estates and creditors; and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED THAT:**

1.      For the reasons set forth on the record, the Application is GRANTED as set forth herein.

2.      Notwithstanding the terms of the Engagement Agreement attached to the Application, the Application is approved solely as set forth in this Order.

3.      The Debtors are authorized to retain GCG effective as of the Petition Date under the terms of the Engagement Agreement to the extent set forth herein, and GCG is authorized and directed to perform noticing services and to receive, maintain, record and otherwise administer the proofs of claim filed in these cases, and all related tasks, all as described in the Application (the "**Claims and Noticing Services**").

4.      GCG shall serve as the custodian of court records and shall be designated as the authorized repository for all proofs of claim filed in these cases and is authorized and directed to maintain official claims registers for each of the Debtors and to provide the Clerk with a certified duplicate thereof upon the request of the Clerk.

5.      GCG is authorized and directed to obtain a post office box or address for the

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Application.

receipt of proofs of claim.

6.      GCG is authorized to take such other action to comply with all duties set forth in the Application.

7.      The Debtors are authorized to compensate GCG in accordance with the terms of the Engagement Agreement upon the receipt of reasonably detailed invoices setting forth the services provided by GCG and the rates charged for each, and to reimburse GCG for all reasonable and necessary expenses it may incur, upon the presentation of appropriate documentation, without the need for GCG to file fee applications or otherwise seek Court approval for the compensation of its services and reimbursement of its expenses; provided, however, that the United States Trustee for the District of Delaware, the ad hoc group of a majority of the unaffiliated holders of the Secured Notes, and any official committee appointed in the Chapter 11 Cases (together, the "**Notice Parties**") shall be provided copies of GCG's invoices and shall have a period of ten (10) days to object to the amount of such invoice prior to the Debtors' payment of such amounts or such shorter time as agreed by the Notice Parties.

8.      GCG shall maintain records of all services showing dates, categories of services, fees charged and expenses incurred.

9.      The parties shall meet and confer in an attempt to resolve any dispute, which may arise relating to the Engagement Agreement or monthly invoices, and that the parties may seek resolution of the matter from the Court if resolution is not achieved.

10.     Pursuant to section 503(b)(1)(A) of the Bankruptcy Code, the fees and expenses of GCG under this Order shall be an administrative expense of the Debtors' estates.

11.     GCG may apply its retainer to all pre-petition invoices, which retainer shall be replenished to the original retainer amount, and thereafter, the GCG may hold its retainer under the Engagement Agreement during these Chapter 11 Cases as security for the payment of fees

and expenses incurred under the Engagement Agreement.

12.     The Debtors shall indemnify GCG under the terms of the Engagement Agreement, as modified by paragraphs 13, 14, and 15 herein.

13.     GCG shall not be entitled to indemnification, contribution or reimbursement pursuant to the Engagement Agreement for services other than the services provided under the Engagement Agreement, unless such services and the indemnification, contribution or reimbursement therefore are approved by the Court.

14.     Notwithstanding anything to the contrary in the Engagement Agreement, the Debtors shall have no obligation to indemnify GCG, or provide contribution or reimbursement to the GCG, for any claim or expense that is either: (i) judicially determined (the determination having become final) to have arisen from the GCG's gross negligence, willful misconduct, or fraud; (ii) for a contractual dispute in which the Debtors allege the breach of the GCG's contractual obligations if the Court determines that indemnification, contribution or reimbursement would not be permissible pursuant to *In re United Artists Theatre Co., et al.*, 315 F.3d 217 (3d Cir. 2003), or (iii) settled prior to a judicial determination under (i) or (ii), but determined by this Court, after notice and a hearing, to be a claim or expense for which GCG should not receive indemnity, contribution or reimbursement under the terms of the Engagement Agreement as modified by this Order.

15.     If, before the earlier of (i) the entry of an order confirming a chapter 11 plan in these cases (that order having become a final order no longer subject to appeal), or (ii) the entry of an order closing these Chapter 11 Cases, the GCG believes that it is entitled to the payment of any amounts by the Debtors on account of the Debtors' indemnification, contribution and/or reimbursement obligations under the Engagement Agreement (as modified by this Order), including without limitation the advancement of defense costs, GCG must file an application

5

therefore in this Court, and the Debtors may not pay any such amounts to GCG before the entry of an order by this Court approving the payment. This paragraph is intended only to specify the period of time under which the Court shall have jurisdiction over any request for fees and expenses by the GCG for indemnification, contribution or reimbursement, and not a provision limiting the duration of the Debtors' obligation to indemnify GCG. All parties in interest shall retain the right to object to any demand by GCG for indemnification, contribution or reimbursement.

16.     In the event the GCG is unable to provide the services set out in this order, GCG will immediately notify the Clerk and Debtors' attorney and cause to have all original proofs of claim and computer information turned over to another claims and noticing agent with the advice and consent of the Clerk and counsel to the Debtors.

17.     GCG shall comply with all relevant statutory provisions and rules of procedure, including the Local Rules, general orders and applicable guidelines.

18.     Counsel to the Debtors shall notify both GCG and the Clerk's Office within seven (7) days of an order of dismissal or conversion of these Chapter 11 Cases.

19.     At the end of any of these Chapter 11 Cases or upon the termination of GCG's services, the Debtors must obtain a termination order to terminate the services provided.

20.     Any limitation of liability provisions in the Engagement Agreement are hereby deemed null and void.

21.     The Debtors may submit a separate retention application, pursuant to 11 U.S.C. § 327 and/or any applicable law, for work that is to be performed by the GCG but is not specifically authorized by this Order.

22.     The Debtors and GCG are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Application.

23.     Notwithstanding any term in the Engagement Agreement to the contrary, the Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

24.     GCG shall not cease providing claims processing services during the case(s) for any reason, including nonpayment, without an order of the Court.

25.     Notwithstanding anything to the contrary contained herein, any payment made (or to be made) and any authorization contained in this Order shall be subject to the terms, conditions, limitations, and requirements of any debtor-in-possession financing order or any other order regarding the Debtors' use of cash collateral entered in the Chapter 11 Cases (together with any approved budgets in connection therewith).

26.     In the event of any inconsistency between the Engagement Agreement, the Application and this Order, this Order shall govern.

Dated: _____, 2016    _____

                                    HONORABLE _____
                                    UNITED STATES BANKRUPTCY JUDGE