**THIS DISCLOSURE STATEMENT HAS
NOT YET BEEN APPROVED BY THE COURT**

**This proposed Disclosure Statement is not a solicitation of acceptance or rejection of the Plan of Reorganization. The proposed Plan does not require solicitation of acceptances, and this proposed Disclosure Statement is submitted as a matter of postpetition disclosure under Bankruptcy Code section 1125. This proposed Disclosure Statement is being submitted for approval only, and has not yet been approved by the Bankruptcy Court.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| OPTIMA SPECIALTY STEEL, INC., *et al.*, | Case No. 16-12789 (KJC) |
| Debtors.[1] | Jointly Administered |

## DISCLOSURE STATEMENT RELATING TO THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF OPTIMA SPECIALTY STEEL, INC. AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION

Paul J. Keenan Jr.
Greenberg Traurig, P.A.
333 S.E. 2nd Avenue
Suite 4400
Miami, FL 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717
keenanp@gtlaw.com

Dennis A. Meloro
(DE Bar No. 4435)
Greenberg Traurig, LLP
The Nemours Building
1007 North Orange Street Suite 1200
Wilmington, DE 19801
Telephone: (302) 661-7000
Facsimile: (302) 661-7360
melorod@gtlaw.com

Counsel for Debtors and Debtors-in-Possession

Dated: Wilmington, Delaware
         May 24, 2017

---

[1]   The Debtors in these Chapter 11 Cases, along with the business addresses and the last four (4) digits of each Debtor's federal tax identification number, if applicable, are: Optima Specialty Steel, Inc., 200 S. Biscayne Blvd., Suite 5500, Miami, FL 33131-2310 (0641); Michigan Seamless Tube LLC, 400 McMunn Street, South Lyon, MI 48178 (3850); Niagara LaSalle Corporation, 1412 150th Street, Hammond, IN 46327 (0059); KES Acquisition Company d/b/a Kentucky Electric Steel, 2704 South Big Run Road, Ashland, KY 41102 (2858); and The Corey Steel Company, 2800 South 61st Court, Cicero, IL 60804 (0255).

UNLESS OTHERWISE DEFINED IN THIS DISCLOSURE STATEMENT, CAPITALIZED TERMS USED HEREIN HAVE THE MEANINGS ASCRIBED TO THEM IN THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF OPTIMA SPECIALTY STEEL, INC. TO THE EXTENT OF ANY INCONSISTENCY BETWEEN THE PROVISIONS OF THIS DISCLOSURE STATEMENT AND THE PLAN, THE PROVISIONS CONTAINED IN THE PLAN WILL CONTROL.

THE DEBTORS ARE FURNISHING THIS DISCLOSURE STATEMENT TO EACH HOLDER OF CLAIMS AGAINST THE DEBTORS AND INTERESTS IN THE DEBTORS AS A MATTER OF POSTPETITION DISCLOSURE PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE. THIS DISCLOSURE STATEMENT IS TO BE USED BY EACH SUCH HOLDER SOLELY IN CONNECTION WITH ITS EVALUATION OF THE PLAN. USE OF THIS DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE IS NOT AUTHORIZED.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, EVENTS IN THE DEBTORS' CHAPTER 11 CASES, AND FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT THE PLAN AND RELATED DOCUMENTS AND STATUTORY PROVISION SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL PROJECTIONS AND OTHER FINANCIAL INFORMATION, IS WITHOUT ANY INACCURACY OR OMISSION.

IN EVALUATING THE POSTPETITION DISCLOSURES CONTAINED HEREIN, HOLDERS OF CLAIMS AGAINST THE DEBTORS AND HOLDERS OF INTERESTS AGAINST THE DEBTORS MUST RELY ON THEIR OWN EXAMINATION OF THE DEBTORS AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY. SEE ARTICLE VII – "CERTAIN FACTORS TO BE CONSIDERED" FOR A DISCUSSION OF VARIOUS FACTORS THAT SHOULD BE CONSIDERED IN CONNECTION WITH THE PLAN.

NOTWITHSTANDING THAT THE DEBTORS ARE NOT SOLICITING ACCEPTANCES FOR THE PLAN, THE PROJECTED FINANCIAL INFORMATION REGARDING THE REORGANIZED DEBTORS AND CERTAIN OTHER FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT FOR PURPOSES OF POSTPETITION DISCLOSURE PURSUANT TO SECTION 1125 OF THE

BANKRUPTCY CODE.  SUCH STATEMENTS ARE PROVIDED PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND, TO THE EXTENT APPLICABLE, SECTION 1125(e) OF THE BANKRUPTCY CODE, AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN, ALL OF WHICH ARE BASED ON VARIOUS ESTIMATES AND ASSUMPTIONS.  SUCH INFORMATION AND STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE RISKS, INCLUDING, AMONG OTHERS, THOSE SUMMARIZED HEREIN.  SEE ARTICLE VII – "CERTAIN FACTORS TO BE CONSIDERED."

NO PERSON HAS BEEN AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THIS DISCLOSURE STATEMENT OR THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS.  THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY SECURITIES, OR AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES IN ANY JURISDICTION IN WHICH, OR TO ANY PERSON TO WHOM, IT IS UNLAWFUL TO MAKE SUCH OFFER OR SOLICITATION.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE EXPRESSLY SET FORTH HEREIN, AND NEITHER THE DELIVERY OF THIS DISCLOSURE STATEMENT NOR THE DISTRIBUTION OF ANY SECURITIES PURSUANT TO THE PLAN WILL CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF.  ANY ESTIMATES OF CLAIMS OR EQUITY INTERESTS SET FORTH IN THIS DISCLOSURE STATEMENT MAY VARY FROM THE AMOUNTS OF CLAIMS OR EQUITY INTERESTS ULTIMATELY ALLOWED BY THE BANKRUPTCY COURT.

THE SUMMARIES OF THE PLAN AND OTHER DOCUMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN ITSELF, THE EXHIBITS ATTACHED THERETO AND ALL DOCUMENTS DESCRIBED THEREIN.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE SUMMARIES PROVIDED HEREIN AND THE TERMS OF THE PLAN OR SUCH RELATED DOCUMENTS, THE TERMS OF THE PLAN OR SUCH RELATED DOCUMENTS SHALL GOVERN.  THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING, BUT NOT LIMITED TO, THE INFORMATION REGARDING THE HISTORY, BUSINESSES, AND OPERATIONS OF THE DEBTORS, THE HISTORICAL AND PROJECTED FINANCIAL INFORMATION OF THE DEBTORS AND THE LIQUIDATION ANALYSIS RELATING TO THE DEBTORS ARE INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN.  AS TO ANY JUDICIAL PROCEEDINGS IN ANY COURT, INCLUDING ANY ADVERSARY PROCEEDINGS OR CONTESTED MATTERS THAT MAY BE FILED IN THE

BANKRUPTCY COURT, SUCH INFORMATION IS NOT TO BE CONSTRUED AS AN ADMISSION OR STIPULATION BUT RATHER AS STATEMENTS MADE IN SETTLEMENT NEGOTIATIONS AND SHALL BE INADMISSIBLE FOR ANY PURPOSE ABSENT THE EXPRESS WRITTEN CONSENT OF THE DEBTORS.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS HEREIN.

THE CONFIRMATION HEARING WILL COMMENCE ON **JUNE 29, 2017 AT 1:30 P.M.** (EASTERN), BEFORE THE HONORABLE KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 NORTH MARKET STREET, WILMINGTON, DELAWARE 19801. THE DEBTORS MAY CONTINUE THE CONFIRMATION HEARING FROM TIME TO TIME WITHOUT FURTHER NOTICE OTHER THAN AN ADJOURNMENT ANNOUNCED IN OPEN COURT OR A NOTICE OF ADJOURNMENT FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE MASTER SERVICE LIST AND THE ENTITIES WHO HAVE FILED AN OBJECTION TO THE PLAN. THE BANKRUPTCY COURT, IN ITS DISCRETION AND BEFORE THE CONFIRMATION HEARING, MAY PUT IN PLACE ADDITIONAL PROCEDURES GOVERNING THE CONFIRMATION HEARING. THE PLAN MAY BE MODIFIED, IF NECESSARY, BEFORE, DURING, OR AS A RESULT OF THE CONFIRMATION HEARING, WITHOUT FURTHER NOTICE TO PARTIES IN INTEREST.

THE PLAN OBJECTION DEADLINE IS **JUNE 22, 2017 AT 4:00 P.M.** (EASTERN). ALL PLAN OBJECTIONS MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE DEBTORS AND CERTAIN OTHER PARTIES IN INTEREST IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER SO THAT THEY ARE <u>ACTUALLY RECEIVED</u> BY THE DEBTORS AND SUCH PARTIES ON OR BEFORE THE PLAN OBJECTION DEADLINE.

THE PLAN, THIS DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT AND EXHIBITS, ONCE FILED, AND OTHER DOCUMENTS AND MATERIALS RELATED THERETO MAY BE OBTAINED BY: (A) ACCESSING THE DEBTORS' RESTRUCTURING WEBSITE AT HTTP://CASES.GARDENCITYGROUP.COM/OMA, (B) EMAILING OMAINFO@GARDENCITYGROUP.COM, (C) CALLING THE DEBTORS' RESTRUCTURING HOTLINE AT (866) 550-5957, OR (D) ACCESSING THE COURT'S WEBSITE AT HTTP://WWW.DEB.USCOURTS.GOV. COPIES OF SUCH DOCUMENTS AND MATERIALS MAY ALSO BE EXAMINED BETWEEN THE HOURS OF 8:00 AM AND 4:00 PM, MONDAY THROUGH FRIDAY, EXCLUDING FEDERAL HOLIDAYS, AT THE OFFICE OF THE CLERK OF THE COURT, 824 NORTH MARKET STREET, 3RD FLOOR, WILMINGTON, DELAWARE 19801.

**INTERNAL REVENUE SERVICE CIRCULAR 230 NOTICE:** TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, HOLDERS OF CLAIMS AND INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED,

BY HOLDERS OF CLAIMS OR INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................1

II.   SUMMARY OF CLASSIFICATION, TREATMENT AND VOTING STATUS OF CLAIMS AND INTERESTS UNDER PLAN ..................................2

III.  BACKGROUND TO THE CHAPTER 11 CASES........................................2

    A.    The Debtors' Business ........................................................2
    B.    The Debtors' Corporate Structure and History .............................3

        1.    Niagara ........................................................3
        2.    KES ..........................................................4
        3.    Corey ........................................................4

    C.    Prepetition Indebtedness ......................................................4

        1.    Secured Claims ..............................................4
        2.    Unsecured Noteholder Claims ................................5
        3.    Unsecured Claims and Equity .................................5
        4.    Retired ABL Facility .........................................6

    D.    Appointment of the Special Committee .....................................6
    E.    Key Events Leading to the Chapter 11 Cases ...............................6

        1.    Macroeconomic and Industry Challenges......................6
        2.    Maturing Notes ..............................................7

IV.  EVENTS DURING THE CHAPTER 11 CASES .........................................7

    A.    First Day Motions and Certain Related Relief................................7

        1.    Cash Collateral Motion [Docket No. 17].......................8
        2.    Cash Management Motion [Docket No. 7].......................8
        3.    Critical Vendor Motion [Docket No. 14].......................8
        4.    Wage and Benefits Motion [Docket No. 6] .....................8
        5.    Customer Program Motion [Docket No. 13] .....................8
        6.    Insurance Motion [Docket No. 8] .............................9
        7.    Taxes Motion [Docket No. 9].................................9
        8.    Utilities Motion [Docket No. 10].............................9
        9.    Shippers' Motion [Docket No. 11] ...........................9
        10.   Reclamation Procedures Motion [Docket No. 12]................9
        11.   Applications for Retention of Debtors' Professionals ..............9
        12.   Administrative Motions:  Motion for Joint Administration [Docket No. 3], Motion to File Consolidated List of Creditors [Docket No. 5], and Application to Retain Claims and Noticing Agent [Docket No. 15] ...........................................10

    B.    Creditors' Committee............................................10
    C.    DIP Financing ...................................................10
    D.    Filing of the Schedules and Establishment of the Claims Bar Date ....11

| | | |
|---|---|---|
| E. | Non-Core Asset Sale | 12 |
| F. | Exclusive Period for Filing a Plan and Soliciting Votes | 12 |
| G. | Motion to Approve Plan Support Agreement | 13 |
| H. | Payment of Good Faith Deposits by OA | 13 |

V. THE PLAN ............................................................................................... 13

| | | |
|---|---|---|
| A. | Administrative Expenses and Priority Claims | 13 |
| | 1. Administrative Claims | 13 |
| | 2. DIP Claims | 14 |
| | 3. Professional Claims | 15 |
| | 4. Priority Tax Claims | 15 |
| B. | Classification, Treatment, and Voting of Claims and Interests | 16 |
| | 1. Classification of Claims and Interests | 16 |
| C. | Provisions for Treatment of Claims and Interests | 17 |
| | 1. Class 1 – Other Priority Claims | 17 |
| | 2. Class 2 – Other Secured Claims | 17 |
| | 3. Class 3-A – Unsecured Notes Claims | 18 |
| | 4. Class 3-B – General Unsecured Claims | 19 |
| | 5. Class 4 – Intercompany Claims | 20 |
| | 6. Class 5 – Intercompany Interests | 20 |
| | 7. Class 6 – Existing Optima Equity Interests | 20 |
| D. | Acceptance | 21 |
| | 1. No Classes Entitled to Vote | 21 |
| | 2. Elimination of Classes | 21 |
| | 3. Cramdown | 21 |
| E. | Means for Implementation of The Plan | 21 |
| | 1. Substantive Consolidation | 21 |
| | 2. General Settlement of Claims and Interests | 21 |
| | 3. Plan Funding | 21 |
| | 4. Existing Optima Common Stock Unimpaired | 22 |
| | 5. Exemptions from Securities Act Registration Requirements | 23 |
| | 6. Cancellation of Old Optima Securities and Agreements | 23 |
| | 7. Issuance of New Securities; Execution of Plan Documents | 24 |
| | 8. Continued Corporate Existence | 24 |
| | 9. Restructuring Transactions | 24 |
| | 10. Directors and Officers of the Reorganized Debtors | 25 |
| | 11. Corporate Action | 25 |
| | 12. Effectuating Documents; Further Transactions | 26 |
| | 13. Employment, Retirement, and Other Agreements and Employee Compensation Plans | 26 |
| | 14. Preservation of Causes of Action | 27 |
| | 15. Reservation of Rights | **Error! Bookmark not defined.** |
| | 16. Exemption from Certain Transfer Taxes and Recording Fees | 28 |

17.    Insured Claims ................................................................28

F.    Unexpired Leases and Executory Contracts ................................28

    1.    Rejection of Executory Contracts and Unexpired Leases.........................28
    2.    Assumption of Executory Contracts and Unexpired Leases....................29
    3.    Insurance Policies ................................................................32
    4.    Contracts and Leases Entered into After the Petition Date....................33
    5.    General Reservation of Rights ...............................................33

G.    Procedures for Resolving Disputed Claims and Interests.....................33

    1.    Determination of Claims and Interests ...................................33
    2.    Claims Administration Responsibility....................................34
    3.    Objections to Claims................................................................34
    4.    Disallowance of Claims .........................................................35
    5.    Estimation of Claims..............................................................35
    6.    No Interest on Disputed Claims .............................................36
    7.    Amendments to Claims...........................................................36

H.    Provisions Governing Distributions.............................................36

    1.    Time of Distributions ..............................................................36
    2.    Currency....................................................................................36
    3.    Distribution Agent ..................................................................36
    4.    Distribution on Account of Claims Administered by Servicers;
          Delivery of Distributions to Servicers .........................................37
    5.    Distributions on Account of Claims Allowed After the Effective
          Date ................................................................................37
    6.    Delivery of Distributions .........................................................38
    7.    Surrender of Securities or Instruments ...................................39
    8.    Compliance Matters ................................................................40
    9.    Claims Paid or Payable by Third Parties ................................40
    10.    Setoffs....................................................................................41
    11.    Recoupment ............................................................................41
    12.    Allocation of Plan Distributions Between Principal and Interest ............41

I.    Effect of the Plan on Claims and Interests.............................................41

    1.    Vesting of Assets ....................................................................42
    2.    Discharge of the Debtors ........................................................42
    3.    Compromises and Settlements ...............................................42
    4.    Release by Debtors ................................................................43
    5.    Release by Holders of Claims and Interests ...........................43
    6.    General Release of Plan Sponsor by Debtors, the Debtors' Estates
          and Reorganized Debtors.......................................................44
    7.    Exculpation and Limitation of Liability ................................45
    8.    Indemnification Obligations ...................................................45
    9.    Injunction ................................................................................45
    10.    Subordination Rights ..............................................................46
    11.    Protection Against Discriminatory Treatment ..........................46

|  |  | 12. | Release of Liens | 47 |
|  |  | 13. | Reimbursement or Contribution | 47 |
|  | J. | | Conditions Precedent | 47 |
|  |  | 1. | Conditions to the Effective Date of the Plan | 47 |
|  |  | 2. | Waiver of Conditions Precedent | 48 |
|  |  | 3. | Notice of Effective Date | 48 |
|  |  | 4. | Effect of Non-Occurrence of Conditions to Consummation | 48 |
|  | K. | | Retention of Jurisdiction | 48 |
|  | L. | | Miscellaneous Provisions | 50 |
|  |  | 1. | Binding Effect | 50 |
|  |  | 2. | Payment of Statutory Fees | 50 |
|  |  | 3. | Payment of Certain Additional Professional Fees | 51 |
|  |  | 4. | Payment of Fees and Expenses of the Unsecured Notes Indenture Trustee | 51 |
|  |  | 5. | Modification and Amendments | 52 |
|  |  | 6. | Confirmation of the Plan | 52 |
|  |  | 7. | Additional Documents | 52 |
|  |  | 8. | Dissolution of Creditors' Committee | 52 |
|  |  | 9. | Revocation, Withdrawal, or Non-Consummation | 53 |
|  |  | 10. | Notices | 53 |
|  |  | 11. | Term of Injunctions or Stays | 54 |
|  |  | 12. | Governing Law | 54 |
|  |  | 13. | Entire Agreement | 54 |
|  |  | 14. | Severability | 55 |
|  |  | 15. | No Waiver or Estoppel | 55 |
|  |  | 16. | Conflicts | 55 |
|  |  | 17. | Waiver of Limitations on Releases of Unknown Claims | 55 |
| VI. | | | EXEMPTION FROM SECURITIES LAWS | 56 |
| VII. | | | FINANCIAL INFORMATION, PROJECTIONS AND REORGANIZATION VALUE | 56 |
|  | A. | | Historical Financial Information | 56 |
|  | B. | | Projected Financial Information | 57 |
|  | C. | | Reorganization Value | 58 |
| VIII. | | | CERTAIN FACTORS TO BE CONSIDERED | 59 |
|  | A. | | General | 59 |
|  | B. | | Industry-Specific Risk Factors | 59 |
|  | C. | | Certain Bankruptcy Considerations | 64 |
|  | D. | | Bankruptcy-Specific Risk Factors That Could Negatively Impact the Debtors' Business | 64 |
|  | E. | | Classification and Treatment of Claims and Interests | 65 |
|  | F. | | Conditions Precedent to Consummation of the Plan | 66 |
|  | G. | | Funding Necessary for the Consummation of the Plan | 66 |
|  | H. | | Liquidation under Chapter 7 | 66 |

I.      Certain Tax Consequences of the Plan ......................................................67

IX.     CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .................67

A.      U.S. Federal Income Tax Consequences to the Debtors.........................68

    1.      Taxation of the Reorganized Debtors in General .......................68
    2.      Net Operating Losses and other Losses; Section 382 ...............69
    3.      Cancellation of Debt Income .....................................................69

B.      U.S. Federal Income Tax Consequences to U.S. Holders of Claims and
    Interests ...................................................................................................71

    1.      In General...................................................................................71
    2.      Satisfaction of Claims or Interests ............................................71
    3.      Accrued but Unpaid Interest ......................................................76
    4.      Market Discount.........................................................................76

C.      U.S. Federal Income Tax Consequences to Non-U.S. Holders of Claims
    and Interests ............................................................................................77

    1.      Gain Recognition upon Consummation of the Plan ..................77
    2.      Payments Attributable to Interest...............................................78
    3.      Sale, Redemption, or Repurchase of Existing Optima Common
        Stock ..........................................................................................79
    4.      FATCA .......................................................................................79

D.      Information Reporting and Backup Withholding ...................................80
E.      Importance of Obtaining Your Own Professional Tax Assistance........81

X.      CONFIRMATION OF THE PLAN..................................................................81

A.      Confirmation Hearing .............................................................................81
B.      Requirements for Confirmation of the Plan - Consensual Confirmation .............81

    1.      The Best Interest Test ................................................................82
    2.      Feasibility...................................................................................83

C.      Requirements for Confirmation of the Plan - Non-Consensual
    Confirmation ...........................................................................................83

    1.      The Plan is Fair and Equitable ..................................................84
    2.      No Unfair Discrimination ..........................................................84

XI.     ALTERNATIVES TO CONFIRMATION AND CONSUMMATION THE PLAN........85

A.      Alternative Plans.....................................................................................85
B.      Liquidation under Chapter 7 or Chapter 11 ...........................................85

XII.    THE SOLICITATION AND VOTING PROCEDURES .......................................86

XIII.   RECOMMENDATION AND CONCLUSION.....................................................86

## TABLE OF EXHIBITS

Exhibit A        Plan

Exhibit B        Financial Statements

Exhibit C        Financial Projections

Exhibit D        Liquidation Analysis

## I.      INTRODUCTION

The Debtors commenced these Chapter 11 Cases on December 15, 2016.  The Debtors continue to operate their business and manage their properties pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors' proposal for the restructuring of the Claims against the Debtors and the Interests in the Debtors is as set forth in the Plan, a copy of which is attached as **Exhibit A** hereto.

The Plan provides for a comprehensive reorganization of the Debtors that will (i) leave all creditors unimpaired, paying fixed, undisputed and liquidated claims in full in cash and reinstating contingent, disputed or unliquidated claims, (ii) leave unimpaired and reinstated the equity interests in Debtor Optima, which is the parent of the subsidiary Debtors, (iii) allow the Debtors to emerge from chapter 11 much sooner than anticipated, and (iv) substantially deleverage the capital structure of the Debtors so that the reorganized Debtors are financially strong and can thrive in the marketplace and fulfill their ongoing business relationships with all of their constituencies, including vendors, suppliers, employees, and pensioners.

Specifically, Optima Acquisitions LLC, a Delaware limited liability company ("**OA**" or the "**Plan Sponsor**"), which is the sole 100% common stock shareholder of Debtor Optima and is the Plan Sponsor, will fund the Plan with the Plan Sponsor Contribution, a $200 million cash equity contribution to Reorganized Optima as a contribution in respect of the Plan Sponsor's outstanding and Unimpaired Existing Optima Common Stock.  Under the Plan, the Debtors will raise an additional approximately $105 million exit financing term loan and an exit financing revolver of approximately $35 million, commitments for which will be obtained from one or more third parties.  The $200 million Plan Sponsor Contribution and the approximately $140 million of exit financing will fund the implementation of the Plan's provisions providing for unimpaired treatment to all creditors and leave OA (as sole shareholder) unimpaired.  In return for the $200 million Plan Sponsor Contribution, OA will retain its existing 100% equity interest in Optima.

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Debtors' proposed Plan, as attached hereto.  Certain provisions of the Plan, and thus the description and summaries contained herein, may be subject to change.  Accordingly, the Debtors reserve the right to modify the Plan consistent with Bankruptcy Code section 1127, Bankruptcy Rule 3019, and Article 13.5 of the Plan.

The Debtors are furnishing this Disclosure Statement as a matter of postpetition disclosure pursuant to section 1125 of the Bankruptcy Code.  The Plan proposes to substantially deleverage the Debtors' balance sheet in a manner that pays all creditors in full, maximizes the value of the Debtors' business as a going concern, preserves the jobs of employees, honors the claims of its pensioners, and maintains the Debtors' relationships with its vendors, suppliers and other constituencies.  The Debtors believe that any alternative to confirmation of the Plan, such as liquidation or attempts by another party in interest to propose or file a plan, could result in significant delays, litigation and costs, and could risk job losses for employees and/or lesser recoveries for other constituencies.  For these reasons, the Debtors urge you to support confirmation of the Plan.

## II.    SUMMARY OF CLASSIFICATION, TREATMENT AND VOTING STATUS OF CLAIMS AND INTERESTS UNDER PLAN

The following table summarizes the classification and voting status of creditors and equity holders under the Plan who are Holders of Allowed Claims and Interests.

For a further explanation, please refer to the discussion in Article V.C-"Provisions for Treatment of Claims and Interests," and the Plan itself.

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 3-A | Unsecured Notes Claims | Unimpaired | No (deemed to accept) |
| 3-B | General Unsecured Claims | Unimpaired | No (deemed to accept) |
| 4 | Intercompany Claims | Unimpaired | No (deemed to accept) |
| 5 | Intercompany Interests | Unimpaired | No (deemed to accept) |
| 6 | Interests in Optima | Unimpaired | No (deemed to accept) |

## III.    BACKGROUND TO THE CHAPTER 11 CASES

### A.    The Debtors' Business

The Debtors are leading independent domestic manufacturers of specialty steel products. These steel products include (i) special bar quality and merchant bar quality hot rolled steel bars ("**HRSB**"), (ii) value-added precision-tolerance, cold drawn seamless tubes, and (iii) high quality engineered cold finished steel bars ("**CFSB**"). The Debtors' products are utilized across a diversified range of end markets, including transportation (e.g. automotive), energy (e.g. oil and gas shale extraction), agriculture, power generation, yellow goods/construction equipment, railroad car, industrial chain manufacturing, and trailer support beam flanges. The Debtors focus on niche applications within the broader steel supply chain and their products are sold at prices that reflect a spread over the cost of raw material that reflects the value added by their manufacturing processes. The Debtors' processing operations require substantial technical expertise and specialized equipment to manufacture high quality engineered steel products, which include pressure-carbon, pressure-alloy, mechanical-carbon and mechanical-alloy tubing and specialty cold finished steel bars.

All of the Debtors' manufacturing facilities are located in the United States, and each of the Debtors' operating units has operated in the steel industry for more than 50 years. Through their seven manufacturing and processing facilities in five different states, the Debtors' operating units have the capacity to roll approximately 250,000 tons of HRSB, produce over 50,000 tons of cold drawn seamless pressure and mechanical tube products, and process nearly 700,000 tons of CFSB.

2

The majority of the Debtors' sales involve products specified to meet specific and sometimes unique customer demands, which creates strong customer relationships and recurring revenues. The Debtors' products encompass (a) special bar quality and merchant bar quality HRSB produced by Debtor KES Acquisition Company d/b/a Kentucky Electric Steel ("**KES**"), (b) pressure-carbon, pressure-alloy, mechanical-carbon and mechanical-alloy tubing produced by Debtor Michigan Seamless Tube LLC ("**MST**"), and (c) quench and tempered bars, Custom Cut® bars and blanks, free machining bars, Stressproof® steel bars, Fatigue-Proof® steel bars, e.t.d.® 150® bars, and other CFSB products produced by Debtor Niagara LaSalle Corporation ("**Niagara**") and Debtor Corey Steel Company ("**Corey**"; together with KES, MST and Niagara, the "**Subsidiaries**").

These products are sold directly to original equipment manufacturers and to distributors, often referred to as metal service centers, which then resell the products in smaller quantities to end users. The Debtors have over one thousand customers in the United States in the transportation, energy, agriculture and power generation industries. The Debtors also sell limited quantities of product to customers in countries other than the United States. The Debtors collectively employ more than 900 people.

### B.    The Debtors' Corporate Structure and History

Optima was formed in 2008 to invest in the U.S. steel industry and shortly thereafter acquired MST. This acquisition was funded, in part, by a cash contribution of capital from OA in the amount of $80 million. Since that initial acquisition, Optima grew its steel operations through three (3) strategic acquisitions intended to enhance operations and take advantage of synergies and create efficiencies within the business. These three (3) strategic acquisitions, which are discussed in greater detail below, included Optima's purchase of Niagara in 2011, KES in 2013 and Corey in 2015. Optima wholly owns each of the Subsidiaries, and, for avoidance of doubt, Optima and the Subsidiaries comprise all the Debtors in these Chapter 11 Cases.

### 1.    Niagara

On December 5, 2011, Optima acquired Niagara for a total consideration of $236.1 million. In order to fund the acquisition, Optima obtained $168.0 million in proceeds from the issuance of the Secured Notes (as defined below) and received an additional cash contribution of capital from OA of $85 million. Niagara is the largest independent CFSB producer in North America and through various corporate iterations has been in business for over 100 years. Niagara operates facilities in Hammond, Indiana, South Holland, Illinois, Warren, Michigan and Midlothian, Texas.

The Niagara acquisition increased the Debtors' manufacturing scale and raw material consumption, particularly in purchases and consumption of SBQ steel, which is the main raw material for all Optima production processes. As a result of this increased scale, management expected to achieve cost synergies by negotiating more favorable terms with suppliers.

### 2.    KES

On February 5, 2013, Optima completed the acquisition of KES for total net consideration of $110.6 million.  To fund the KES acquisition, Optima issued $35 million of unsecured debt, received an additional cash contribution of capital from OA of $20 million, and drew $15 million on its revolving credit facility.  The remaining purchase price was funded with cash on hand.  KES is a value-added manufacturer of special bar quality and merchant bar quality HRSB, and operates a single 450,000 square foot facility in Ashland, Kentucky.  KES' operations date back over 50 years and it was (and continues to be) a supplier to Niagara.  The KES acquisition solidified Optima's position in the specialty steel industry, strengthened relationships with customers and suppliers, and was part of the Company's long-term strategy of building a leading specialty steel producer.

### 3.    Corey

Optima completed its acquisition of Corey on January 29, 2015 for a net purchase price of $43.5 million.  Optima issued $85 million of unsecured debt (as discussed below) to finance the Corey acquisition.  Proceeds from that debt issuance were also used to redeem the $35 million principal amount of unsecured notes issued in 2013 in connection with the acquisition of KES.  Corey has been in the metals processing business since 1924 and today is a leading North American CFSB producer operating from a single 380,000 square foot facility located in Cicero, Illinois.  Corey's facility is relatively new, highly automated and houses what is perhaps the most modern set of continuous coil-to-bar CFSB drawing lines in North America.  The addition of Corey provides the Debtors with further operational and commercial scale, as well as cost and logistics synergy opportunities.  Corey's products are distributed to customers in a diverse range of industries primarily located in the U.S., including automotive, hydraulic, fluid power, agriculture, construction, appliance, electrical, and oil and gas.

### C.    Prepetition Indebtedness

To finance its strategic acquisitions, working capital, and other needs, Optima raised debt financing in addition to its shareholder contributions.  As of the Petition Date, the Debtors had outstanding debt obligations in the aggregate amount of over $259 million, including accrued and unpaid interest, consisting primarily of their obligations under the Senior Secured Notes and the Senior Unsecured Notes (each as defined below, and collectively, the "**Notes**").

### 1.    Secured Claims

On December 5, 2011, in connection with its acquisition of Niagara, Optima issued $175 million aggregate principal amount of 12.5% senior secured notes due December 15, 2016 (the "**Secured Notes**") to various holders that may trade from time to time (the "**Secured Noteholders**").  The Secured Notes were priced at 96.0% of par resulting in a yield to maturity of 13.62% with interest payable semi-annually in arrears on June 15 and December 15 of each year.  Until the maturity date, interest was timely paid under the Secured Notes.

In connection with the issuance of the Secured Notes, Optima and its existing and future subsidiaries and Wilmington Trust, National Association as trustee and noteholder

collateral agent, entered into an indenture dated December 5, 2011, which governs the Secured Notes. The Secured Notes are fully guaranteed, on a senior secured basis, by each of the Subsidiaries. The Secured Notes and related guarantees are secured by substantially all of the Debtors' assets, subject to permitted liens and specified excluded assets.

In addition to making all interest payments timely under the Secured Notes until the filing of these Chapter 11 Cases, the Debtors made an excess cash flow payment in 2015 in the amount of $13.3 million. As of the Petition Date, the approximate amount outstanding under the Secured Notes was $171.7 million, which includes interest in the approximate amount of $10 million through the Petition Date. Pursuant to, and in accordance with the terms and conditions of, the DIP Orders (as defined below), the Secured Notes have been paid in full from the proceeds of the DIP Facility.

### 2.       Unsecured Noteholder Claims

On January 29, 2015, in connection with the acquisition of Corey, Optima issued $85 million of senior unsecured notes at 100% of face value, bearing interest at 12.0% per annum, payable semi-annually in arrears on March 15 and September 15 of each year (the "**Unsecured Notes**"). The Unsecured Notes were set to mature on the earlier of December 30, 2016, or 15 days after the maturity date of the Secured Notes. Until the commencement of these Chapter 11 Cases, interest payments due under the Unsecured Notes were paid timely.

In connection with the issuance of the Unsecured Notes, Optima and its existing and future subsidiaries and Wilmington Savings Fund Society, FSB as successor trustee, entered into an indenture dated January 29, 2015, which governs the Unsecured Notes. The Unsecured Notes are fully guaranteed by each of the Subsidiaries.

As of the Petition Date, the Unsecured Notes were held solely by funds managed by DDJ Capital Management, LLC (the "**Unsecured Noteholder**," and together with the Secured Noteholders, the "**Noteholders**"). The approximate amount currently outstanding under the Unsecured Notes is $87.5 million, which includes accrued interest in the approximate amount of $2.5 million as of the Petition Date.

### 3.       Unsecured Claims and Equity

The Debtors have general unsecured claims which include, among others, trade claims, litigation claims and environmental claims. As of the Petition Date, the general unsecured claims (excluding the Unsecured Notes) were in excess of $37 million.

Optima is wholly-owned by OA, a privately owned U.S.-based investment firm. OA is the Plan Sponsor under the Plan. OA is owned directly or indirectly or beneficially by three individuals: Mordechai Korf (33%), Gennadiy Bogolyubov (33%) and Igor Kolomoyskyy (33%). Mordechai Korf has been the Chief Executive Officer and/or Chairman of Optima since its formation in 2008.

4.      **Retired ABL Facility**

In addition to the Notes, the Debtors had a prepetition asset based revolving credit facility with PNC Bank, N.A., as lender and agent (the "**ABL Facility**") that matured on November 30, 2016.  Unable to secure a further extension of the ABL Facility maturity date from PNC Bank, the Debtors paid all outstanding amounts thereunder and retired the ABL Facility on November 30, 2016.

D.      **Appointment of the Special Committee**

Before the Petition Date, the Debtors formed a special committee comprised of two independent directors (the "**Special Committee**") to review, evaluate and make key decisions regarding the restructuring of the Debtors' business, assets, liabilities, and interests during these Chapter 11 Cases (the "**Restructuring Process**").  The independent directors are John H. Goodish and Menachem M. Mayberg.  Mr. Mayberg is a practicing attorney in Miami, Florida.  Mr. Goodish has deep steel-industry experience having worked in the industry for forty years including serving as Chief Operating Officer and Executive Vice President of United States Steel Corp. from June 1, 2005 to December 31, 2010.

After the Petition Date, as set forth in Article IV.A.11-"Applications for Retention of Debtors' Professionals," the Debtors retained a Chief Restructuring Officer.  Since the retention of the Chief Restructuring Officer, the Restructuring Process has been led by the Chief Restructuring Officer and the Special Committee.  The Chief Restructuring Officer and the Special Committee review and evaluate issues arising in the Restructuring Process, and the Special Committee makes the key decisions concerning the Restructuring Process.  Mordechai Korf, the Chief Executive Officer and Chairman of Optima (and the President of OA, the Plan Sponsor), is not a member of the Special Committee.  He has not made any decisions on behalf of the Debtors with regard to the Plan Support Agreement or the Plan.

E.      **Key Events Leading to the Chapter 11 Cases**

A summary of the key events that precipitated these Chapter 11 Cases is provided below.

1.      **Macroeconomic and Industry Challenges**

Since late 2014, North American steel companies have been affected by reduced demand from domestic energy producers, weakened iron ore and steel scrap pricing, and weaker demand from the mining and agricultural sectors that support the sale of heavy equipment. Moreover, a strong U.S. Dollar has encouraged steel consumers to look for product from offshore producers.

More specifically, the industrial manufacturing sector has been weakened by the impact of low oil prices and slowing growth in other parts of the world, particularly China.  Low oil prices resulted in a shutdown of more than half the oil and gas rigs in North America, which has resulted in a commensurate decrease in demand for products from the steel and equipment producers, such as the Debtors, supplying the extraction industry.  The global manufacturing slowdown that has persisted for the past two years has led to significant excess capacity in the

metals and mining industries.  Excess capacity in Asia and around the world has also led to falling prices and efforts to reduce inventories throughout the supply chain.  The impact on the United States has been magnified by the relative strength of the U.S. Dollar, which reduces the cost of imported steel.

Continued strength in North American automotive production, modest support from the construction industry, and consumption of seamless tubes in the power generation industry continue to bolster the Debtors' sales, but have not been able to offset the pressures exerted from the commodity elements of the steel pricing cycle that negatively impacted the Debtors' and the industry's financial results in 2015 and 2016, and the reduction in demand cited above.

Falling steel prices have also discouraged the Debtors' distribution-oriented customer base from holding inventory as both metal service centers and original equipment manufacturers seek to avoid or minimize inventory holding losses.  Shorter lead times resulting from available capacity at the primary producing mills also lessens the need for inventory throughout the supply chain.  These inventory reductions, at both metal service centers and original equipment manufacturers, tend to exacerbate the volume decreases that result from weaker end user demand.  The impact on the Debtor should moderate as pricing stabilizes and customers begin to normalize inventory levels relative to sales, and potentially replenish depleted inventories.

These challenging macroeconomic conditions led to the Debtors' financial performance falling below their expectations in 2015 and 2016.

## 2.    Maturing Notes

As described above, the Debtors' Secured Notes were scheduled to mature on December 15, 2016 with the maturity of the Unsecured Notes following shortly thereafter on or about December 30, 2016.  On August 8, 2016, the Debtors retained Lampert Debt Advisors ("**Lampert**"), a debt placement advisory firm, to source debt financing to refinance the maturing Notes and assist in the restructuring of the Debtors' balance sheet.  The Debtors, with the assistance of Lampert, devoted several months to extensive negotiations with existing debt holders, OA as 100% shareholder of Optima, and potential new lenders.  The Debtors and their stakeholders considered various proposals for the refinancing comprised of new senior secured debt plus a substantial infusion of new debt and equity capital by OA.  While those detailed negotiations made substantial and substantive progress for several months, they ultimately failed to result in a binding term sheet or any definitive agreement.  With the refinancing negotiations breaking down in December 2016 and the maturity of the Secured Notes looming on December 15, 2016, the Debtors were left with little choice but to seek Chapter 11 relief to facilitate a restructuring.

## IV.    EVENTS DURING THE CHAPTER 11 CASES

### A.    First Day Motions and Certain Related Relief

Each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on December 15, 2016.  Recognizing that any interruption of the Debtors'

business, even for a short period, could negatively affect customer and vendor relationships and the Debtors' goodwill, revenue, and profits, which would be detrimental to the value of the Debtors' estates, the Debtors filed certain first day motions authorizing the Debtors to continue operating their businesses in the ordinary course. The first day motions sought to stabilize the Debtors' operations and were designed to facilitate a smooth transition into chapter 11 and ease the strain on the Debtors' business as a consequence of the filing of the Chapter 11 Cases. The following summary highlights certain of the first day orders.

### 1.    Cash Collateral Motion [Docket No. 17]

By interim order granted on December 19, 2016 [Docket No. 54], the Bankruptcy Court authorized the Debtors to use cash collateral until January 19, 2017, granted adequate protection to the Secured Notes Agent for the benefit of itself and the Secured Noteholders, and granted other related relief. By a stipulation, approved by the Bankruptcy Court in an order granted on January 19, 2017 [Docket No. 227], the Debtors' authority to use cash collateral was extended until January 26, 2017. The Debtors' authority to use cash collateral after January 24, 2017 has been governed by the DIP Orders (as defined below).

### 2.    Cash Management Motion [Docket No. 7]

The Bankruptcy Court authorized the Debtors to continue using their cash management systems and their respective bank accounts, business forms, and intercompany transactions, and authorized a waiver of, or extension of time to comply with, requirements under Bankruptcy Code section 345(b) by a final order granted on January 19, 2017 [Docket No. 223].

### 3.    Critical Vendor Motion [Docket No. 14]

The Bankruptcy Court authorized the Debtors to pay certain prepetition claims of critical and foreign vendors and to pay certain prepetition mechanics' liens by a final order granted on January 19, 2017 [Docket No. 226].

### 4.    Wage and Benefits Motion [Docket No. 6]

The Bankruptcy Court authorized the Debtors to pay prepetition wages, compensation, and amounts associated with employee benefit programs, except with respect to certain incentive and profit sharing plans, and continue such programs in the ordinary course by a final order granted on January 17, 2017 [Docket No. 196]. With respect to the incentive and profit sharing plans, the Bankruptcy Court authorized payments to non-insider employees in accordance with the terms and conditions of such plans and payments to insider employees subject to certain modifications by separate order granted on January 31, 2017 [Docket No. 286].

### 5.    Customer Program Motion [Docket No. 13]

The Bankruptcy Court authorized the Debtors to honor certain prepetition obligations to customers and to otherwise continue certain prepetition customer practices and programs that the Debtors offer in the ordinary course by a final order granted on January 17, 2017 [Docket No. 199].

6.        **Insurance Motion [Docket No. 8]**

The Bankruptcy Court authorized the Debtors to pay and maintain various insurance policies, including, among other things, general liability, workers' compensation liability, directors and officers liability, umbrella liability, and property liability by a final order granted on January 19, 2017 [Docket No. 224].

7.        **Taxes Motion [Docket No. 9]**

The Bankruptcy Court authorized the Debtors to pay certain prepetition fees and taxes to various federal, state, county, and city taxing and licensing authorities by a final order granted on January 17, 2017 [Docket No. 197].

8.        **Utilities Motion [Docket No. 10]**

The Bankruptcy Court established procedures for determining adequate assurance of payment for future utility services by a final order granted on January 17, 2017 [Docket No. 198].

9.        **Shippers' Motion [Docket No. 11]**

The Bankruptcy Court authorized the Debtors to pay certain prepetition claims of common carriers, shippers and truckers in the ordinary course of business by a final order granted on January 19, 2017 [Docket No. 225].

10.        **Reclamation Procedures Motion [Docket No. 12]**

The Bankruptcy Court established exclusive procedures for asserting, processing, and satisfying any claims against the Debtors arising under section 546(c) of the Bankruptcy Code by a final order granted on January 17, 2017 [Docket No. 201].

11.        **Applications for Retention of Debtors' Professionals**

The Bankruptcy Court has approved the Debtors' retention of certain Professionals to represent and assist the Debtors in connection with the Chapter 11 Cases. These Professionals include, among others:  (a) Greenberg Traurig, LLP as counsel for the Debtors (order granted January 17, 2017) [Docket No. 191]; (b) Ernst & Young LLP as auditor and restructuring advisor (order granted January 17, 2017) [Docket No. 192]; (c) Miller Buckfire & Co., LLC and Stifel, Nicolaus & Co., Inc. as investment banker (order granted January 26, 2017) [Docket No. 274]; and (d) Conway MacKenzie Management Services, LLC as turnaround manager and Michael S. Correra as Chief Restructuring Officer (order granted February 21, 2017) [Docket No.343].

The Bankruptcy Court has also authorized the Debtors to retain certain professionals utilized by the Debtors in the ordinary course of business prior to the Petition Date (order granted January 17, 2017) [Docket No. 200].  Further, the Bankruptcy Court has authorized the interim compensation and reimbursement of professional expenses during these cases (order granted January 17, 2017) [Docket No. 190].

12. **Administrative Motions: Motion for Joint Administration [Docket No. 3], Motion to File Consolidated List of Creditors [Docket No. 5], and Application to Retain Claims and Noticing Agent [Docket No. 15]**

To facilitate a smooth and efficient administration of the Chapter 11 Cases and to reduce the administrative burden associated therewith, by an order granted on December 19, 2016, the Bankruptcy Court authorized joint administration of the Debtors' cases for procedural purposes only [Docket No. 48].  By an order granted on December 19, 2016, the Bankruptcy Court authorized the Debtors to file consolidated lists of creditors for the Debtors [Docket No. 49].  The Court further authorized the retention of Garden City Group, LLC as claims and noticing agent by an order granted on December 19, 2016 [Docket No. 53].

## B.    Creditors' Committee

On January 4, 2017, the U.S. Trustee appointed an Official Committee of Unsecured Creditors (the "**Creditors' Committee**") [Docket No. 120].  Subsequently, the Bankruptcy Court authorized the retention of Squire Patton Boggs (US) LLP as the Creditors' Committee's bankruptcy counsel [Docket No. 314], Whiteford, Taylor & Preston LLC as the Creditors' Committee's Delaware counsel [Docket No. 315], and FTI Consulting, Inc. as the Creditors' Committee's financial advisor [Docket No. 363].

## C.    DIP Financing

On January 9, 2017, the Debtors filed the *Motion for the Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing the Debtors to Obtain Non-Priming Senior Secured Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying The Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 147] (the "**First DIP Motion**"). Pursuant to the First DIP Motion, the Debtors' sought approval for a $40 million non-priming junior secured debtor-in-possession financing facility from OA.  The First DIP Motion was opposed by an ad hoc group of unaffiliated holders of a majority in amount of the Secured Notes and by DDJ Capital Management, LLC ("**DDJ**"), including, *inter alia*, whether the proposed financing was non-priming and junior to the Secured Notes.  In addition, a limited objection to the First DIP motion, dated January 16, 2017 [Docket No. 187], was filed by Steel Dynamics Sales North America, Inc. and Roanoke Electric Steel Corporation d/b/a Steel Dynamics Roanoke Bar Division.

On January 17, 2017, the Debtors filed the *Motion for the Entry of Interim and Final Orders (I) Authorizing Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105(a), 361 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) And 364(e), (II) Authorizing the Debtors' Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363 and 364, and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(B) and 4001(C)* [Docket No.202] (the "**Second DIP Motion**").  The Second DIP Motion sought approval for a $50 million DIP New Money Loan and an approximately $161.7 million (in principal amount) DIP Replacement Loan provided by DDJ

and other lenders from time to time party to the DIP Credit Agreement.  In light of the filing of the Second DIP Motion, the Debtors adjourned further proceedings on the First DIP Motion.

The Creditors' Committee objected to the Second DIP Motion by the filing of a preliminary objection, dated January 19, 2017 [Docket No. 229], a supplemental objection, dated January 22, 2017 [Docket No. 245], and a final objection, dated February 21, 2017 [Docket No. 344].   Additional objections to the Second DIP motion were made as follows: (i) an objection, dated January 19, 2017 [Docket No. 222], by ArcelorMittal International America LLC and ArcelorMittal USA LLC (the "**ArcelorMittal Objection**"); (ii) a joinder in the ArcelorMittal Objection, dated January 20, 2017 [Docket No. 234], by Steel Dynamics Sales North America, Inc. and Roanoke Electric Steel Corporation d/b/a Steel Dynamics Roanoke Bar Division; (iii) a joinder to the ArcelorMittal Objection, dated January 20, 2017 [Docket No. 236], filed by Tata Steel International (Americas) Inc.; and (iv) a joinder to the ArcelorMittal Objection, dated January 21, 2017 [Docket No. 239], by Sterling Steel Company, LLC.

The Bankruptcy Court granted the Second DIP Motion and approved the DIP Facility on an interim basis in an order, dated January 24, 2017 [Docket No. 257], and on a final basis in an order, dated February 28, 2017 [Docket No. 366] (such interim and final orders, the "**DIP Orders**").

### D.        Filing of the Schedules and Establishment of the Claims Bar Date

Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007 direct that, unless otherwise ordered by the court, debtors must prepare and file certain schedules of claims, executory contracts, and unexpired leases and related information (the "**Schedules**"), as well as statements of financial affairs (the "**Statements**," and together with the Schedules, the "**Schedules and Statements**") within 15 days of the commencement of a chapter 11 case.  The purpose of this requirement is to provide a debtor's creditors, equity security holders, and other interested parties with sufficient information to make informed decisions with respect to the Debtors' reorganization.  In appropriate circumstances, however, a bankruptcy court may modify or dispense with the filing of the Schedules and the Statement pursuant to section 521 of the Bankruptcy Code.  On February 7, 2017, the Bankruptcy Court entered an order extending the Debtors' deadline to file their Schedules and Statements to February 17, 2017 [Docket No. 293]. The Debtors filed their Schedules and Statements on February 17, 2017 [Docket Nos. 333-342]. The Debtors filed amendments to their Schedules E and F on March 12 and 13, 2017 [Docket Nos. 384, 386-389].

On March 10, 2017, the Bankruptcy Court entered an order [Docket No. 382] (the "**Bar Date Order**") establishing April 14, 2017 at 5:00 p.m. (Prevailing Eastern Time) (the "**General Bar Date**") as the last deadline for filing Proofs of Claims against the Debtors in these Chapter 11 Cases for Claims arising before the Petition Date, and establishing June 14, 2017 at 5:00 p.m. (Prevailing Eastern Time) (the "**Governmental Bar Date**"; together with the General Bar Date, collectively, the "**Bar Date**") as the deadline for all governmental units, as defined in section 101(27) of the Bankruptcy Code, for filing Proofs of Claim against the Debtors in these Chapter 11 Cases for all Claims arising before the Petition Date.

In the event that the Debtors reject any Executory Contract or Unexpired Lease under section 365 of the Bankruptcy Code, the Bar Date Order provides that each person or entity holding a claim against the Debtors arising from such rejection must file a Proof of Claim by the later of (a) 30 days after the effective date of rejection of such executory contract or unexpired lease as provided by an order of the Bankruptcy Court or pursuant to a notice under procedures approved by the Bankruptcy Court; (b) any date set by another order of the Bankruptcy Court; or (c) the General Bar Date (the "**Rejection Bar Date**").

In the event that the Debtors amend or supplement the Schedules and Statements, the Bar Date Order provides that the Debtors shall give notice of any amendment or supplement to the Holders of Claims affected thereby, and such Holders shall be given until the later of (a) the applicable Bar Date or (b) thirty (30) days from the date such notice is given to file Proofs of Claim with respect to such affected Claim, if necessary, or be barred from filing such Claim (the "**Amended Schedule Bar Date**").

As of the date of filing of this Disclosure Statement, the Claims Agent has received over 500 Proofs of Claim.  The Debtors have commenced the process of reviewing and reconciling their books and records to determine whether Proofs of Claims are invalid, untimely, duplicative, or overstated, but such process has not yet been completed.  The Debtors intend to file subsequent objections to claims on both substantive and non-substantive grounds, and the outcome of such future objections could affect the amount of Allowed Claims in each Class.

E.      **Non-Core Asset Sale**

By order dated April 10, 2017 [Docket No. 567], the Bankruptcy Court authorized the private sale of certain real property and related assets located in Buffalo, New York, free and clear of liens and interests, and approved the lease back to the Debtors of approximately 25,000 square feet of dedicated storage space and certain office space for a term of ten years for no rent.

F.      **Exclusive Period for Filing a Plan and Soliciting Votes**

On April 14, 2017, the Debtors filed a motion with the Bankruptcy Court, pursuant to section 1121 of the Bankruptcy Code, requesting an extension of the exclusive period within which only the Debtors may file a chapter 11 plan through and including July 13, 2017, and the exclusive period within which only the Debtors may solicit acceptances of a chapter 11 plan through and including September 11, 2017.  On May 12, 2017, the Bankruptcy Court entered an order granting the motion, and extending the exclusive period within which only the Debtors may file a chapter 11 plan through and including July 13, 2017, and of the exclusive period within which only the Debtors may solicit acceptances of a chapter 11 plan through and including August 31, 2017 [Docket No. 742].

### G.   Motion to Approve Plan Support Agreement

On April 20, 2017, the Debtors filed a motion with the Bankruptcy Court, pursuant to sections 105(a), 363(b), 503(b), 507(a)(2), and 1125 of the Bankruptcy Code, requesting authority for the Debtors to enter into, undertake and perform their obligations under the Plan Support Agreement between the Debtors and the Plan Sponsor, including approval of the OA Expense Reimbursement, as defined therein, and granting the OA Expense Reimbursement administrative expense priority status, as described by the Plan Support Agreement.  As more fully set forth in the motion and the Plan Support Agreement itself, the Plan Support Agreement provides for a comprehensive reorganization of the Debtors pursuant to the Plan described by this Disclosure Statement.  On May 10, 2017, the Bankruptcy Court held a hearing on approval of the Plan Support Agreement and entered an order approving it and the OA Expense Reimbursement.

### H.   Payment of Good Faith Deposits by OA

On April 25, 2017, OA delivered to the Debtors an initial $10 million Good Faith Deposit (as defined in the Plan Support Agreement) in accordance with the terms of the Plan Support Agreement.  Thereafter, following the filing of the Plan and proposed Disclosure Statement, OA delivered an additional $5 million Good Faith Deposit on May 2, 2017; following Bankruptcy Court approval of the Plan Support Agreement, OA delivered an additional $5 million Good Faith Deposit on May [19], 2017; and following Bankruptcy Court approval of this Disclosure Statement, OA delivered an additional $5 million Good Faith Deposit on May [●], 2017.  Accordingly, as of the date hereof, OA has deposited with the Debtors a total of $25 million in Good Faith Deposits as agreed in the Plan Support Agreement.

## V.   THE PLAN

### A.   Administrative Expenses and Priority Claims

**1.   Administrative Claims**.  Except to the extent that the Debtors, with the consent of the Plan Sponsor, or the Reorganized Debtors, as applicable, and a Holder of an Allowed Administrative Claim agree to a less favorable treatment, a Holder of an Allowed Administrative Claim (other than a DIP Claim, which shall be subject to Article 2.2 of the Plan, or a Professional Claim, which shall be subject to Article 2.3 of the Plan) shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim (and, in the case of Section 503(b)(9) Claims, post-Petition Date interest (if any) on terms and in an amount equal to post-Petition Date interest (if any) paid to General Unsecured Claims under Article 4.4(b) of the Plan) either (a) on the later of (x) the Initial Distribution Date; or (y) the first Periodic Distribution Date occurring after the later of (i) 30 days after the date when an Administrative Claim becomes an Allowed Administrative Claim or (ii) 30 days after the date when an Administrative Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the Holder of such Administrative Claim; or (b) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative

Claims, without any further action by the Holders of such Allowed Administrative Claims; provided, however, that other than Holders of (i) a DIP Facility Claim, (ii) a Professional Claim, (iii) an Administrative Claim Allowed by an order of the Bankruptcy Court on or before the Effective Date, or (iv) an Administrative Claim that is not Disputed and arose in the ordinary course of business and was paid or is to be paid in accordance with the terms and conditions of the particular transaction giving rise to such Administrative Claim, the Holder of any Administrative Claim shall have filed a proof of Claim form no later than the Administrative Claims Bar Date and such Claim shall have become an Allowed Claim.  Except as otherwise provided herein and as set forth in Articles 2.2 or 2.3 of the Plan, all requests for payment of an Administrative Claim must be filed, in substantially the form of the Administrative Claim Request Form contained in the Plan Supplement, with the Claims Agent and served on counsel for the Debtors or the Reorganized Debtors, as applicable, no later than the Administrative Claims Bar Date.  Any request for payment of an Administrative Claim pursuant to Article 2.1 of the Plan that is not timely filed and served shall be Disallowed automatically without the need for any objection from the Reorganized Debtors.  The Reorganized Debtors may settle an Administrative Claim without further Bankruptcy Court approval.  In the event that the Reorganized Debtors object to an Administrative Claim and there is no settlement, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim.

2.    **DIP Claims**.  Pursuant to the DIP Order, all DIP Claims are Allowed.

(a)    DIP Replacement Loan Claims.  In full and final satisfaction, settlement, release, and discharge of and in exchange for each and every DIP Replacement Loan Claim, on the Effective Date, each Holder of a DIP Replacement Loan Claim shall be paid in full in Cash from the proceeds of the Exit Facilities and Plan Sponsor Contribution, with such payments to be distributed to the DIP Agent on the Effective Date for the ratable benefit of the Holders of DIP Replacement Loan Claims.

(b)    DIP New Money Loan Claims.  In full and final satisfaction, settlement, release, and discharge of and in exchange for each and every DIP New Money Loan Claim, on the Effective Date, each Holder of DIP New Money Loan Claims shall be paid in full in Cash from the proceeds of the Exit Facilities and Plan Sponsor Contribution (after satisfying the DIP Replacement Loan Claims), with such payments to be distributed to the DIP Agent on the Effective Date for the ratable benefit of the Holders of DIP New Money Loan Claims.

Upon the Effective Date, and upon receipt by the DIP Agent of Cash in the full amount of the DIP Claims, all Liens and security interests granted to secure the DIP Facility shall be deemed discharged, cancelled, and released and shall be of no further force and effect.  To the extent that the DIP Lenders or the DIP Agent have filed or recorded publicly any Liens and/or security interests to secure the Debtors' obligations under the DIP Facility, the DIP Lenders or the DIP Agent, as the case may be, shall take any commercially reasonable steps requested by the Debtors or the Reorganized Debtors, at the expense of the Reorganized Debtors, that are necessary to cancel and/or extinguish such publicly-filed Liens and/or security interests.

3.      **Professional Claims**.

(a)      <u>Final Fee Applications</u>.    All final requests for payment of Professional Claims and requests for reimbursement of expenses of members of the Creditors' Committee must be filed no later than forty-five (45) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules and prior orders of the Bankruptcy Court, the Allowed amounts of such Professional Claims shall be determined by the Bankruptcy Court.

(b)      <u>Payment of Interim Amounts</u>.  Subject to the Holdback Escrow Amount, on the Effective Date, the Reorganized Debtors shall pay all amounts owing to Professionals for all outstanding amounts billed relating to prior periods through the Effective Date as to which no objection has been filed.  No later than five (5) Business Days prior to the Effective Date, the Professionals shall estimate fees and expenses due for periods that have not or will not have been billed as of the Effective Date and shall deliver such estimate to counsel for the Debtors and such estimate shall be included in the Holdback Escrow Amount.  For the avoidance of doubt, no such estimate shall be deemed to limit the amount of the fees and expenses that are the subject of a professional's final request for payment of professional claims filed with the Bankruptcy Court.  As soon as reasonably practicable after the Effective Date, a Professional seeking payment for estimated amounts as of the Effective Date shall submit a detailed invoice covering such period.  Upon receipt of such invoice, the Debtors shall pay from the Holdback Escrow Account 80% of the invoiced fees and 100% of the invoiced expenses.

(c)      <u>Holdback Escrow Account</u>.    On the Effective Date, the Reorganized Debtors shall fund the Holdback Escrow Account with Cash equal to the aggregate Holdback Escrow Amount for all Professionals.    The Distribution Agent shall maintain the Holdback Escrow Account in trust for the Professionals with respect to whom fees have been held back pursuant to the Professional Fee Order.  Such funds shall not be considered property of the Debtors, the Reorganized Debtors, or the Estates.    Following any payments from the Holdback Escrow Account as set forth in <u>Article 2.3(b)</u> of the Plan, the remaining amount of Professional Claims owing to the Professionals shall be paid to such Professionals by the Distribution Agent from the Holdback Escrow Account when such claims are finally Allowed by the Bankruptcy Court.  When all Professional Claims have been paid in full, amounts remaining in the Holdback Escrow Account, if any, shall be paid to the Reorganized Debtors.

(d)      <u>Post-Effective Date Retention</u>.    Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors shall employ and pay Professionals in the ordinary course of business (including the reasonable fees and expenses incurred by Professionals in preparing, reviewing, prosecuting, defending, or addressing any issues with respect to final fee applications).

4.      **Priority Tax Claims**.  On the later of (a) the Initial Distribution Date or (b) the first Periodic Distribution Date occurring after the later of (i) 30 days after the date when a Priority Tax Claim becomes an Allowed Priority Tax Claim or (ii) 30 days after the date when a Priority Tax Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the Holder of such Priority Tax Claim, except to the extent that the

Debtors (or Reorganized Debtors) and a Holder of an Allowed Priority Tax Claim agree to a less favorable treatment, each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive one of the following treatments on account of such Claim: (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, (b) Cash in an amount agreed to by the Debtors (or the Reorganized Debtors) and such Holder, provided, however, that such parties may further agree for the payment of such Allowed Priority Tax Claim to occur at a later date, or (c) at the sole option of the Debtors, Cash in the aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of not more than five (5) years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

## B.    Classification, Treatment, and Voting of Claims and Interests

### 1.    Classification of Claims and Interests.

(a)    The Plan is a single plan of reorganization for the jointly administered Chapter 11 Cases, but does not constitute a substantive consolidation of the Debtors' Estates except for the limited purpose set forth in Article 6.1 of the Plan.  The Plan, though proposed jointly, constitutes a separate plan for each of the Debtors for all other purposes.  Therefore, all Claims against and Interests in a particular Debtor are placed in the Classes set forth below with respect to such Debtor.  Classes that are not applicable as to a particular Debtor or group of Debtors shall be eliminated as set forth more fully in Article 5.2 of the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims of the kinds specified in sections 507(a)(1) and 507(a)(8) of the Bankruptcy Code have not been classified and their treatment is set forth in Article II of the Plan.

(b)    Pursuant to sections 1122 and 1123 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Interests in the Debtors.  A Claim or Interest is placed in a particular Class for the purposes of, to the extent applicable, receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

(c)    Claims and Interests are divided into numbered Classes as set forth below:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3-A | Unsecured Notes Claims | Unimpaired | Deemed to Accept |
| 3-B | General Unsecured Claims | Unimpaired | Deemed to Accept |
| 4 | Intercompany Claims | Unimpaired | Deemed to Accept |
| 5 | Intercompany Interests | Unimpaired | Deemed to Accept |
| 6 | Interests in Optima | Unimpaired | Deemed to Accept |

**C.    Provisions for Treatment of Claims and Interests**

**1.    Class 1 – Other Priority Claims**.

(a)    <u>Classification</u>: Class 1 consists of all Other Priority Claims.

(b)    <u>Treatment</u>:    Except as otherwise provided in and subject to Article 9.5 of the Plan, and except to the extent that a Holder of an Allowed Class 1 Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class 1 Claim, each such Holder of an Allowed Class 1 Claim shall be paid in full in Cash on the later of (a) the Initial Distribution Date or (b) the first Periodic Distribution Date occurring after the later of (i) 30 days after the date when a Class 1 Claim becomes an Allowed Class 1 Claim or (ii) 30 days after the date when a Class 1 Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the Holder of such Class 1 Claim; provided, however, that Other Priority Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

(c)    <u>Voting</u>: Class 1 is Unimpaired, and Holders of Allowed Class 1 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Class 1 Claims are not entitled to vote to accept or reject the Plan.

**2.    Class 2 – Other Secured Claims**.

(a)    <u>Classification</u>: Class 2 consists of all Other Secured Claims.

(b)    <u>Treatment</u>: Except as otherwise provided in and subject to Article 9.5 of the Plan, and except to the extent that a Holder of an Allowed Class 2 Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 2 Claim, each such Holder of an Allowed

Class 2 Claim shall, at the election of the Debtors, with the consent of the Plan Sponsor, or the Reorganized Debtors, as applicable:

> (i)      have its Allowed Class 2 Claim Reinstated and rendered Unimpaired on the Effective Date in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the Holder of an Allowed Class 2 Claim to demand or receive payment of such Allowed Class 2 Claim prior to the stated maturity of such Allowed Class 2 Claim from and after the occurrence of a default;

> (ii)      be paid in full in Cash in an amount equal to such Allowed Class 2 Claim, including postpetition interest, if any, on such Allowed Class 2 Claim required to be paid pursuant to section 506 of the Bankruptcy Code, on the later of (a) the Initial Distribution Date or (b) the first Periodic Distribution Date occurring after the later of (i) 30 days after the date when a Class 2 Claim becomes an Allowed Class 2 Claim or (ii) 30 days after the date when a Class 2 Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the Holder of such Class 2 Claim; or

> (iii)      receive the collateral securing its Allowed Class 2 Claim.

Nothing in <u>Article 4.2</u> of the Plan or elsewhere in the Plan shall preclude the Reorganized Debtors, as applicable, from challenging the validity of any alleged Lien or any asset of the Debtors or the value of the property that secures any alleged Lien.

> (c)      <u>Voting</u>: Class 2 is Unimpaired, and Holders of Allowed Class 2 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Class 2 Claims are not entitled to vote to accept or reject the Plan.

**3.      Class 3-A – Unsecured Notes Claims**.

> (a)      <u>Classification</u>: Class 3-A consists of all Unsecured Notes Claims.

> (b)      <u>Treatment</u>: Except to the extent that a Holder of an Allowed Class 3-A Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class 3-A Claim, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 3-A Claim shall receive cash in an amount equal to 100% of such Allowed Claim, plus post-Petition Date interest (if any) for the period between the Petition Date and the Effective Date at the Federal judgment rate or such other rate as minimally necessary (only if payment of interest is required) to leave such Allowed Class 3-A Claim Unimpaired.

> (c)      <u>Voting</u>: Class 3-A is Unimpaired and Holders of Allowed Class 3-A Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Order.  Therefore, Holders of Allowed Class 3-A Claims are not entitled to vote to accept or reject the Plan.

4. **Class 3-B – General Unsecured Claims**.

(a)    Classification: Class 3-B consists of all General Unsecured Claims.

(b)    Treatment: Except as otherwise provided in and subject to Article 9.5 of the Plan, and except to the extent that a Holder of an Allowed Class 3-B Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class 3-B Claim, each Holder of an Allowed Class 3-B Claim shall receive the following treatment: (a) in the case of Allowed Class 3-B Claims that are not due and payable as of the Effective Date, each such Claim shall be reinstated (in accordance with section 1124(2) of the Bankruptcy Code) and paid in the ordinary course of business pursuant to the respective terms relating to such Claim; or (b) in the case of Allowed Class 3-B Claims that are due and payable as of the Effective Date, each such Claim shall be paid in full in Cash in an amount equal to 100% of the Allowed amount of such Claim, plus post-Petition Date interest at three percent (3%) per annum accrued for the period between the Petition Date and the Effective Date, only if the Creditors' Committee: (i) supports (and does not directly or indirectly oppose, challenge or object to) confirmation of the Plan, approval of the Disclosure Statement, approval of the Plan Support Agreement and approval of related Debtor motions and (ii) does not (directly or indirectly) advocate for or support any alternative plan or plan process, or any formal or informal opposition, challenge or objection to confirmation of the Plan, approval of the Disclosure Statement, approval of the Plan Support Agreement or approval of directly related Debtor motions.

In the event the conditions in the foregoing clauses "(i)" and "(ii)" are not satisfied, then instead of receiving the treatment provided for in the foregoing clause "(b)" each applicable holder of an Allowed Class 3-B Claim shall receive Cash in an amount equal to 100% of the Allowed amount of such Claim, plus post-Petition Date Interest (if any) at the Federal judgment rate or such other rate as necessary to leave such Allowed Claim unimpaired, for the period between the Petition Date and the Effective Date.  Notwithstanding the foregoing, the Creditors' Committee shall not be deemed to have violated this provision by providing to the Debtors and/or the Plan Sponsor comments, or requesting changes, to any document, agreement or filing.

All payments and distributions on account of Allowed Class 3-B Claims shall be made as set forth above on the later of (i) the Initial Distribution Date or (ii) if a Class 3-B Claim is a Disputed Claim, the first Periodic Distribution Date occurring after the later of (y) 30 days after the date when a Class 3-B Claim becomes an Allowed Class 3-B Claim or (z) 30 days after the date when a Class 3-B Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the Holder of such Class 3-B Claim.

(c)    Voting: Class 3-B is Unimpaired and Holders of Allowed Class 3-B Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Order.  Therefore, Holders of Allowed Class 3-B Claims are not entitled to vote to accept or reject the Plan.

5. **Class 4 – Intercompany Claims**

      (a)    <u>Classification</u>:  Class 4 consists of all Intercompany Claims.

      (b)    <u>Treatment</u>: On the Effective Date, all net Allowed Class 4 Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among the Debtors and/or any Affiliates of the Debtors shall, at the election of the Debtors, with the consent of the Plan Sponsor, or the Reorganized Debtors, as applicable, be either (i) Reinstated, or (ii) released, waived, and discharged.

      (c)    <u>Voting</u>: Class 4 is Unimpaired, and Holders of Allowed Class 4 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Class 4 Claims are not entitled to vote to accept or reject the Plan.

6. **Class 5 – Intercompany Interests**

      (a)    <u>Classification</u>:  Class 5 consists of all Intercompany Interests.

      (b)    <u>Treatment</u>:  On the Effective Date, all Class 5 Interests held by the Debtors shall be Reinstated.  The foregoing treatment of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the Holders of Existing Optima Common Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims.  For the avoidance of doubt, any Interest in any non-Debtor subsidiary owned by a Debtor (if any) shall continue to be owned by the applicable Reorganized Debtor.

      (c)    <u>Voting</u>: Class 5 is Unimpaired, and Holders of Class 5 Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 5 Interests are not entitled to vote to accept or reject the Plan.

7. **Class 6 – Existing Optima Equity Interests**.

      (a)    <u>Classification</u>:  Class 6 consists of all Existing Optima Equity Interests.

      (b)    <u>Treatment</u>: On the Effective Date, Allowed Class 6 Existing Optima Equity Interests shall be Reinstated and Unimpaired and shall not be discharged, canceled, released, extinguished or otherwise altered as a result of or by the Plan Support Agreement or the Plan, and the Plan Sponsor as Holder of all Existing Optima Equity Interests shall continue on the Effective Date to hold all Existing Optima Equity Interests without interruption.

      (c)    <u>Voting</u>: Class 6 is Unimpaired, and Holders of Allowed Class 6 Existing Optima Equity Interests are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Class 6 Optima Equity Interests are not entitled to vote to accept or reject the Plan.

D.      **Acceptance**

        1.      **No Classes Entitled to Vote**.  No Classes are entitled to vote to accept or reject the Plan.  By operation of law, Classes 1, 2, 3-A, 3-B, 4, 5 and 6 are Unimpaired and are deemed to have accepted the Plan and, therefore, are not entitled to vote.

        2.      **Elimination of Classes**.  To the extent applicable, any Class that does not contain any Allowed Claims as of the date of commencement of the Confirmation Hearing, for all Debtors or with respect to any particular Debtor, shall be deemed to have been deleted from the Plan for all Debtors or for such particular Debtor, as applicable, for purposes of (a) deemed acceptance or rejection of the Plan in accordance with Article 5.1 of the Plan and (b) determining whether it has accepted or rejected the Plan under section 1129(a)(8) of the Bankruptcy Code.  In particular, Class 6 shall exist only with respect to Optima, Class 3-A shall exist only with respect to Debtors that are obligors or guarantors under the Unsecured Notes Documents, and Class 3-B shall only exist with respect to Debtors that are obligated to one or more Holders of an Allowed General Unsecured Claim.

        3.      **Cramdown**.  To the extent necessary, the Debtors shall request confirmation of the Plan, as it may be modified from time to time in accordance with the terms hereof, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to modify, amend, or withdraw the Plan, with respect to all Debtors or any individual Debtor or group of Debtors, with the consent of the Plan Sponsor, to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

E.      **Means for Implementation of The Plan**

        1.      **Substantive Consolidation**.  The Plan contemplates and is predicated upon deemed substantive consolidation of the Debtors' Estates and Chapter 11 Cases for distribution purposes only.  On the Effective Date, each Claim Filed or to be Filed against any Debtor shall be deemed Filed only against Optima and shall be deemed a single Claim against and a single obligation of Optima, for distribution purposes only and the claims register shall be updated accordingly.  This limited substantive consolidation effected pursuant to Article 6.1 of the Plan shall not otherwise affect the rights of any Holder of any Claim, or affect the obligations of any Debtor with respect to such Claim.

        2.      **General Settlement of Claims and Interests**.  Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the Plan Sponsor Contribution and for the classification, treatment, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.

        3.      **Plan Funding**.  Distributions under the Plan, and the Reorganized Debtors' operations post-Effective Date will be funded from the following sources:

        (a)      Exit Revolver Facility.  On the Effective Date, the Reorganized Debtors shall enter into the Exit Revolver Facility, the final form and substance of which shall be acceptable to the Reorganized Debtors and the Plan Sponsor, provided, however, that this

Case 16-12789-KJC    Doc 779    Filed 05/24/17    Page 33 of 98

provision shall not diminish the Plan Sponsor's obligations under section 3(a)(1) of the Plan Support Agreement to act in a commercially reasonable manner. The entry of the Confirmation Order shall be deemed approval of the Exit Revolver Facility (including the transactions contemplated thereby, such as any supplementation or additional syndication of the Exit Revolver Facility, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and authorization for the Reorganized Debtors to enter into and execute the Exit Revolver Facility and such other documents as the Exit Revolver Lenders may reasonably require to effectuate the treatment afforded to such lenders pursuant to the Exit Revolver Facility, subject to such modifications as the Reorganized Debtors may deem to be reasonably necessary to consummate such Exit Revolver Facility.

(b)      Exit Term Loan Facility.      On      the      Effective      Date,      the Reorganized Debtors shall enter into the Exit Term Loan Facility, the final form and substance of which shall be acceptable to the Reorganized Debtors and the Plan Sponsor, provided, however, that this provision shall not diminish the Plan Sponsor's obligations under section 3(a)(1) of the Plan Support Agreement to act in a commercially reasonable manner. The entry of the Confirmation Order shall be deemed approval of the Exit Term Loan Facility (including the transactions contemplated thereby, such as any supplementation or additional syndication of the Exit Term Loan Facility, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and authorization for the Reorganized Debtors to enter into and execute the Exit Term Loan Facility and such other documents as the Exit Term Loan Lenders may reasonably require to effectuate the treatment afforded to such lenders pursuant to the Exit Term Loan Facility, subject to such modifications as the Reorganized Debtors may deem to be reasonably necessary to consummate such Exit Term Loan Facility.

(c)      Plan Sponsor Contribution.      On the Effective Date, the Plan Sponsor shall fulfill its funding obligations under the Plan Support Agreement by contributing the Plan Sponsor Contribution to Reorganized Optima as a contribution to capital in respect of the Plan Sponsor's outstanding and Unimpaired Existing Optima Common Stock. The Plan Sponsor Contribution shall be used as needed to pay Allowed DIP Claims, Allowed General Unsecured Claims, Allowed Unsecured Notes Claims and other Allowed Claims against and obligations of the Debtors payable under the Plan.

(d)      Other Plan Funding.      Other than as set forth in Articles 6.3(a), 6.3(b) and 6.3(c) of the Plan, all Cash necessary for the Reorganized Debtors to make payments required by the Plan shall be obtained from the Debtors' and Reorganized Debtors' Cash balances then on hand, after giving effect to the transactions contemplated herein.

## 4.      Existing Optima Common Stock Unimpaired.

(a)      On the Effective Date, the Existing Optima Common Stock shall be shall be Reinstated and Unimpaired. The Reinstatement of Existing Optima Common Stock by Reorganized Optima shall be authorized without the need for any further corporate action or without any further action by the Debtors or the Reorganized Debtors, as applicable.

(b)     On the Effective Date, none of the Existing Optima Common Stock will be registered under the Securities Act or listed on a national securities exchange, the Reorganized Debtors will not be reporting companies under the Exchange Act, the Reorganized Debtors shall not be required to and will not file reports with the Securities and Exchange Commission or any other entity or party, and the Reorganized Debtors shall not be required to file monthly operating reports with the Bankruptcy Court after the Effective Date.

     **5.     Exemptions from Securities Act Registration Requirements**.    The Reinstatement of Existing Optima Common Stock pursuant to the Plan will be exempt from the registration requirements of section 5 of the Securities Act pursuant to section 1145 of the Bankruptcy Code, section 4(a)(2) of the Securities Act, or any other available exemption from registration under the Securities Act, as applicable.  Section 4(a)(2) of the Securities Act exempts transactions not involving a public offering, and section 506 of Regulation D of the Securities Act provides a safe harbor under section 4(a)(2) for transactions that meet certain requirements.  In addition, under section 1145 of the Bankruptcy Code, if applicable, the Reinstated Existing Optima Common Stock will be freely transferable under the Securities Act by the recipients thereof, subject to (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Existing Optima Common Stock, (2) the restrictions, if any, in the documents governing Existing Optima Common Stock, and (3) any other applicable regulatory approval.  In reliance upon these exemptions, the Reinstated Existing Optima Common Stock will not be registered under the Securities Act or any applicable state Blue Sky Laws, and may not be transferred, encumbered or otherwise disposed of in the absence of such registration or an exemption therefrom under the Securities Act or under such laws and regulations thereunder.

     **6.     Cancellation of Old Optima Securities and Agreements**.    On the Effective Date, except as otherwise specifically provided for in the Plan (a) the Old Optima Securities and any other note, bond, indenture, Certificate, or other instrument or document evidencing or creating any funded-debt indebtedness or debt obligation of the Debtors (including the Unsecured Notes Indenture and the Secured Notes Indenture), shall be deemed to be automatically cancelled without further action by any person and (b) the obligations of and Claims against Optima and/or any of the Debtors under, relating, or pertaining to any agreements, indentures or similar documents governing the Old Optima Securities, and any other note, bond, indenture, Certificate, or other instrument or document evidencing or creating any funded-debt indebtedness or obligation of the Debtors, as the case may be, shall be deemed to be automatically released and discharged and cancelled without further action by any person; provided, however, that any agreement (including the Unsecured Notes Indenture and the Secured Notes Documents) that governs the rights of a Holder of a Claim and that is administered by a Servicer shall continue in effect solely for the purposes of allowing such Servicer to (w) make the distributions on account of such Claims under this Plan and perform such other necessary functions with respect thereto, if any, as provided for in Article 9.4 of the Plan, (x) maintain and exercise its Charging Lien or other right to priority payment against distributions under the Plan on account of such Servicer's reasonable fees, expenses, and indemnities owed to such Servicer under the terms of the Unsecured Notes Indenture, (y) prepare, execute, and/or make any documents or other filings evidencing the release of the

Secured Notes Indenture Trustee's Liens in the Collateral (as defined in the Secured Notes Documents) and effectuate the transfer of any Collateral (as defined in the Secured Notes Documents) in each case in accordance with the Secured Notes Documents, and (z) enforce any indemnification obligations in accordance with Article 10.9.   For the avoidance of doubt, reasonable fees and expenses owed to any Servicer for any distributions made to Holders of Class 3-A Claims shall remain subject to any Charging Lien maintained by any Servicer under the Unsecured Notes Documents.  On and after the Effective Date, all duties and responsibilities of the DIP Agent under the DIP Facility, the Unsecured Notes Indenture Trustee under the Unsecured Notes Documents, and the Secured Notes Indenture Trustee under the Secured Notes Documents shall be discharged and deemed satisfied except to the extent required in order to make distributions to Holders of DIP Claims and Unsecured Noteholders, as applicable, and to otherwise effectuate the Plan. For the avoidance of doubt, nothing contained in the Plan or the Confirmation Order shall in any way limit or affect the standing of the DIP Agent, the Unsecured Notes Indenture Trustee, or the Secured Notes Indenture Trustee to appear and be heard in the Chapter 11 Cases on and after the Effective Date.

> **7.    Issuance of New Securities; Execution of Plan Documents**.  Except as otherwise provided in the Plan, on or as soon as reasonably practicable after the Effective Date, the Reorganized Debtors shall issue all Securities, notes, instruments, Certificates, and other documents (including Exit Facility Documents) required to be issued pursuant to the Plan and Exit Facilities.

> **8.    Continued Corporate Existence**.  As provided in the Plan, including Article 6.9 of the Plan, the Debtors shall continue to exist after the Effective Date as separate entities, the Reorganized Debtors, with all the powers of corporations or other entities under applicable law in the jurisdictions in which the Debtors have been incorporated or formed, as applicable, and pursuant to their certificate of incorporation and bylaws (or in each case, the functional equivalent thereof, as applicable) or other organizational documents in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or in each case, the functional equivalent thereof, as applicable) or other organization documents are amended and restated by the Plan without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.  To the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan without any further notice to or action, order, or approval of the Bankruptcy Court or any other court of competent jurisdiction (other than the requisite filings required under applicable state, provincial, or federal law).

> **9.    Restructuring Transactions**.

> (a)    On or following the Confirmation Date, the Debtors, with the consent of the Plan Sponsor, or Reorganized Debtors, as the case may be, shall take such actions as may be necessary or appropriate to effect the relevant restructuring transactions as set forth in the Plan and the Plan Transaction Documents, and may take other actions on or after the Effective Date.  The anticipated post-Effective Date structure of the Reorganized Debtors shall be provided with the Plan Supplement.

(b)      Prior to, on, or after the Effective Date, and pursuant to the Plan, the Reorganized Debtors shall enter into the restructuring transactions described herein and in the Disclosure Statement and the Plan Transaction Documents.   Subject to the Plan Support Agreement, the Debtors, with the consent of the Plan Sponsor, or the Reorganized Debtors, as applicable, shall take any actions as may be necessary or appropriate to effect a restructuring of the Debtors' businesses or the overall organization structure of the Reorganized Debtors.  The restructuring transactions may include one or more restructurings, conversions, or transfers as may be determined by the Debtors, with the consent of the Plan Sponsor, to be necessary or appropriate.   The actions taken by the Debtors, with the consent of the Plan Sponsor, or the Reorganized Debtors, as applicable, to effect the restructuring transactions may include:  (i) the execution, delivery, adoption, and/or amendment of appropriate agreements or other documents of restructuring, conversion, disposition, or transfer containing terms that are consistent with the terms of the Plan, the Disclosure Statement, the Plan Transaction Documents, and any ancillary documents and that satisfy the applicable requirements of applicable state law and any other terms to which the applicable parties may agree; (ii) the execution, delivery, adoption, and/or amendment of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Disclosure Statement, the Plan Transaction Documents, and any ancillary documents and having other terms for which the applicable parties may agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, or conversion (or, in each case, the functional equivalent thereof) pursuant to applicable state law, including but not limited to an amended certificate of incorporation and by-laws (or, in each case, the functional equivalent thereof, as applicable); and (iv) all other actions that the Debtors or the Reorganized Debtors, with the consent of the Plan Sponsor, as applicable, determine to be necessary, desirable, or appropriate to implement, effectuate, and consummate the Plan or the restructuring transactions contemplated hereby, including making filings or recordings that may be required by applicable state law in connection with the restructuring transactions.

**10.    Directors and Officers of the Reorganized Debtors**.  On the Effective Date, the term of the current members of the board of directors of Optima shall expire, and the New Board, as determined by the Plan Sponsor, shall be appointed.  On the Effective Date, the term of the current members of the boards of directors of the Subsidiary Debtors shall expire, and the New Subsidiary Debtor Boards as selected by the Plan Sponsor, shall be appointed.  On and after the Effective Date, each director or officer of the Reorganized Debtors shall serve pursuant to the terms of the New Corporate Governance Documents and applicable state corporation law or alternative comparable law, as applicable.

**11.    Corporate Action**.  Each of the matters provided for under the Plan involving the corporate structure of the Debtors or the Reorganized Debtors or corporate action to be taken by or required of the Debtors or the Reorganized Debtors shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized, approved, and to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, creditors, or directors of the Debtors or the Reorganized Debtors.   Such actions may include (a) the adoption and filing of the New Corporate Governance Documents, if any, (b) the appointment of the New Board and the New Subsidiary Debtor Boards, (c) the Reinstatement of Existing Optima Common Stock, and (d) entry into the Exit Facilities.

**12.    Effectuating Documents; Further Transactions**.    On and after the Effective Date, the Reorganized Debtors, and the officers thereof and members of the New Board and the New Subsidiary Debtor Boards, shall be authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, or to otherwise comply with applicable law, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

**13.    Employment, Retirement, and Other Agreements and Employee Compensation Plans**.

(a)    <u>Employment Agreements</u>.    The Debtors (with the consent of the Plan Sponsor) may assume or reject employment, severance (change in control), retirement, indemnification or other agreements with their pre-Effective Date directors, officers, managing members and employees in accordance with the provisions of <u>Article VII</u> of the Plan.    The Reorganized Debtors may enter into new employment arrangements and/or change in control agreements with the Debtors' officers who continue to be employed after the Effective Date.    On the Effective Date, the Reorganized Debtors may (with the consent of the Plan Sponsor) adopt, approve, and authorize new employment arrangements and/or change in control agreements with respect to such officers of the Reorganized Debtors without further action, order, or approval of the New Board or the New Subsidiary Debtor Boards.

(b)    <u>Other Incentive Plans and Employee Benefits</u>.    Unless otherwise specified in the Plan, and except in connection and not inconsistent with Article 6.13(a) of the Plan, on and after the Effective Date, the Reorganized Debtors shall have the sole discretion to (i) amend, adopt, assume, and/or honor, in the ordinary course of business or as otherwise provided herein, any contracts, agreements, policies, programs, and plans for, among other things, compensation, pursuant to the terms thereof or hereof, including any incentive plan, 401(k) plan, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation benefits, life insurance, and accidental death and dismemberment insurance for the directors, officers and employees of the Debtors who served in such capacity from and after the Petition Date, and (ii) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date.

Notwithstanding the foregoing or anything in the Plan to the contrary, on the Effective Date, subject to the Reorganized Debtors' rights, if any, under applicable non-bankruptcy law, unless otherwise ordered by the Bankruptcy Court, the Reorganized Debtors shall assume the Debtors' obligations under the Multi-Employer Plan, the Single Employer Plan and the Niagara LaSalle Corporation Supplemental Executive Retirement Plan, and shall honor and perform all obligations thereunder in the ordinary course of business.

On the Effective Date, Niagara LaSalle Corporation shall assume and continue the Single Employer Plan and shall pay in cash any aggregate unpaid (i) minimum required funding contributions under 29 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083 and (ii)

delinquent PBGC premiums under 29 U.S.C. §§ 1306 and 1307, in each case with interest, for the Single Employer Plan under ERISA or the Internal Revenue Code.

No provision contained in the Disclosure Statement, the Plan, the Order confirming the Plan, or section 1141 of the Bankruptcy Code, shall be construed as discharging, releasing, or relieving any party, in any capacity, from any liability with respect to the Mult-Employer Plan or the Single Employer Plan under any law, government policy, or regulatory provision.  PBGC, the Multi-Employer Plan and the Single Employer Plan shall not be enjoined or precluded from enforcing such liability against any party as a result of the Plan's provisions for satisfaction, release, and discharge of claims.

14.    **Preservation of Causes of Action**.  In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors shall retain and may (but are not required to) enforce all rights to commence and pursue any and all Causes of Action that are not released pursuant to Articles 10.4 and 10.6 of the Plan or an order of the Bankruptcy Court, whether arising before or after the Petition Date, including but not limited to any actions or categories of actions specifically enumerated in a list of retained Causes of Action contained in the Plan Supplement, and such Causes of Action shall vest in the Reorganized Debtors as of the Effective Date.  The Reorganized Debtors, in their sole and absolute discretion, shall determine whether to bring, settle, release, compromise, or enforce such Causes of Action (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action.  The Reorganized Debtors or any successors may pursue such litigation claims in accordance with the best interests of the Reorganized Debtors or any successor holding such rights of action.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or an order of the Bankruptcy Court, the Reorganized Debtors expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or consummation of the Plan; provided, however, that all Avoidance Actions shall be waived and released as of the Effective Date.

15.    **Reservation of Rights.**  With respect to any Avoidance Actions that the Debtors release in accordance with Article 6.14 of the Plan, the Debtors and the Reorganized Debtors, as applicable, reserve all rights, including the right under section 502(d) of the Bankruptcy Code, with the consent of the Plan Sponsor, to use defensively (by recoupment or otherwise) the released avoidance cause of action (and facts giving rise to such action) as a basis to object to all or any part of a Claim against any Estates asserted by a creditor which remains in possession of, or otherwise obtains the benefit of, the avoidable transfer; provided, however, that this reservation of rights does not extend to, and no objection to any Claim may be based upon, the holder of any such Claims having received a potentially avoidable preferential transfer under section 547 of the Bankruptcy Code, or being potentially liable on any Avoidance Action to the

27

extent a transferee who is liable under such Avoidance Action would retain an Allowed Claim against the Debtors' Estates for the amount avoided or recovered.

        **16.**   **Exemption from Certain Transfer Taxes and Recording Fees**. Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment to the fullest extent contemplated by section 1146(a) of the Bankruptcy Code, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

        **17.**   **Insured Claims**. Notwithstanding anything to the contrary contained herein, to the extent the Debtors have insurance with respect to any Allowed General Unsecured Claim, the Holder of such Allowed Claim shall (a) be paid any amount from the proceeds of insurance to the extent that the Claim is insured, and (b) receive the treatment provided for in the Plan for Allowed General Unsecured Claims to the extent the applicable insurance policy does not provide coverage with respect to any portion of the Claim.

    **F.**   **Unexpired Leases and Executory Contracts**

        **1.**   **Rejection of Executory Contracts and Unexpired Leases**.

        (a)   <u>Rejection</u>. Except as otherwise provided herein, each Executory Contract and Unexpired Lease listed on the Schedule of Rejected Executory Contracts and Unexpired Leases shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

        The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Counterparties to Executory Contracts or Unexpired Leases that are deemed rejected as of the Effective Date shall have the right to assert any Claim on account of the rejection of such Executory Contracts or Unexpired Leases subject to compliance with the requirements herein.

        (b)   <u>Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases</u>. Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or the Reorganized Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts.

        (c)   <u>Claims Procedures Related to Rejection of Executory Contracts or Unexpired Leases</u>. Unless otherwise provided by a Bankruptcy Court order, any proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases pursuant to the Plan or otherwise must be filed with the Claims Agent no later than 30 days after

the later of the Effective Date or the effective date of rejection. Any proofs of Claim arising from the rejection of the Executory Contracts or Unexpired Leases that are not timely filed shall be disallowed automatically and forever barred, estopped, and enjoined from assertion and shall not be enforceable against the Debtors or the Reorganized Debtors, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims.

(d)    Reservation of Rights. Notwithstanding anything to the contrary herein, prior to the Effective Date, the Debtors, with the consent of the Plan Sponsor, may amend their decision with respect to the rejection of any Executory Contract or Unexpired Lease.

## 2.    Assumption of Executory Contracts and Unexpired Leases.

(a)    Automatic Assumption. Except as otherwise provided herein, each Executory Contract and Unexpired Lease not listed on the Schedule of Rejected Executory Contracts and Unexpired Leases shall automatically be assumed, or assumed and assigned, as applicable, and shall vest in and be fully enforceable by the Reorganized Debtors or its assignee in accordance with its terms, except as modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing or providing for its assumption or applicable federal law.

The Confirmation Order will constitute an order of the Bankruptcy Court approving such assumptions pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan (including any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Reorganized Debtors' assumption of such Executory Contract or Unexpired Lease, then such provision shall be deemed modified such that the transactions contemplated by the Plan will not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Each Executory Contract and Unexpired Lease assumed pursuant to the Plan will revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

(b)    Modifications, Amendments, Supplements, Restatements, or Other Agreements. Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated pursuant hereunder.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

(c)    Proofs of Claim Based on Executory Contracts or Unexpired Leases that Have Been Assumed.  Any and all proofs of Claims based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including hereunder, except proofs of Claims asserting Cure amounts, pursuant to the order approving such assumption, including the Confirmation Order, shall be deemed disallowed and expunged from the claims register as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court.

(d)    Cure Procedures and Payments Related to Assumption of Executory Contracts and Unexpired Leases.  With respect to each of the Executory Contracts or Unexpired Leases assumed hereunder, the Debtors shall designate a proposed Cure, with the consent of the Plan Sponsor, and the assumption of such Executory Contract or Unexpired Lease shall be conditioned upon the disposition of all issues with respect to Cure.  Except as otherwise set forth in the Plan Supplement, the Cure amount with respect to each of the Executory Contracts or Unexpired Leases assumed hereunder is designated by the Debtors as zero dollars ($0), subject to the determination of a different Cure amount pursuant to the procedures set forth herein and in the Cure Notices.  Except with respect to Executory Contracts and Unexpired Leases for which the Cure is $0, the Cure shall be satisfied by the Reorganized Debtors or their assignee, if any, by payment of the Cure in Cash within 30 days following the occurrence of the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as may be ordered by the Bankruptcy Court or agreed upon by the parties to the applicable Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court.

Any provisions or terms of the Executory Contracts or Unexpired Leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure, or by an agreed-upon waiver of Cure.  If there is a dispute regarding such Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors, with the consent of the Plan Sponsor, or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.  The Debtors, with the consent of the Plan Sponsor, or the Reorganized Debtors, as applicable, reserve the right either to reject or nullify the assumption of any Executory Contract or Unexpired Lease after a Final Order determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease is made.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in

30

control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

(e)     Cure Notices.  No later than 14 days before the Confirmation Hearing, the Debtors shall serve upon counterparties to such Executory Contracts and Unexpired Leases a Cure Notice, which shall be in form and substance acceptable to the Plan Sponsor, that will (i) notify the counterparty of the proposed assumption, (ii) list the applicable Cure, if any, (iii) describe the procedures for filing objections to the proposed assumption or assumption and assignment of the applicable Executory Contract or Unexpired Lease, (iv) describe the procedures for filing objections to the proposed Cure of the applicable Executory Contract or Unexpired Lease, and (v) explain the process by which related disputes will be resolved by the Bankruptcy Court.  If no objection is timely received, (x) the non-Debtor party to the Assumed Contract shall be deemed to have consented to the assumption of the applicable Executory Contract or Unexpired Lease and shall be forever barred from asserting any objection with regard to such assumption, and (y) the proposed Cure shall be controlling, notwithstanding anything to the contrary in any applicable Executory Contract or Unexpired Lease or other document as of the date of the filing of the Plan, and the non-Debtor party to an applicable Executory Contract or Unexpired Lease shall be deemed to have consented to the Cure amount and shall be forever barred from asserting, collecting, or seeking to collect any additional amounts relating thereto against the Debtors or the Reorganized Debtors, or the property of any of them.  For the avoidance of doubt, all proposed Cures shall be acceptable to the Plan Sponsor.

(f)     Cure Objections.  If a proper and timely objection to the Cure Notice or proposed Cure was filed by the Cure Objection Deadline, the Cure shall be equal to (i) the amount agreed to between the Debtors, with the consent of the Plan Sponsor, or Reorganized Debtors, as applicable, and the applicable counterparty, or, (ii) to the extent the Debtors or Reorganized Debtors and counterparty do not reach an agreement regarding any Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues.  Objections, if any, to the proposed assumption and/or Cure must be in writing, filed with the Bankruptcy Court and served in hard-copy form on the parties identified in the Cure Notice so that they are actually received by the Cure Objection Deadline.

(g)     Hearing with Respect to Objections.  If an objection to the proposed assumption and/or to the Cure is timely filed and received in accordance with the procedures set forth in Article 7.2(f) of the Plan, and the parties do not reach a consensual resolution of such objection, a hearing with respect to such objection shall be held at such time scheduled by the Bankruptcy Court or the Debtors or Reorganized Debtors.  Objections to the proposed Cure or assumption of an Executory Contract or Unexpired Lease will not be treated as objections to Confirmation of the Plan.

(h)     Reservation of Rights.  Notwithstanding anything to the contrary herein, prior to the Effective Date, the Debtors, with the consent of the Plan Sponsor, may amend their decision with respect to the assumption of any Executory Contract or Unexpired Lease and provide a new notice amending the information provided in the applicable notice.  In the case of an Executory Contract or Unexpired Lease designated for assumption that is the subject of a Cure Objection which has not been resolved prior to the Effective Date, the Debtors, with the

31

consent of the Plan Sponsor, or the Reorganized Debtors, as applicable, may designate such Executory Contract or Unexpired Lease for rejection at any time prior to the payment of the Cure.

(i)    Collective Bargaining Agreements and Other Employee Benefit and Incentive Plans.  Notwithstanding anything in Article 7.1, Article 7.2(h) or any other provision in the Plan to the contrary, as of the Effective Date, the Debtors as Reorganized Debtors shall assume and be deemed to have assumed (i) the Collective Bargaining Agreements, (ii) the Single Employer Plan and the Multi-Employer Plan, and (iii) the Niagara LaSalle Corporation Supplemental Executive Retirement Plan.

**3.    Insurance Policies**.

(a)    Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, the Plan Documents, the Plan Supplement, the Confirmation Order, any other document related to any of the foregoing or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening or grants an injunction or release, including, but not limited to, those set forth in Article IX of the Plan): (i) on the Effective Date, the Reorganized Debtors shall assume all insurance policies, as amended or modified, issued or providing coverage at any time to the Debtors, their Affiliates or predecessors of any of the foregoing and all agreements related thereto, as amended or modified (such policies and agreements, collectively, the "**Insurance Contracts**"); (ii) nothing in the Disclosure Statement, the Plan, the Plan Documents, the Plan Supplement or the Confirmation Order alters, modifies or otherwise amends the terms and conditions of (or the coverage provided by) any of the Insurance Contracts or releases or discharges the security interest and/or liens insurers and third party administrators have on any collateral and/or security, except that as of the Effective Date, the Reorganized Debtors shall become and remain liable for all of the Debtors' obligations and liabilities thereunder regardless of whether such obligations and liabilities arise before or after the Effective Date, provided, however that the Debtors or Reorganized Debtors, as applicable, shall retain the right to challenge any amounts owed under the Insurance Contracts in accordance with their terms, and the rights and obligations under the Insurance Contracts shall remain fully enforceable after the Effective Date of the Plan; (iii) nothing in the Disclosure Statement, the Plan, the Plan Documents, Plan Supplement, the Confirmation Order, any prepetition or administrative claim bar date order (or notice) or claim objection order alters or modifies the duty, if any, that the insurers and/or third party administrators have to pay claims covered by the Insurance Contracts and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) or draw on any collateral or security therefor in accordance with the terms of the Insurance Contracts; (iv) insurers and third party administrators shall not need to nor be required to file or serve a Cure Dispute or a request, application, claim, proof of claim or motion for payment and shall not be subject to any Bar Date or similar deadline governing Cure amounts or Claims; (v) the claims of insurers and/or third party administrators (whether arising before or after the Effective Date) under Insurance Contracts shall be paid in full in the ordinary course by the Debtors (or, after the Effective Date, the Reorganized Debtors), whether as an Allowed Administrative Claim or otherwise regardless of when such amounts are or shall become liquidated, due or paid and shall not be released or discharged by the Plan or the Confirmation Order; and (vi) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set

forth in Article 10.10 of the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (A) claimants with valid claims covered by any of the Insurance Contracts ("**Insured Claims**") to proceed with their claims; (B) insurers and/or third party administrators to administer, handle, defend, settle, and/or pay, in the ordinary course of business and subject to the terms of the Insurance Contracts, without further order of the Bankruptcy Court, (i) all Insured Claims, and (ii) all costs in relation to each of the foregoing; (C) the insurers and/or third party administrators to draw against any or all of any collateral or security provided by or on behalf of the Debtors (or the Reorganized Debtors, as applicable) at any time and to hold the proceeds thereof as security for the obligations of the Debtors (and the Reorganized Debtors, as applicable)  to the applicable insurers and/or third party administrators and/or apply such proceeds to the obligations of the Debtors (and the Reorganized Debtors, as applicable)  in accordance with the terms of  the Insurance Contracts, and (D) the insurers and/or third party administrators to (i) cancel any policies under the Insurance Contracts, and (ii) take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, each in accordance with the terms of the Insurance Contracts.

(b)     The Debtors or the Reorganized Debtors, as the case may be, shall maintain D&O Insurance providing coverage for those indemnitees currently covered by such policies for the remaining term of such policy and may, at the discretion of the Debtors or Reorganized Debtors (and with the approval of the Plan Sponsor), maintain runoff policies or tail coverage under policies in existence as of the Effective Date for a period of six years after the Effective Date, to the fullest extent permitted by such provisions, in each case insuring such parties in respect of any claims, demands, suits, Causes of Action, or proceedings against such indemnitees based upon any act or omission related to such indemnitee's service with, for, or on behalf of the Debtors in at least the scope and amount as currently maintained by the Debtors.

**4.     Contracts and Leases Entered into After the Petition Date**.  Contracts and leases entered into after the Petition Date by the Debtors, and any Executory Contracts and Unexpired Leases assumed by the Debtors, may be performed by the Reorganized Debtors in the ordinary course of business and in accordance with the terms thereof.

**5.     General Reservation of Rights**.  Neither the exclusion nor inclusion of any contract or lease on the Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtors, or any of their Affiliates, has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, with the consent of the Plan Sponsor, or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**G.     Procedures for Resolving Disputed Claims and Interests**

**1.     Determination of Claims and Interests**.  Notwithstanding anything to the contrary in the Plan, after the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses the Debtors had with respect to any Claim or Interest immediately prior to the Effective Date, including the Causes of Action retained pursuant to Article 6.14 of

the Plan and the reservation of rights pursuant to Article 6.15 of the Plan, except with respect to any Claim or Interest deemed Allowed under the Plan.

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Interest.    All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.  For the avoidance of doubt, any Claim determined and liquidated pursuant to (a) an order of the Bankruptcy Court or (b) applicable non-bankruptcy law (which determination has not been stayed, reversed, or amended and as to which determination or any revision, modification, or amendment thereof as to which the time to appeal or seek review or rehearing has expired and no appeal or petition for review or rehearing was filed or, if filed, remains pending) shall be deemed an Allowed Claim in such liquidated amount and satisfied in accordance with the Plan.

Nothing contained in Article 8.1 of the Plan shall constitute or be deemed a waiver of any claim, right, or Cause of Action that the Debtors or the Reorganized Debtors may have against any Entity in connection with or arising out of any Claim, including any rights under section 157(b) of title 28 of the United States Code.

**2.    Claims Administration Responsibility**.  Except as otherwise specifically provided for in the Plan, after the Effective Date, the Reorganized Debtors shall retain responsibility for (a) administering, disputing, objecting to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors, including (i) filing, withdrawing, or litigating to judgment objections to Claims or Interests, (ii) settling or compromising any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, and (iii) administering and adjusting the claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court, and (b) making distributions (if any) with respect to all Claims and Interests.

**3.    Objections to Claims**.  Unless otherwise extended by the Bankruptcy Court, any objections to Claims (other than Administrative Claims) shall be served and filed on or before the Claims Objection Deadline (or such later date as may be established by the Bankruptcy Court upon request of the Reorganized Debtors without further notice to parties-in-interest).  Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Debtors or the Reorganized Debtors effect service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (b) to the extent counsel for a Holder of a Claim or Interest is unknown, by first class mail, postage prepaid, on the signatory on the proof of Claim or other representative identified on the proof of Claim or any attachment thereto (or at the last known addresses of such Holders of Claims if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address), or (c) by first class mail, postage prepaid, on any counsel that has appeared on behalf of the Holder of the Claim in the Chapter 11 Cases and has not withdrawn such appearance.

4. **Disallowance of Claims**. EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM OR ADMINISTRATIVE CLAIM FILED AFTER THE APPLICABLE DEADLINE FOR FILING SUCH PROOFS OF CLAIM OR ADMINISTRATIVE CLAIM SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO, OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.

Nothing herein shall in any way alter, impair, or abridge the legal effect of the Bar Date Order, or the rights of the Debtors, the Plan Sponsor, the Reorganized Debtors, the Creditors' Committee before the Effective Date, or other parties-in-interest to object to Claims on the grounds that they are time barred or otherwise subject to disallowance or modification. Nothing in the Plan shall preclude amendments to timely filed proofs of Claim to the extent permitted by applicable law.

5. **Estimation of Claims**. Before or after the Effective Date, the Debtors, with the consent of the Plan Sponsor, or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate a Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Disputed Claim, including during the litigation of any objection to any Disputed Claim or during the pendency of any appeal relating to such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), without prejudice to the Holder of such Claim's right to request that estimation should be for the purpose of determining the Allowed amount of such Claim, and the Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. All estimation procedures set forth in the Plan shall be applied in accordance with section 502(c) of the Bankruptcy Code. Disputed Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Plan or the Bankruptcy Court.

All Claims of any Entity from which property is sought by the Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order; provided, however, that the foregoing does not extend to, and no objection to any Claim may be based upon, the holder of any such Claims having received a

35

potentially avoidable preferential transfer under section 547 of the Bankruptcy Code, or being potentially liable on any Avoidance Action to the extent a transferee who is liable under such Avoidance Action would retain an Allowed Claim against the Debtors' Estates for the amount avoided or recovered.

      **6.**    **No Interest on Disputed Claims**.  Except to the extent specifically provided for in the Plan or as otherwise required by section 506(b) of the Bankruptcy Code, postpetition interest shall not accrue or be paid on Claims or Interests, and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any Claim or Interest.  Additionally, and without limiting the foregoing, unless otherwise specifically provided for in the Plan or as otherwise required by section 506(b) of the Bankruptcy Code, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made, when and if such Disputed Claim becomes an Allowed Claim.

      **7.**    **Amendments to Claims**.  On or after the Effective Date, except as otherwise provided herein, a Claim may not be filed or amended without the authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such authorization is not received, any such new or amended Claim filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

    **H.**    **Provisions Governing Distributions**

      **1.**    **Time of Distributions**.  Except as otherwise provided for herein or ordered by the Bankruptcy Court, distributions under the Plan shall be made on the later of (a) Initial Distribution Date or (b) on the first Periodic Distribution Date occurring after the later of (i) 30 days after the date when a Claim is Allowed or (ii) 30 days after the date when a Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the Holder of such Claim; provided, however, that the Reorganized Debtors may, in their sole discretion, make one-time distributions on a date that is not a Periodic Distribution Date; provided, further, that the timing of distributions made on account of the DIP New Money Loan Claims and the DIP Replacement Loan Claims shall be as set forth in Article 2.2 and Article 13.3 of the Plan.

      **2.**    **Currency**.  Except as otherwise Provided in the Plan or Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate as of Effective Date at 4:00 p.m. prevailing Eastern Time, mid-range spot rate of exchange for the applicable currency as published in the next *The Wall Street Journal, National Edition* following the Effective Date.

      **3.**    **Distribution Agent**.  Except as otherwise provided herein, all distributions under the Plan shall be made by the Reorganized Debtors as Distribution Agent, or by such other Entity designated by the Reorganized Debtors as a Distribution Agent on or after the Effective Date.  The Distribution Agent shall not be required to give any bond or surety or other security for the performance of the Reorganized Debtors' duties as Distribution Agent unless otherwise ordered by the Bankruptcy Court.  The Distribution Agent shall be empowered

to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.  If the Distribution Agent is an entity other than the Reorganized Debtors, such entity shall be paid its reasonable fees and expenses, including the reasonable fees and expenses of its attorneys or other professionals.

**4.    Distribution on Account of Claims Administered by Servicers; Delivery of Distributions to Servicers**.  In the case of Holders of Claims whose Claims are governed by an agreement and administered by a Servicer, the respective Servicer shall be deemed to be the Holder of such Claims for purposes of distributions to be made hereunder.  The Distribution Agent shall make all distributions on account of such Claims to the Servicers or as directed by the Servicers, in the Servicers' sole discretion.  Each Servicer shall, at its option, hold or direct such distributions for the beneficial Holders of such Allowed Claims, as applicable; provided, however, the Servicer shall retain all rights under its respective agreement in connection with delivery of distributions to the beneficial Holders of such Allowed Claim, including rights on account of the Charging Lien; and provided further, however, that the Debtors' and the Reorganized Debtors' obligations to make distributions pursuant to the Plan shall be deemed satisfied upon delivery of distributions to each Servicer or the entity or entities designated by the Servicers.  The Servicers shall not be required to give any bond, surety, or other security for the performance of their duties with respect to such distributions.  For the avoidance of doubt, the Unsecured Notes Indenture Trustee Fees may be satisfied from the Unsecured Notes Indenture Trustee's Charging Lien.

**5.    Distributions on Account of Claims Allowed After the Effective Date**.

(a)    <u>No Distributions Pending Allowance</u>.  No payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order of the Bankruptcy Court, and the Disputed Claim has become an Allowed Claim; provided, however, that to the extent the holder of a Disputed Claim is also the holder of a separate Allowed Claim that is not a Disputed Claim on the Effective Date, the Debtors shall pay the amount of such Allowed Claim (that is not a Disputed Claim on the Effective Date) in full in Cash on the Initial Distribution Date.

(b)    <u>Special Rules for Distributions to Holders of Disputed Claims</u>.  Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties, no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.  All distributions made pursuant to the Plan on account of a Disputed Claim that is later deemed an Allowed Claim by the Bankruptcy Court shall be made together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Holders of Allowed Claims included in

the applicable Class; provided, however, that no interest shall be paid on account to such Allowed Claims unless required under applicable bankruptcy law.

**6.      Delivery of Distributions**.

(a)      Record Date for Distributions.  On the Distribution Record Date, the claims register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those record Holders listed on the claims register as of the close of business on the Distribution Record Date.  Further, the Unsecured Notes Indenture Trustee shall have no obligation to recognize any transfer of any Unsecured Notes Claims occurring after the close of business on the Distribution Record Date and shall instead be entitled to recognize and deal for all purposes under the Plan with only those Holders of record as of the close of business on the Distribution Record Date.

(b)      Cash Distributions.  Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Reorganized Debtors, except that Cash payments made to foreign creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

(c)      Address for Distributions.  Distributions to Holders of Allowed Claims shall be made by the Distribution Agent or the appropriate Servicer (i) at the addresses set forth on the proofs of Claim filed by such Holders of Claims (or at the last known addresses of such Holders of Claims if no proof of Claim is filed or if the Debtors or the Distribution Agent have been notified in writing of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related proof of Claim, (iii) at the addresses reflected in the Schedules if no proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address, or (iv) in the case of a Holder of a Claim whose Claim is governed by an agreement and administered by a Servicer, at the addresses contained in the official records of such Servicer.  The Debtors, the Reorganized Debtors, and the Distribution Agent shall not incur any liability whatsoever on account of any distributions under the Plan.

(d)      Undeliverable Distributions.  If any distribution to a Holder of a Claim is returned as undeliverable, no further distributions to such Holder of such Claim shall be made unless and until the Distribution Agent or the appropriate Servicer is notified of then-current address of such Holder of the Claim, at which time all missed distributions shall be made to such Holder of the Claim without interest, dividends, or accruals of any kind on the next Periodic Distribution Date.  Amounts in respect of undeliverable distributions shall be returned to the Reorganized Debtors until such distributions are claimed.

(e)      Reversion.  Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after such distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revert to and vest in the Reorganized Debtors free of any restrictions thereon.  Upon such vesting, the Claim of any Holder or successor to such Holder with respect to such property shall be cancelled, discharged and forever barred, notwithstanding federal or state escheat, abandoned, or unclaimed property laws to the contrary.  The provisions of the Plan regarding undeliverable

distributions and Unclaimed Distributions shall apply with equal force to distributions that are issued by the Reorganized Debtors or the Distribution Agent made pursuant to any indenture or Certificate (but only with respect to the initial distribution by the Servicer to Holders that are entitled to be recognized under the relevant indenture or Certificate and not with respect to Entities to whom those recognized Holders distribute), notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned, or unclaimed property law.

(f)    <u>De Minimis Distributions</u>.  Notwithstanding any other provision of the Plan to the contrary, the Reorganized Debtors, the Distribution Agent, and any Servicer shall not be required to make a distribution on account of an Allowed Claim if (i) the aggregate amount of all distributions authorized to be made on the Periodic Distribution Date in question is or has a value less than $25,000; <u>provided</u> that the Reorganized Debtors shall make, or cause to be made, a distribution on a Periodic Distribution Date of less than $25,000 if the Reorganized Debtors expect that such Periodic Distribution Date shall be the final Periodic Distribution Date; or (ii) the amount to be distributed to the specific Holder of the Allowed Claim on the particular Periodic Distribution Date does not both (x) constitute a final distribution to such Holder and (y) have a value of at least $50.00.

(g)    <u>Fractional Distributions</u>.  Notwithstanding any other provision of the Plan to the contrary, the Reorganized Debtors, the Distribution Agent, and any Servicer shall not be required to make partial distributions or distributions or payments of fractions of dollars (except with respect to distributions to Holders of DIP Claims or Unsecured Noteholders). Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

7.    **Surrender of Securities or Instruments**.  As soon as practicable after the Effective Date, each DIP Lender and Unsecured Noteholder shall surrender its note(s) to the relevant DIP Agent or Unsecured Notes Indenture Trustee (as applicable), or in the event such Unsecured Note(s) are held in the name of, or by a nominee of, the DTC, the Reorganized Debtors shall seek the cooperation of the DTC to provide appropriate instructions to the Unsecured Notes Indenture Trustee and the Unsecured Noteholder(s), and each Unsecured Noteholder shall be deemed to have surrendered each such Unsecured Note, note, debenture, or other evidence of indebtedness upon surrender of such global security by DTC or such other securities depository or custodian thereof.  No distributions under the Plan shall be made for or on behalf of such Holder unless and until such note(s) is received by Unsecured Notes Indenture Trustee or DIP Agent (as applicable), or the loss, theft or destruction of such note(s) is established to the reasonable satisfaction of the Unsecured Notes Indenture Trustee or DIP Agent (as applicable), which satisfaction may require such Holder to submit (a) a lost instrument affidavit and (b) an indemnity bond holding the Debtors, the Reorganized Debtors, and the Unsecured Notes Indenture Trustee or DIP Agent (as applicable), harmless in respect of such note and distributions made thereof.  Upon compliance with <u>Article 9.7</u> of the Plan by a DIP Lender or Unsecured Noteholder, such DIP Lender or Holder shall, for all purposes under the Plan, be deemed to have surrendered such Claim.  Any Holder that fails to surrender such DIP Claim or Unsecured Note or satisfactorily explain its non-availability to the DIP Lender or Unsecured Notes Indenture Trustee (as applicable) within one (1) year of the Effective Date shall

be deemed to have no further Claim against the Debtors, the Reorganized Debtors (or their property), the DIP Agent or the Unsecured Notes Indenture Trustee (as applicable) in respect of such Claim and shall not participate in any distribution under the Plan. All property in respect of such forfeited distributions, including interest thereon, shall be promptly returned to the Reorganized Debtors by the DIP Lender or Unsecured Notes Indenture Trustee (as applicable), and any such security shall be cancelled. Notwithstanding the foregoing, if the record Holder of an Unsecured Notes Claim is the DTC or its nominee or such other securities depository or custodian thereof, or if an Unsecured Notes Claim is held in book-entry or electronic form pursuant to a global security held by the DTC or such other securities depository or custodian thereof, then the beneficial Holder of such an Allowed Unsecured Notes Claim shall be deemed to have surrendered such Holder's security, note, debenture or other evidence of indebtedness upon surrender of such global security by the DTC or such other securities depository or custodian thereof.

8. **Compliance Matters**. In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

9. **Claims Paid or Payable by Third Parties**.

(a) <u>Claims Paid by Third Parties</u>. The Claims Agent shall reduce in full a Claim to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors or the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Debtors or the Reorganized Debtors on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution under the Plan to the Reorganized Debtors, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

(b) <u>Claims Payable by Insurance Carriers</u>. No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agree to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to

the extent of any agreed upon satisfaction on the claims register by the Claims Agent without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

    (c)    <u>Applicability of Insurance Policies</u>. Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

    **10.**    **Setoffs**. Except as otherwise expressly provided for in the Plan and except with respect to any DIP Claims, Unsecured Notes Claim, and any distribution on account thereof, the Reorganized Debtors pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors, as applicable, may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); <u>provided</u>, <u>however</u>, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Reorganized Debtors of any such Claims, rights, and Causes of Action that the Reorganized Debtors may possess against such Holder. In no event shall any Holder of Claims be entitled to set off any Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

    **11.**    **Recoupment**. In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless (i) such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date or (ii) such Holder's right to recoupment is preserved by applicable bankruptcy law.

    **12.**    **Allocation of Plan Distributions Between Principal and Interest**. To the extent that any Allowed Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

    **I.**    **Effect of the Plan on Claims and Interests**

1.     **Vesting of Assets**.  Except as otherwise explicitly provided in the Plan, on the Effective Date, all property comprising the Estate (including Causes of Action, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court) shall vest in the Reorganized Debtors which, as Debtors, owned such property or interest in property as of the Effective Date, free and clear of all Claims, Liens, charges, encumbrances, rights, and Interests. As of and following the Effective Date, the Reorganized Debtors may operate their business and use, acquire, and dispose of property and settle and compromise Claims, Interests, or Causes of Action without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

2.     <u>**Discharge of the Debtors**</u>**.  Pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in the Plan or the Confirmation Order, and effective as of the Effective Date: (a) the distributions and rights that are provided in the Plan, if any, and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Causes of Action, whether known or unknown, including any interest accrued on such Claims from and after the Petition Date, against, liabilities of, Liens on, obligations of, and rights against the Debtors or any of their assets or properties (except for the Excluded DIP Obligations), regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, and rights, including, but not limited to, Claims that arose before the Effective Date and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a proof of Claim or interest based upon such Claim, debt, or right is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) a Claim based upon such Claim, debt or right is Allowed under section 502 of the Bankruptcy Code, or (iii) the Holder of such a Claim, or right accepted the Plan; (b) the Plan shall bind all Holders of Claims and Interests; (c) all Claims shall be satisfied, discharged, and released in full (except for the Excluded DIP Obligations), and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Estates, the Reorganized Debtors, their successors and assigns, and their assets and properties any other Claims based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date (except for the Excluded DIP Obligations).  The Confirmation Order shall be a judicial determination of the discharge of all Claims against the Debtors, subject to the occurrence of the Effective Date.**

3.     **Compromises and Settlements**.  The Plan is intended to incorporate, pursuant to Bankruptcy Rule 9019(a), a global compromise, settlement and resolution of all Claims against and Interests in the Debtors pursuant to the terms of the Plan, and the agreements reached in the Plan Support Agreement.  Pursuant to Bankruptcy Rule 9019(a), the Debtors may compromise and settle various (a) Claims and (b) Causes of Action that the Debtors have against other Entities up to the Effective Date.  After the Effective Date, any such right shall pass to the Reorganized Debtors as contemplated in <u>Article 10.1</u> of the Plan, without the need for further approval of the Bankruptcy Court.  Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided

pursuant to the Plan or any distribution to be made on account of an Allowed Claim, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that any such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests, and is fair, equitable, and reasonable.

**4.      Release by Debtors.  Pursuant to section 1123(b) of the Bankruptcy Code, as of the Effective Date, the Debtors and their Estates, and the Reorganized Debtors shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged the Released Parties from any and all Claims, obligations, rights, suits, damages, Avoidance Actions, remedies, and liabilities whatsoever, including any derivative Claims, asserted or assertable by or on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the DIP Facility, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, provided under any applicable law, rule, or regulation, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the DIP Credit Agreement, Plan, the Disclosure Statement, the Plan Support Agreement, the Plan Supplement, the Exit Revolver Facility, the Exit Term Loan Facility, any other Plan Transaction Document, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined by final non-appealable order to constitute willful misconduct or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.  For the avoidance of doubt, nothing in this paragraph shall in any way affect the operation of Article 10.2 of the Plan, pursuant to section 1141(d) of the Bankruptcy Code.**

**5.      Release by Holders of Claims and Interests.  As of the Effective Date, the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged the Debtors, the Reorganized Debtors, their Estates, and the Released Parties from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted or assertable by or on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the DIP Facility**

(except for the Excluded DIP Obligations), the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors provided under any applicable law, rule, or regulation, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the DIP Credit Agreement, the Plan, the Disclosure Statement, the Plan Support Agreement, the Plan Supplement, the Exit Revolver Facility, the Exit Term Loan Facility any other Plan Transaction Document, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined by final non-appealable order to constitute willful misconduct or gross negligence. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not: (i) release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; or (ii) release or Impair any Allowed Claim, any Indemnification Obligations owed to any Indemnittee, or any Interest Reinstated under the terms of the Plan.

For the avoidance of doubt, except as expressly provided in the Plan, nothing in **Article 10.5** of the Plan shall in any way affect the operation of **Article 10.2** of the Plan, pursuant to section 1141(d) of the Bankruptcy Code.

6.    **General Release of Plan Sponsor by Debtors, the Debtors' Estates and Reorganized Debtors**. In consideration for the Plan Sponsor Contribution, and pursuant to Bankruptcy Rule 9019(a) and Article 10.3 of the Plan, upon the occurrence of the Effective Date, (a) the Debtors, (b) the Debtors' estates, (c) the Reorganized Debtors, and (d) with respect to each of the foregoing Entities in subparts (a) through (c), their respective current and former officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals (all of the foregoing in their respective capacities as such), shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged the Plan Sponsor and each of the Plan Sponsor's Affiliates, and each of their respective predecessors, successors and assigns, and current and former direct and indirect stockholders, members, limited partners, general partners, equity holders, principals, partners, managed funds, parents, equity holders, members, employees, agents, officers, directors, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants (the foregoing including without limitation (x) Mordechai Korf, (y) Gennadiy Bogolyubov, and (z) Igor Kolomoyskyy), from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, owned, held asserted or assertable by or on behalf of the Debtors, the Debtors' Estates or the Reorganized Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that any such Entity would have been legally or equitably entitled to assert (whether individually or collectively) based upon, or in any way relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, agreement, event, or other occurrence taking place on or before the

**Effective Date of the Plan**.  For the avoidance of doubt, the releases provided for by **Article 10.6 of the Plan are, and are intended to be, general releases.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

**For the avoidance of doubt, except as expressly provided in the plan, nothing in Article 10.6 of the Plan shall in any way affect the operation of Article 10.2 of the Plan, pursuant to section 1141(d) of the Bankruptcy Code.**

**7.    Exculpation and Limitation of Liability.  The Exculpated Parties shall neither have nor incur any liability to any Entity for any Exculpated Claim; provided, however, that the foregoing "exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.**

**The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code and, therefore, are not and shall not be liable at any time for the violations of any applicable, law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

8.    **Indemnification Obligations**.  From and after the Effective Date, the Reorganized Debtors will indemnify each Indemnitee to the same extent of any Indemnification Obligation in effect immediately prior to the Effective Date.  The Reorganized Debtors' indemnification obligation shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way.  The treatment of Indemnification Obligations in Article 10.7 of the Plan shall be in complete satisfaction, discharge, and release of any Claim on account of such Indemnification Obligation of the Debtors, except that any Indemnitee may assert a Claim in the Chapter 11 Cases for any prepetition Indemnification Obligation that is not satisfied because of the limitation contained in the prior sentence.

.    Notwithstanding the occurrence of the Effective Date or any provision of the Plan to the contrary, the Debtors or the Reorganized Debtors (as applicable) shall pay and reimburse and be liable to the Secured Notes Indenture Trustee and its directors, officers, agents and employees (the "**Indenture Indemnified Parties**") on demand for, and indemnify and hold harmless the Indenture Indemnified Parties from and against all losses, claims, damages, liabilities or expenses in any way, directly or indirectly, arising out of, or related to, or connected with the implementation of the Plan, in each case in accordance with the terms of the in Secured Notes Documents.

10.    **Injunction.  The satisfaction, release, and discharge pursuant to this Article X of the Plan shall act as an injunction, from and after the Effective Date, against any Entity (a) commencing or continuing in any manner or in any place, any action, employment of process, or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order; (c) creating, perfecting, or enforcing any lien or encumbrance; (d) asserting a setoff, right of subrogation, or**

**recoupment of any kind against any debt, liability, or obligation due to the Debtors, except as set forth in** Article 9.10 **or** 9.11 **of the Plan, in each case with respect to any Claim or Cause of Action satisfied, released or to be released, exculpated or to be exculpated, or discharged under the Plan or pursuant to the Confirmation Order and to the fullest extent authorized or provided by the Bankruptcy Code, including to the extent provided for or authorized by sections 524 and 1141 thereof; provided, however, that nothing contained herein shall preclude such Entities from exercising their rights pursuant to and consistent with the terms of the Plan or the Confirmation Order; and provided further, however, that nothing contained herein shall preclude the DIP Agent or the DIP Lenders from exercising any appropriate remedies against the Reorganized Debtors in connection with any Excluded DIP Obligations.**

11.    **Subordination Rights**.

(a)    Except as otherwise provided in the Plan, the allowance, classification and treatment of all Allowed Claims and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  All Claims and all rights and claims between or among Holders of Claims relating in any manner whatsoever to distributions on account of Claims or Interests, based upon any claimed subordination rights, whether asserted or unasserted, legal or equitable, shall be deemed satisfied by the distributions under the Plan to Holders of Claims having such subordination rights, and such subordination rights shall be deemed waived, released, discharged, and terminated as of the Effective Date.  Except as otherwise specifically provided for in the Plan, distributions to the various Classes of Claims hereunder shall not be subject to levy, garnishment, attachment, or like legal process by any Holder of a Claim by reason of any subordination rights or otherwise, so that each Holder of a Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.

(b)    Except as otherwise provided in the Plan, the right of the Debtors or the Reorganized Debtors to seek subordination of any Claim pursuant to section 510 of the Bankruptcy Code is fully reserved, and the treatment afforded any Claim or Interest that becomes a subordinated Claim or Interest at any time shall be modified to reflect such subordination.  Unless the Plan or the Confirmation Order otherwise provide, no distributions shall be made on account of a Claim subordinated pursuant to Article 10.9(b) of the Plan unless ordered by the Bankruptcy Court.

12.    **Protection Against Discriminatory Treatment**.  Consistent with section 525 of the Bankruptcy Code and paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another entity with whom the Reorganized Debtors have been associated, solely because the Debtors have been debtors under chapter 11, have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or have not paid a debt that is dischargeable in the Chapter 11 Cases.

13.     **Release of Liens**.  Except as otherwise provided in the Plan, including Article 4.2 of the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.  Notwithstanding the above, nothing in the Plan or the Confirmation Order shall release any deed restriction, easements, or institutional control that runs with the land under environmental law.

14.     **Reimbursement or Contribution**.  If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as noncontingent or (2) the relevant Holder of a Claim has filed a noncontingent proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

J.      **Conditions Precedent**

1.      **Conditions to the Effective Date of the Plan**.   The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Article 11.2 of the Plan, and each of which must be acceptable to the Plan Sponsor:

(a)     the Plan and Plan Transaction Documents shall be in a form and substance consistent in all material respects with the Plan Support Agreement;

(b)     the Bankruptcy Court shall have entered the Disclosure Statement Order, and such order shall be a Final Order;

(c)     the Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent in all material respects with the Plan Support Agreement, and such order shall be a Final Order;

(d)     the Bankruptcy Court shall have entered the Plan Support Agreement Approval Order and the Plan Support Agreement shall not have been terminated by any of the parties thereto, and no defaults or termination events thereunder shall exist;

(e)     Optima (i) shall have obtained the Exit Facilities, (ii) shall have executed and delivered the documentation governing the Exit Facilities, which Exit Facilities shall close substantially contemporaneously with the Effective Date, and (iii) all conditions to effectiveness of the Exit Facilities (other than any required receipt of the Plan Sponsor Contribution) shall have been satisfied or waived (or will be satisfied and waived substantially concurrently with the occurrence of the Effective Date);

(f)     the New Corporate Governance Documents shall have been adopted and (where required by applicable law) filed with the applicable authorities of the

relevant jurisdictions of organization and shall have become effective in accordance with such jurisdiction's corporation, limited liability company, or alternative comparable laws, as applicable;

(g)    all authorizations, consents, certifications, approvals, rulings, no action letters, opinions or other documents or actions required by any law, regulation or order to be received or to occur in order to implement the Plan on the Effective Date shall have been obtained or shall have occurred unless failure to do so will not have a material adverse effect on the Reorganized Debtors;

(h)    all statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid and satisfied in full; and

(i)    the Plan Sponsor will have demonstrated, in a manner reasonably satisfactory to the Debtors, the availability of the Plan Sponsor Contribution in accordance with the terms of the Plan Support Agreement and the Plan.

**2.    Waiver of Conditions Precedent**.   The conditions set forth in Article 11.1 of the Plan, except for conditions "(e)" and "(i)", may be waived, in whole or in part, by the Debtors and the Plan Sponsor, in each such party's respective sole discretion, without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing.

**3.    Notice of Effective Date**.   The Reorganized Debtors shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within a reasonable period of time after the conditions in Article 11.1 of the Plan have been satisfied or waived pursuant to Article 11.2 of the Plan.

**4.    Effect of Non-Occurrence of Conditions to Consummation**.   If prior to consummation of the Plan, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action, (b) prejudice in any manner the rights of the Debtors or any other Entity, or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors or any other Entity.

**K.    Retention of Jurisdiction**

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

(a)    resolve any matters related to Executory Contracts and Unexpired Leases, including: (i) the assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear and determine the allowance of Claims resulting therefrom including the amount of Cure, if any, required to be paid; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) the Reorganized Debtors' amendment, modification, or supplement after the Effective Date, pursuant to

Article VII of the Plan, of the lists of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (iv) any dispute regarding whether a contract or lease is or was executory or expired;

        (b)     adjudicate any and all adversary proceedings, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases, the Plan, or that were the subject of proceedings before the Bankruptcy Court, prior to the Effective Date, proceedings to adjudicate the allowance of Disputed Claims and Disputed Interests, and all controversies and issues arising from or relating to any of the foregoing;

        (c)     ensure that distributions to Holders of Allowed Claims are accomplished as provided herein and adjudicate any and all disputes arising from or relating to distributions under the Plan;

        (d)     allow in whole or in part, disallow in whole or in part, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including hearing and determining any and all objections to the allowance or estimation of Claims or Interests filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest, and the resolution of request for payment of any Administrative Claim;

        (e)     hear and determine or resolve any and all matters related to Causes of Action;

        (f)     enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified, and/or vacated;

        (g)     issue and implement orders in aid of execution, implementation, or consummation of the Plan;

        (h)     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

        (i)     hear and determine all applications for allowance of compensation and reimbursement of Professional Claims under the Plan or under sections 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code;

        (j)     determine requests for the payment of Claims entitled to priority under section 507(a)(1) of the Bankruptcy Code, including compensation and reimbursement of expenses of parties entitled thereto;

        (k)     adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

        (l)     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the

Plan and disputes arising in connection with any Entity's obligations incurred in connection with the Plan;

(m)    hear and determine all suits or adversary proceedings to recover assets of the Debtors and property of their Estates, wherever located;

(n)    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)    resolve any matters relating to pre- or post-confirmation sales of the Debtors' assets;

(p)    grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

(q)    hear any other matter not inconsistent with the Bankruptcy Code;

(r)    hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge;

(s)    enter a Final Decree closing the Chapter 11 Cases;

(t)    enforce all orders previously entered by the Bankruptcy Court;

(u)    hear and determine all matters relating to any Section 510(b) Claim; and

(v)    hear and determine all matters arising in connection with the interpretation, implementation, or enforcement of the Backstop Commitment Letter.

From the Confirmation Date through the Effective Date, the Bankruptcy Court shall retain jurisdiction with respect to each of the foregoing items and all other matters that were subject to its jurisdiction prior to the Confirmation Date; provided, however, that the Bankruptcy Court shall not have nor retain exclusive jurisdiction over any post-Effective Date agreement, including but not limited to any of the Exit Facility Documents.  Nothing contained herein shall be construed to increase, decrease or otherwise modify the independence, sovereignty or jurisdiction of the Bankruptcy Court.

### L.    Miscellaneous Provisions

**1.    Binding Effect**.  Upon the Effective Date, the Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all current and former Holders of Claims, all current and former Holders of Interests, and all other parties-in-interest and their respective heirs, successors, and assigns.

**2.    Payment of Statutory Fees**.  All fees payable pursuant to section 1930 of title 28 of the United States Code, as of the entry of the Confirmation Order as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.  The

Reorganized Debtors shall continue to pay fees pursuant to section 1930 of title 28 of the United States Code until the Chapter 11 Cases are closed by entry of the Final Decree. Furthermore, following entry of the Confirmation Order, the Reorganized Debtors shall continue to file quarterly reports in compliance with Bankruptcy Rule 2015(a)(5); however, such reports shall not purport to be prepared in accordance with GAAP, may not be construed as reports filed under the Securities Exchange Act, and may not be relied upon by any party for any purpose except as set forth in Bankruptcy Rule 2015(a)(5).

**3.    Payment of Certain Additional Fees and Expenses**.  Notwithstanding any provision in the Plan to the contrary, on the Effective Date, all unpaid fees and expenses of the DIP Agent and the DIP Professionals, including the reasonably estimated fees and expenses to be incurred through the Effective Date, shall be paid in full in Cash by the Debtors or Reorganized Debtors (as applicable); provided, that following the Effective Date, any such amounts paid to the DIP Agent and the DIP Professionals in excess of such fees and expenses actually and reasonably incurred through the Effective Date shall be returned to the Reorganized Debtors.  In addition, to the extent the DIP Agent or DIP Lenders incurs any costs, fees or expenses related to the period after the Effective Date in connection with distributions made pursuant to the Plan or to otherwise effectuate the Plan, such costs, fees and expenses reasonably incurred shall be promptly paid in full in cash by the Debtors or Reorganized Debtors (as applicable).  On or as soon as practicable following the Effective Date, the Reorganized Debtors shall reimburse and pay to the Plan Sponsor all reasonable and documented legal professional fees and expenses incurred by the Plan Sponsor in connection with the Chapter 11 Cases.

**4.    Payment of Fees and Expenses of the Unsecured Notes Indenture Trustee**.  Notwithstanding any provision in the Plan to the contrary, the Debtors or Reorganized Debtors (as applicable) shall promptly pay in full in Cash any outstanding reasonable and documented Unsecured Notes Indenture Trustee Fees incurred by the Unsecured Notes Indenture Trustee without the need for such parties to file fee applications with the Bankruptcy Court; provided, however, that, to receive payment on the Effective Date, the Unsecured Notes Indenture Trustee and their respective counsel shall provide the Debtors and the Plan Sponsor with the invoices, as applicable, for which it seeks payment within ten (10) Business Days prior to the Effective Date; provided, further, that if the Debtors and the Plan Sponsor, as applicable, have previously agreed to or have no objection to such reasonable fees, such reasonable fees shall be paid on or as soon as practicable after the Effective Date.  To the extent that the Debtors and/or the Plan Sponsor, as applicable, object in writing prior to the expiration of the ten (10) Business Day payment period to any of the Unsecured Notes Indenture Trustee Fees not previously agreed to, the Debtors shall not be required to pay any disputed portion of such amounts until a resolution of such objection is agreed to by the Debtors and/or the Plan Sponsor, as applicable, or a further order of the Bankruptcy Court upon a motion by the Unsecured Notes Indenture Trustee.  Nothing herein shall be deemed to impair, waive, discharge, or negatively impact the Charging Lien of the Unsecured Notes Indenture Trustee.  The Debtors and Reorganized Debtors shall have no obligation to pay Unsecured Notes Indenture Trustee Fees that may be incurred after the Effective Date.

.    Notwithstanding any provision in the Plan to the contrary, the Debtors or Reorganized Debtors (as applicable) shall promptly pay in full in Cash any outstanding reasonable and documented Secured Notes Indenture Trustee Fees incurred by the Secured Notes

Indenture Trustee without the need for such parties to file fee applications with the Bankruptcy Court; provided, however, that, to receive payment on the Effective Date, the Secured Notes Indenture Trustee and their respective counsel shall provide the Debtors and the Plan Sponsor with the invoices, as applicable, for which it seeks payment within ten (10) Business Days prior to the Effective Date; provided, further, that if the Debtors and the Plan Sponsor, as applicable, have previously agreed to or have no objection to such reasonable fees, such reasonable fees shall be paid on or as soon as practicable after the Effective Date. To the extent that the Debtors and/or the Plan Sponsor, as applicable, object in writing prior to the expiration of the ten (10) Business Day payment period to any of the Secured Notes Indenture Trustee Fees not previously agreed to, the Debtors shall not be required to pay any disputed portion of such amounts until a resolution of such objection is agreed to by the Debtors and/or the Plan Sponsor, as applicable, or a further order of the Bankruptcy Court upon a motion by the Secured Notes Indenture Trustee.

**6.    Modification and Amendments**. Subject to the terms and conditions of the Plan Support Agreement, the Debtors, with consent of the Plan Sponsor, may alter, amend, or modify the Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date. After the Confirmation Date and prior to substantial consummation of the Plan as defined in section 1101(2) of the Bankruptcy Code, the Debtors may, with the consent of the Plan Sponsor, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan.

**7.    Confirmation of the Plan**. The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Debtors reserve the right to amend the Plan to any extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

**8.    Additional Documents**. On or before the Effective Date, in each case subject to the terms of the Plan Support Agreement, the Debtors may file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Reorganized Debtors, as applicable, and Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provision and intent of the Plan.

**9.    Dissolution of Creditors' Committee**. Effective on the Effective Date, the Creditors' Committee shall dissolve automatically, whereupon their members, professionals, and agents shall be released from any further duties, responsibilities, and liabilities in the Chapter 11 Cases and under the Bankruptcy Code, provided that obligations arising under confidentiality agreements, joint interest agreements, and protective orders entered during the Chapter 11 Cases shall remain in full force and effect according to their terms. The Creditors' Committee may make applications for Professional Claims. The Professionals retained by the Creditors' Committee and jointly by the Creditors' Committee and the Debtors and the respective members of the Creditors' Committee shall not be entitled to compensation and reimbursement of

expenses for services rendered after the Effective Date, <u>provided</u>, <u>however</u>, notwithstanding the foregoing, the Professionals retained by the Creditors' Committee shall be entitled to submit invoices for compensation and reimbursement of expenses for time spent with respect to applications for the allowance of compensation and reimbursement of expenses filed after the Effective Date, and have such allowed amounts paid from the Holdback Escrow Account.

**10.    Revocation, Withdrawal, or Non-Consummation**.

(a)    <u>Right to Revoke or Withdraw</u>.  Subject to the terms and conditions of the Plan Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Effective Date and file subsequent chapter 11 plans.

(b)    <u>Effect of Withdrawal, Revocation, or Non-Consummation</u>.  If the Debtors revoke or withdraw the Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, then the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims or the allocation of the distributions to be made hereunder), the assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be null and void in all respects.  In such event, nothing contained herein or in the Disclosure Statement, and no acts taken in preparation for consummation of the Plan, shall be deemed to constitute a waiver or release of any Claims or Causes of Action by or against the Debtors or any other Entity, to prejudice in any manner the rights and defenses of the Debtors, the Holder of a Claim or Interest, or any Entity in any further proceedings involving the Debtors, or to constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

**11.    Notices**.  After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered on the Parties below shall be served as follows:

**If to the Reorganized Debtors:**

Optima Specialty Steel, Inc.
200 S. Biscayne Blvd.
Suite 5500
Miami, FL 33131-2310
Attention: General Counsel

with a copy (which shall not constitute notice) to:

Paul J. Keenan Jr.
Greenberg Traurig, LLP
333 S.E. 2nd Avenue
Suite 4400
Miami, FL 33131

**If to the Plan Sponsor:**

Optima Acquisitions, LLC
200 S. Biscayne Blvd.
Suite 5500
Miami, FL 33131-2310
Attention:  Mordechai Korf

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE 19899
Attention: Mark S. Chehi
          Jason M. Liberi


**If to the Office of the United States Trustee:**

Office of the United States Trustee for the District of Delaware
Room 2207, Lockbox 35
844 North King Street
Wilmington, DE 19801
Attention:  Jane M. Leamy


      **12.**    **Term of Injunctions or Stays**.  Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

      **13.**    **Governing Law**.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware shall govern the construction and implementation of the Plan, any agreements, documents, and instruments executed in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control).  Corporate governance matters shall be governed by the laws of the state of incorporation, formation, or functional equivalent thereof, as applicable, of the applicable Reorganized Debtor.

      **14.**    **Entire Agreement**.  Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings,

and representations on such subjects, all of which have become merged and integrated into the Plan.

15.    **Severability**.  If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted; provided, however, that any such revision, amendment, or modification must be consistent with the Plan Support Agreement.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.   The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the Debtors' consent, and (c) nonseverable and mutually dependent.

16.    **No Waiver or Estoppel**.  Upon the Effective Date, each Holder of a Claim or Interest shall be deemed to have waived any right to assert that its Claim or Interest should be Allowed in a certain amount, in a certain priority, be secured, or not be subordinated by virtue of an agreement made with the Debtors and/or their counsel, the Creditors' Committee and/or its counsel, or any other party, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court.

17.    **Conflicts**.  In the event that the provisions of the Disclosure Statement and the provisions of the Plan conflict, the terms of the Plan shall govern.

18.    **Waiver of Limitations on Releases of Unknown Claims**. Each of the Releasing Parties and Released Parties agree and acknowledge, or shall be deemed to agree and acknowledge, that the releases contained in Articles 10.4, 10.5 and 10.6 of the Plan extend to Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities that the parties do not know or expect to exist at the time of the release, which, if known, might have affected the decision to enter into the release and which each of the Releasing Parties and Released Parties shall be deemed to waive, and shall waive and relinquish to the fullest extent permitted by law, any and all provisions, rights, and benefits conferred by any law of the United States or any state or territory thereof, or principle of common law, which governs or limits a person's release of unknown claims; further, with respect to any and all such Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities, including any and all unknown claims that the Releasing Parties and Released Parties shall be deemed to waive, and shall waive and relinquish, to the fullest extent permitted by law, the provisions, rights, and benefits of Section 1542 of the California Civil Code, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM

OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

The Releasing Parties and Released Parties also shall be deemed to waive any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to California Civil Code § 1542. The Releasing Parties and Released Parties also acknowledge, or shall be deemed to acknowledge, that they may discover facts in addition to or different from those that they now know or believe to be true with respect to the subject matter of this release, but that it is the intention of the parties to fully, finally, and forever settle and release with prejudice any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities conceivably within the scope of the releases contained in <u>Articles 10.4, 10.5 and 10.6,</u> including any and all unknown claims, without regard to the subsequent discovery or existence of additional or different facts. Such parties expressly agree, or shall be deemed to expressly agree, that any fraudulent inducement or similar claims that could be premised on unknown facts or facts that are subsequently discovered are included within the definition of unknown claims.

## VI.    EXEMPTION FROM SECURITIES LAWS

The Debtors are relying on section 1145(a) of the Bankruptcy Code and section 4(2) of the Securities Act, and Regulation D promulgated thereunder, to exempt from the registration requirements of the Securities Act and applicable state securities and "blue sky" laws the Reinstatement or offering, issuance, and distribution, if any, of any Securities pursuant to the Plan and any and all settlement agreements incorporated therein, to the extent that any such laws are applicable.

The Plan contemplates the Reinstatement of the Class 6 Existing Optima Equity Interests in Optima to Holders of such Interests in exchange, or principally in exchange, for the Plan Sponsor Contribution.  In reliance upon section 1145 of the Bankruptcy Code, the Reinstatement of Existing Optima Common Stock to such Holders (the "**1145 Securities**"), will be exempt from the registration requirements of the Securities Act and equivalent provisions in state securities laws, to the extent that any such laws are applicable.   Section 1145(a) of the Bankruptcy Code generally exempts the offer or sale of securities pursuant to a plan of reorganization from the registration requirements of the Securities Act and from registration under state securities laws if the following conditions are satisfied:  (i) the securities are issued or sold under a chapter 11 plan by (a) a debtor, (b) one of its affiliates participating in a joint plan with the debtor, or (c) a successor to a debtor under the plan and (ii) the securities are issued entirely in exchange for a claim against or interest in the debtor or such affiliate, or are issued principally in such exchange and partly for cash or property.  The Debtors believe that the Reinstatement of 1145 Securities for the Plan Sponsor Contribution under the circumstances provided in the Plan will satisfy the requirements of section 1145(a) of the Bankruptcy Code.

## VII.   FINANCIAL INFORMATION, PROJECTIONS AND REORGANIZATION VALUE

### A.    Historical Financial Information

Attached hereto as **Exhibit B** are the audited consolidated balance sheets of the Debtors as of December 31, 2016, 2015, 2014, 2013 and 2012, the related consolidated statements of operations and cash flows for the years ending December 31, 2016, 2015, 2014, 2013 and 2012, and the accompanying report of Ernst & Young LLP.  This financial information is provided as a resource to permit the Holders of Claims and Interests to better understand the Debtors' historical business performance and the impact of the Chapter 11 Cases on their businesses.

**B.      Projected Financial Information**

The Debtors' management has prepared the financial projections, which are attached to this Disclosure Statement as **Exhibit B** (the "**Financial Projections**").  The principal assumptions that are part of the business plan and that underlie the Financial Projections are set forth in **Exhibit B**.

After the date of the Disclosure Statement, the Reorganized Debtors do not intend to update or otherwise revise the Financial Projections to reflect circumstances existing since their preparation or to reflect the occurrence of unanticipated events.

THE FINANCIAL PROJECTIONS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT B WERE NOT PREPARED TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.  THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NOT EXAMINED OR COMPILED THE ACCOMPANYING PROJECTIONS AND ACCORDINGLY DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE PROJECTIONS AND DISCLAIM ANY ASSOCIATION WITH THE PROJECTIONS.  EXCEPT FOR PURPOSES OF THIS DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF ITS ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS.  NONE OF THE DEBTORS, THEIR PROFESSIONALS AND THE REORGANIZED DEBTORS INTEND TO UPDATE OR OTHERWISE REVISE THESE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE OF THIS DISCLOSURE STATEMENT OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.

THE ESTIMATES AND ASSUMPTIONS ON WHICH THE FINANCIAL PROJECTIONS ARE BASED MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE COMPANY'S CONTROL.  NO REPRESENTATIONS CAN BE OR ARE MADE AS TO WHETHER THE ACTUAL RESULTS WILL BE WITHIN THE RANGE SET FORTH IN ITS PROJECTIONS.  SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE, AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR MAY BE UNANTICIPATED, AND THEREFORE MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER.  THE

57

PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. SEE SECTION VIII-"CERTAIN FACTORS TO BE CONSIDERED" AND OTHER QUALIFICATIONS SET FORTH IN <u>EXHIBIT B</u>.

### C.    Reorganization Value

The Debtors have been advised by Miller Buckfire, its investment banker, with respect to the enterprise value for the Reorganized Debtors implied by the transactions contemplated by the Plan. Miller Buckfire has estimated the enterprise value implied by the transaction for the purpose of determining the implied value available for distribution to Holders of Allowed Claims and Interests pursuant to the Plan.

The Plan contemplates that the Plan Sponsor will contribute the Plan Sponsor Contribution in the amount of $200 million as a cash equity contribution to Reorganized Optima in respect of the Plan Sponsor's outstanding and Unimpaired Existing Optima Common Stock, implying an equity value of approximately $200 (the "**Implied Equity Value**"). Based upon the anticipated net debt on the Effective Date of $99.8 million, the implied enterprise value for the Reorganized Debtors for purposes of distributions to Holders of Allowed Claims and Interests under the Plan (the "**Reorganization Value**") is approximately $299.8 million.

THE FOREGOING ANALYSIS IS BASED SOLELY UPON THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND ASSUMES THAT SUCH TRANSACTIONS CLOSE. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE REORGANIZATION VALUE REFLECTED ABOVE WOULD BE REALIZED IF THE TRANSACTIONS CONTEMPLATED UNDER THE PLAN DO NOT CLOSE AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

Miller Buckfire's analysis addresses the Reorganization Value for the Reorganized Debtors, as reflected by the Implied Equity Value, assuming the Plan is approved and becomes effective. It does not address other aspects of the proposed reorganization, the Plan or any other transactions and does not address the Debtors' underlying business decision to effect the reorganization set forth in the Plan. Miller Buckfire's Implied Equity Value and Reorganization Value do not constitute a recommendation to any Holder of Allowed Claims or Interests. Miller Buckfire has not been asked to, nor did Miller Buckfire, express any view as to what value the Existing Optima Common Stock is or will be on the Effective Date of the Plan when the Class 6 Interests are left Unimpaired and Reinstated pursuant to the Plan, or the prices at which the Existing Optima Common Stock may trade in the future. The Implied Equity Value and Reorganization Value set forth herein do not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

THE REORGANIZATION VALUE REFLECTS WORK PERFORMED BY MILLER BUCKFIRE ON THE BASIS OF INFORMATION AVAILABLE TO MILLER BUCKFIRE CURRENT AS OF THE DATE OF THIS DISCLOSURE STATEMENT. ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT MILLER BUCKFIRE'S CONCLUSIONS,

NEITHER MILLER BUCKFIRE NOR THE DEBTORS HAVE ANY OBLIGATION OR INTENT TO UPDATE, REVISE OR REAFFIRM ITS ESTIMATE.

The estimates of value herein do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of Existing Optima Common Stock following on the Effective Date of the Plan and Reinstatement of the Class 6 Interests pursuant to the Plan, which may be significantly higher or lower than the amounts set forth herein. In addition, the valuation of the Existing Optima Common Stock is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices at issuance will depend upon, among other things, the operating performance of the Debtors, prevailing interest rates, conditions in the financial markets, the anticipated holding period of securities received by prepetition constituents, and other factors which generally influence the prices of securities such as supply/demand imbalances and levels of liquidity in the secondary market.

THE CALCULATIONS OF VALUE SET FORTH HEREIN REPRESENT IMPLIED VALUES AND DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE IMPLIED EQUITY VALUE FOR THE REORGANIZED DEBTORS ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET TRADING VALUE. ANY SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPLIED EQUITY VALUE FOR THE REORGANIZED DEBTORS.

## VIII.   CERTAIN FACTORS TO BE CONSIDERED

Holders of Claims against and Interests in the Debtors should consider the risks and uncertainties below in evaluating the Plan. The risks and uncertainties described below are not the only ones the Debtors face. Additional risks and uncertainties not presently known to the Debtors or that they currently deem immaterial may also harm their businesses.

### A.   General

The Plan sets forth the means for satisfying the Claims against and Interests in each of the Debtors. Allowed Claims are expected to be paid in full in Cash on the Effective Date or following their Allowance in accordance with the payment terms of the Plan. Certain Allowed Claims will be Reinstated and paid in full in accordance with their terms. Nevertheless, there are some risks to consummation of the Plan. The Plan has been proposed after a careful consideration of all reasonable restructuring alternatives. Despite the risks inherent in the Plan, as described herein, the Debtors believe that the Plan is in the best interests of Creditors and Holders of Interests when compared to all reasonable alternatives.

### B.   Industry-Specific Risk Factors

The following are risk factors pertaining to the Debtor's operations and industry that could affect the Debtors' ability to consummate the Plan:

1.    **The Debtors' future profitability may fluctuate significantly due to changes in demand in the end markets the Debtors target due to, among other factors, general economic conditions.**

Changes in general economic conditions have affected, and may in the future impact, the demand for the Debtors' products, which creates uncertainty regarding the Debtors' ability to consistently grow sales and profitability, including as a result of excess manufacturing capacity and lower average selling prices.  The Debtors may be affected by changes in conditions in specific industries where the Debtors' products are used.

2.    **The Debtors operate in markets that are highly competitive and their results of operations could be adversely impacted by competitors' and their customers' actions.**

The Debtors operate in highly competitive markets.  The Debtors face several types of risk, including the following:

- The Debtors' competitors and customers vary in size and the breadth of their product offerings.  The Debtors compete against both domestic and international manufacturers.  Some of the Debtors' competitors have greater financial, technological and other resources than the Debtors and have lower raw material costs and costs of production.  Actions by the Debtors' competitors and the Debtors' customers could lead to downward pressure on prices and a decline in market share in any or all of their markets.  The Debtors' business faces risk that certain events, such as a new product and technological development by competitors or customers, changing customer needs, production advances for competing products or price changes in raw materials, could cause customers to switch to competitors' products or reduce their purchases of the Debtors' products.

- Although many of the Debtors' products are expensive to ship and historically imports have accounted for a small portion of the markets in which they operate, international competitors may overcome this hurdle.  Foreign competitors may have lower labor costs, and some are owned, controlled or subsidized by their governments, which may allow their production and pricing decisions to be influenced by political and economic policy considerations as well as prevailing market conditions.  In addition, the relative strength of the U.S. Dollar reduces the cost of imports relative to domestically produced steel.

- Some of the Debtors' existing customers may move offshore where the Debtors may not be able to economically meet their customers' needs when faced with competition from offshore competitors, particularly given the high transportation cost of the Debtors' products.  Sales of some of their most significant products represent a high percentage of the market demand for these products and could be targeted by their competitors.

- Because many of the Debtors' production processes require high labor input, the Debtors may be vulnerable to competition that possesses lower labor costs. To the extent a competitor is able to provide similar products at a lower price to the Debtors' customers; they may be required to reduce the margins for their products to compete. In addition, the Debtors may not be able to compete at such lower prices.

- In many applications, steel competes with other materials, such as aluminum, composites and plastic. Increased use of these materials in substitution for steel could have a material adverse effect on prices and demand for the Debtors' products. For example, as automobile producers strive to comply with increasingly stringent Corporate Average Fuel Economy mileage requirements for new cars and light trucks they may reduce the amount of steel in cars and trucks to improve fuel economy, thereby reducing demand for steel and resulting in further over-supply of steel in North America.

**3.      The loss of significant volume from key customers would likely adversely affect the Debtors.**

The Debtors' largest customer in 2015 represented approximately 10% of their net sales and the Debtors' ten largest customers represented approximately 32% of their net sales. Even though the Debtors have a diverse and unconcentrated customer base, a significant loss of, or decrease in, business from any of the Debtors' largest customers or in an important end-use sector would likely have a material adverse effect on the Debtors' sales and financial results if the Debtors cannot obtain replacement business. Many of the Debtors customers are distributors who re-sell the Debtors' products to end market users.

**4.      Offshore relocation by the Debtors' customers of their manufacturing operations could adversely affect their business.**

Many of the Debtors' customers have moved manufacturing operations offshore. Some customers have also chosen to source material from suppliers that are closer to their manufacturing facilities to improve shipping efficiency and decrease costs. It may be impossible or too costly for the Debtors to continue to supply such customers and maintain the same margins. The Debtors may experience a significant loss of, or decrease in, business from the Debtors' customers due to the relocation of manufacturing facilities to offshore locations where the Debtors do not currently conduct business and replace them with suppliers whose production facilities are perceived to be more territorially advantageous. If the Debtors cannot obtain replacement business or their current business shifts from the North American market to other regions, their business could suffer and their financial results could be adversely affected.

**5.      Price fluctuations in raw materials could adversely affect the Debtors' manufacturing costs.**

Special bar quality ("**SBQ**") steel bars compromise the single largest component of the raw material costs of the businesses of MST, Niagara and Corey. The price of SBQ steel has been, and will likely remain, subject to cyclical price fluctuations and volatility. KES

currently uses steel billets purchased from third parties to produce HRSB.  Like SBQ steel, steel billet pricing has been, and will likely remain, subject to cyclical price fluctuations and volatility. It has been the Debtors' practice to pass through changes in steel prices to the Debtors' customers through the Debtors' pricing arrangements and policies.  While the Debtors have generally been able to adjust the Debtors' selling prices to take account of changing market prices for steel, the Debtors' relative cost of steel sold depends on when and how quickly the Debtors turn over such inventory.

> **6.**     **The costs of manufacturing the Debtors products and the ability to supply the Debtors customers could be negatively affected if the Debtors experience interruptions in deliveries of needed raw materials or supplies.**

> If, for any reason, the Debtors' supply of steel is curtailed or they are otherwise unable to obtain the quantities they need at competitive prices, their business could suffer and their financial results could be adversely affected.  Such interruptions might result from a number of factors beyond the Debtors' control, including events such as a shortage of capacity in the supplier base or of the raw materials, energy or the inputs needed to make steel, failure of suppliers to fulfill their supply obligations, financial difficulties of suppliers resulting in the closing or idling of supplier facilities, other significant events affecting supplier facilities, significant weather events, general economic conditions, domestic and worldwide demand, competition, import duties, tariffs, currency exchange rates and other factors beyond the Debtors' control.

> **7.**     **Disruptions to the Debtors' operations or the operations of the Debtors' customers or suppliers, could adversely impact the Debtors' operations and financial results.**

> Business disruptions, including increased costs for or interruptions in the supply of energy or raw materials or equipment outages and failures, resulting from shortages of supply or transportation, severe weather events (such as hurricanes, earthquakes, floods and blizzards), casualty events (such as explosions, fires or material equipment breakdown), acts of terrorism, pandemic disease, labor disruptions or other events (such as required maintenance shutdowns), could cause interruptions to the Debtors' operations as well as the operations of the their customers and suppliers.  Losses from business disruptions could have a material adverse effect on the Debtors' operations and financial results, particularly to the extent any such losses are not covered by insurance.  Even if such losses are covered by insurance, the Debtors may be unable to recover insurance proceeds due them or there may be delays in the receipt of such reimbursements, each of which could have a material adverse effect on the Debtors' business, financial condition and results of operations.

> **8.**     **The Debtors are subject to operational risks relating to, among other things, equipment failure, production curtailment and shutdowns, including to their automated manufacturing and information processing systems.**

> The Debtors manufacturing processes depend on the uninterrupted operation of their production equipment.  This equipment may, on occasion, be out of service as a result of unanticipated failures.   The Debtors' manufacturing processes may experience shut-downs,

down-time or periods of reduced production as a result of unanticipated equipment malfunction, failure, defect, human error or other circumstances. In the event of unanticipated equipment failure, the Debtors may experience loss of net sales due to reduced production, and the Debtors may be required to make unplanned and potentially significant expenditures to repair or replace faulty equipment. A sustained disruption to the Debtors' production capabilities could result in reputational damage and have a material adverse effect on the Debtors' business, financial condition and results of operations.

9.      **The Debtors may incur additional costs related to environmental matters.**

The Debtors are subject to a variety of laws relating to pollution and protection of the environment, including laws governing hazardous substances and their discharge or release into the environment. These laws expose the Debtors to liability related to their ongoing operations, the environmental condition of their current or former facilities and sites to which they have sent hazardous substances for disposal.

The costs of complying with future, more stringent environmental laws could have a material adverse impact on the Debtors' financial condition and operations. The Debtors may incur significant capital or compliance costs in future years for environmental compliance, including in connection with obtaining, modifying and renewing their environmental permits for ongoing or expanding operations. If the Debtors fail to comply with environmental permits or other environmental requirements, they could face fines and other penalties and curtailment of their operations, which could have a material adverse effect on the Debtors' business or financial condition.

Environmental requirements are complex, change frequently and often become more stringent over time. Future changes in, or modified interpretations of, existing laws or enforcement policies, newly discovered information concerning conditions at the Debtors' facilities or the Debtors' business activities or products may give rise to additional environmental costs that could have a material adverse effect on their financial condition or operations.

Additionally, environmental requirements could affect the market for the Debtors' products. For instance, new laws proposing tax increases on, or reduction of, carbon emissions may result in higher prices for the Debtors' raw materials, energy sources, transport fuels and other adverse effects. The Debtors may not be able to fully pass the cost of new environmental requirements on to their customers without a resulting decline in sales and an adverse impact on their profits. Likewise, increased environmental costs could adversely affect the Debtors' ability to compete against foreign operations.

10.      **The Debtors are currently required to comply with a number of quality assurance standards, and the Debtors' failure to comply with such standards may result in the loss of existing customers or may hamper the Debtors' ability to attract new customers.**

The Debtors facilities' quality management systems have earned the Debtors' facilities various industry certifications and accreditations including TS-16949 and ISO

9001:2008 through the International Organization for Standardization, meeting ASTM/ASME, AMS, SAE, DIN, JIS, military specifications and having NCA-3800 nuclear capabilities.  The Debtors also have various customer quality certifications which authorize the Debtors to supply products to specific customers.  A failure to renew these various quality certifications in future audits may cause the Debtors to lose existing customers and threaten their ability to attract new customers, which could have a material adverse effect on their business, financial condition or results of operations.

C.     **Certain Bankruptcy Considerations**

Even though all Classes of Claims and Interests are Unimpaired, the Bankruptcy Court, which, as a court of equity, has substantial discretion concerning Plan confirmation, and may choose not to confirm the Plan.  Bankruptcy Code section 1129 requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors, and that the value of distributions to dissenting Holders of Claims and Interests will not be less than the value such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, see, *infra*, Article VIII.H – "Liquidation under Chapter 7".  Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

D.     **Bankruptcy-Specific Risk Factors That Could Negatively Impact the Debtors' Business**

1.     **The Debtors are subject to the risks and uncertainties associated with the Chapter 11 Cases.**

For the duration of the Chapter 11 Cases, the Debtors' operations and its ability to execute its business strategy will be subject to risks and uncertainties associated with bankruptcy.  These risks include:

(a)     the Debtors' ability to continue as a going concern;

(b)     the Debtors' ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases;

(c)     the Debtors' ability to develop, prosecute, confirm, and consummate the proposed Plan or any other plan of reorganization with respect to the Chapter 11 Cases;

(d)     the ability of third parties to seek and obtain court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a plan of reorganization, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 cases;

(e)     the Debtors' ability to retain key vendors or secure alternative supply sources;

(f)      the Debtors' ability to obtain and maintain normal payment and other terms with vendors and service providers;

(g)      the Debtors' ability to maintain contracts that are critical to its operations;

(h)      the Debtors' ability to attract, motivate, and retain management and other key employees;

(i)      the Debtors' ability to fund and execute their business plan; and

(j)      the Debtors' ability to obtain Exit Financing and the Plan Sponsor Contribution.

**2.      The Debtors' business could suffer from a long and protracted restructuring.**

Although the Debtors will seek to make their stay in chapter 11 as brief as possible and to obtain relief from the Bankruptcy Court so as to minimize any potential disruption to their business operations, it is possible that the commencement and pendency of the Chapter 11 Cases could materially adversely affect the relationship among the Debtors, customers, employees, vendors, and service providers.

The Debtors' future results are dependent upon the successful confirmation and implementation of a plan of reorganization. Failure to obtain this approval in a timely manner could adversely affect the Debtors' operating results, as their ability to obtain financing to fund operations may be harmed. Accordingly, if the Plan is not confirmed and implemented within a timely manner, there is a significant risk that the value of the Debtors' enterprise would be substantially eroded to the detriment of all stakeholders.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even once a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders, customers, or vendors to do business with a company that recently emerged from bankruptcy proceedings.

**E.      Classification and Treatment of Claims and Interests**

Bankruptcy Code section 1122 requires that the Plan classify Claims against, and Interests in, the Debtors. The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek to modify the Plan to provide for whatever classification might be required for confirmation. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a

reclassification, would approve the Plan based upon such reclassification, without requiring the Debtors to solicit Holders of Claims against or Interests in the Debtors. The Debtors believe that under the Bankruptcy Rules, they would be required to solicit votes for or against the Plan only when a modification adversely affects the treatment of a Claim or an Interest and renders the Class of such Claim or Interest Impaired.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtors believe that the Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

### F.    Conditions Precedent to Consummation of the Plan

Article XI of the Plan provides for certain conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

### G.    Funding Necessary for the Consummation of the Plan

The Debtors require additional capital to fund their future operations. Although the Debtors have made substantial progress toward securing the capital necessary to consummate the Plan, there can be no assurance that the contemplated financing transactions will be successfully and timely completed.

More specifically, the occurrence of the Effective Date is predicated on, among other things, (i) entry into the Exit Facilities; and (ii) consummation of the Plan Sponsor Contribution. The Plan Sponsor's agreement to make the Plan Sponsor Contribution is conditioned upon certain events and actions to be taken by the Debtors, and there can be no assurance that the Debtors will be able to satisfy the applicable conditions necessary to consummate the Plan Sponsor Contribution. Similarly, while the Debtors are engaged in negotiations with a large financial institution concerning the terms of a new, reserve-based credit facility, there is no guarantee that the Debtors will receive exit financing on favorable terms. If the Debtors do not receive the necessary backstop commitments or exit financing, the Debtors will not be able to effectuate the transactions necessary for consummation on the Effective Date.

### H.    Liquidation under Chapter 7

If no plan can be confirmed, the Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities

established by the Bankruptcy Code.  A discussion of the effects that chapter 7 liquidation would have on the recoveries of Holders of Claims and the Debtors' Liquidation Analysis is described herein and attached hereto as **Exhibit D**.

      **I.**      **Certain Tax Consequences of the Plan**

      Some of the material consequences of the Plan regarding United States federal income taxes will be summarized in Article IX – "Certain Federal Income Tax Consequences of the Plan" pursuant to a subsequent amendment or supplement to this Disclosure Statement.  You are urged to consider such analysis carefully when it becomes available.

## IX.      CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

      The following discussion summarizes certain anticipated U.S. federal income tax consequences of the Plan to the Debtors and Holders of DIP Claims or Holders of Claims against and Interests in Classes 1, 2, 3-A, 3-B, 4, 5, and 6.  This summary is provided for information purposes only and is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), Treasury regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect as of the date hereof, and all of which are subject to change, possibly with retroactive effect, that could adversely affect the U.S. federal income tax consequences described below.

      This summary does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder of a Claim against or Interest in the Debtors in light of its particular facts and circumstances or to certain types of Holders of Claims subject to special treatment under the Tax Code (for example, non-U.S. taxpayers, financial institutions, broker-dealers, life insurance companies, tax-exempt organizations, real estate investment trusts, regulated investment companies, grantor trusts, persons holding a Claim as part of a "hedging," "integrated," or "constructive" sale or straddle transaction, persons holding Claims through a partnership or other pass through entity, persons that have a "functional currency" other than the U.S. dollar, and persons who acquired or expect to acquire either an equity interest or other security in a Debtor or a Claim in connection with the performance of services). In addition, this summary does not discuss any aspects of state, local, estate and gift or non-U.S. taxation.

      For purposes of this summary, a "U.S. Holder" means a Holder of a Claim or Interest that, in any case, is, for U.S. federal income tax purposes: (i) an individual that is a citizen or resident of the U.S.; (ii) a corporation, or other entity treated as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the U.S., any state thereof or the District of Columbia; (iii) an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or (iv) a trust, if (a) a court within the U.S. is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all of the substantial decisions of such trust, or (b) it has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person. A "Non-U.S. Holder" means a Holder of a Claim or Interest that is not a U.S. Holder and is, for U.S. federal income tax purposes, an individual, corporation (or other entity treated as a corporation for U.S. federal income tax purposes), estate or trust.

If an entity taxable as a partnership for U.S. federal income tax purposes holds a Claim, the U.S. federal income tax treatment of a partner (or other owner) of the entity generally will depend on the status of the partner (or other owner) and the activities of the entity. Such partner (or other owner) should consult its tax advisor as to the tax consequences of the Plan.

A substantial amount of time may elapse between the date of this Disclosure Statement and the Distribution Date, which includes both initial distribution and periodic distributions under the Plan.   Events occurring after the date of this Disclosure Statement, such as additional or new tax legislation, court decisions, or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder.   There can be no assurance that the Internal Revenue Service (the "**IRS**") will not take a contrary view with respect to one or more of the issues discussed below. No ruling will be sought from the IRS with respect to any of the tax aspects of the Plan, and no opinion of counsel has been or will be obtained by the Debtors with respect thereto.

Accordingly, the following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a Holder of a Claim against or Interest in the Debtors. All Holders of Claims against or Interests in the Debtors are urged to consult their own tax advisors for the federal, state, local and other tax consequences applicable to them under the Plan.

**EACH HOLDER IS HEREBY NOTIFIED THAT:   (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE TAX CODE; (B) SUCH DISCUSSION IS INCLUDED HEREBY BY THE DEBTORS IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN OR THE PLAN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A.      **U.S. Federal Income Tax Consequences to the Debtors**

1.      **Taxation of the Reorganized Debtors in General**

Optima is currently organized as a corporation, is taxed as a corporation for U.S. federal income tax purposes, and is the parent of a consolidated group for U.S. federal income tax purposes that includes some of the Debtor entities that are United States entities. The Reorganized Optima will be taxed as a corporation for U.S. federal income tax purposes and is expected to remain the parent of a consolidated group for U.S. federal income tax purposes.

In general, if as a result of implementing the Plan, the Debtors satisfy any Claims with collateral securing such Claims or sell any collateral, the Debtors will recognize gain or loss in an amount equal to the difference, if any, between the fair market value of the collateral

transferred and the Debtors' adjusted tax basis in such collateral.    In general, if any of the Debtors have net operating loss ("**NOL**") carryforwards, those carryforwards may be used to offset any taxable gains.

## 2.    Net Operating Losses and other Losses; Section 382

The Debtors' balance sheet currently reflects NOLs, including NOL carryforwards. However, under Tax Code section 382, if a "loss corporation" (generally, a corporation with NOLs and/or built-in losses) undergoes an "ownership change," the amount of its pre-change losses (including NOLs and certain losses or deductions which are "built-in," i.e., economically accrued but unrecognized as of the date of the ownership change) that may be utilized to offset future taxable income generally are subject to an annual limitation. Similar rules apply to a corporation's capital loss carryforwards and tax credits.

Notwithstanding the general rule, if the loss corporation (or the consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business during the two-year period beginning on the date of the ownership change, the annual limitation resulting from the ownership change is zero, which will prevent any utilization of the corporation's pre-change losses (absent any increases due to any recognized built-in gains) or tax credits.

The Debtor is wholly owned by the Plan Sponsor, which in turn is equally owned, directly, indirectly or beneficially, by Mordechai Korf, Igor Kolomoysky, and Gennadiy Bogolyubov. Because the ownership of Optima is exactly the same after the adoption of the Plan as before the bankruptcy filing there should be no "ownership change" and accordingly Optima should be able to use all of its NOLs on a going forward basis.

## 3.    Cancellation of Debt Income

Under the Tax Code, a U.S. taxpayer generally must include in gross income the amount of any cancellation of debt ("**COD**") income realized during the taxable year.  COD income generally equals the excess of the adjusted issue price of the indebtedness discharged over the sum of (i) the amount of cash, (ii) the fair market value of any property (including equity interests), and (iii) the issue price of any new indebtedness of the Debtors, in each case, transferred or issued by the Debtors in satisfaction of such discharged indebtedness.  COD income also includes any interest that has been previously accrued and deducted but remains unpaid at the time the indebtedness is discharged.  Any settlement of a guarantee should not give rise to any COD income.

A corporation will not, however, be required to include any amount of COD income in gross income if the corporation is a debtor under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding (the "**Section 108(a) Bankruptcy Exception**"). Instead under Tax Code section 108(b), as a consequence of such exclusion, the debtor must reduce its tax attributes by the amount of COD income excluded from gross income. In general, tax attributes are reduced in the following order: (a) NOLs and NOL carryforwards, (b) general business and minimum tax credit carryforwards, (c) capital loss carryforwards, (d) basis of the debtor's assets, and (e) foreign tax

credit carryforwards. A debtor's tax basis in its assets generally may not be reduced below the amount of liabilities remaining immediately after the discharge of indebtedness. NOLs for the taxable year of the discharge and NOL carryovers to such year generally are the first attributes subject to reduction. However, a debtor may elect under Tax Code section 108(b)(5) (the "**Section 108(b)(5) Election**") to reduce its basis in its depreciable property first. If a debtor makes a Section 108(b)(5) Election, the limitation on reducing a debtor's basis in its assets below the amount of its remaining liabilities does not apply.

COD income is determined on a company-by-company basis. If a debtor with excluded COD income is a member of a consolidated group (as is the case with certain of the United States entities in the Debtor group), Treasury regulations address the application of the rules for the reduction of tax attributes (the "**Consolidated Attribute Reduction Rules**"). If the debtor is a member of a consolidated group and is required to reduce its basis in the stock of another group member, a "look-through rule" generally requires a corresponding reduction in the tax attributes of the lower-tier member. If the amount of a debtor's excluded COD income exceeds the amount of attribute reduction resulting from the application of the foregoing rules, certain other tax attributes of the consolidated group may also be subject to reduction. If a debtor is a member of a consolidated group, the debtor may treat stock in another group member as depreciable property for purposes of the Section 108(b)(5) Election, provided the lower-tier member consents to a corresponding reduction in its basis in its depreciable property. Finally, if the attribute reduction is less than the amount of COD income and a member of the consolidated group has an excess loss account (an "**ELA**") (i.e., negative basis in the stock of another member of the consolidated group), the consolidated group will recognize taxable income to the extent of the lesser of such ELA or the amount of the COD income that was not offset by tax attributes.

The Debtors do not expect to realize a significant amount of COD income as a result of the Plan. The amount of COD income will depend upon, among other things, the fair market value the property transferred in satisfaction of the Debtors' indebtedness.   In any event, pursuant to the Section 108(a) Bankruptcy Exception, the Debtors will not include this COD income in gross income. Instead, the Debtors will be required to reduce their tax attributes in accordance with the Consolidated Attribute Reduction Rules after determining the taxable income (or loss) of the Debtors' consolidated group for the taxable year of discharge. Accordingly, the tax attributes (and, in particular, NOLs) are available to offset taxable income that accrues between the Effective Date and the end of the Debtors' taxable year. Basis reduction applies to assets owned by the Debtors at the beginning of the tax year following the discharge.

Under the Consolidated Attribute Reduction Rules, the Debtors' excluded COD income will be applied to reduce their NOLs  and, if necessary, other tax attributes, including the Debtors' tax basis in their assets. The extent to which NOLs and other tax attributes remain following the application of the Consolidated Attribute Reduction Rules will depend upon a number of factors, including the amount of COD income that is actually incurred and whether the Debtors make the Section 108(b)(5) Election.  The Debtors have not yet determined whether or not they will make a Section 108(b)(5) Election.

B.      **U.S. Federal Income Tax Consequences to U.S. Holders of Claims and Interests**

1.      **In General**

Generally, the U.S. federal income tax consequences to Holders of Allowed Claims against and Interests in the Debtors arising from the Distributions to be made in satisfaction of their Claims pursuant to the Plan may vary, depending upon, among other things: (a) the type of consideration received by the Holder of a Claim against or Interest in the Debtors in exchange for such Claim or Interest; (b) the taxable year in which the Holder receives distributions under the Plan; (c) the nature of such Claim or Interest; (d) whether the Holder has previously claimed a bad debt or worthless security deduction in respect of such Claim or Interest; (e) whether such Claim constitutes a security; (f) whether the Holder of such Claim or Interest in the Debtors is a citizen or resident of the United States for tax purposes, or otherwise subject to U.S. federal income tax on a net income basis, or falls into any special class of taxpayers, as mentioned above; (g) whether the Holder of such Claim against or Interests in the Debtors reports income on the accrual or cash basis; (h) the manner in which the Holder acquired the Claim and whether the Claim was acquired at a discount; (i) the length of time that the Claim has been held; (j) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; and (k) whether the Holder of such Claim against or Interests in the Debtors receives Distributions under the Plan in more than one taxable year.  For tax purposes, if a Claim is reinstated yet subject to a modification, the reinstatement may be treated as a taxable exchange of the Claim for a new Claim, even though no actual transfer takes place.

In addition, where gain or loss is recognized by a Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the Claim or Interest constitutes a capital asset in the hands of the Holder and how long it has been held or is treated as having been held, whether the Claim was acquired at a market discount, and whether and to what extent the Holder previously claimed a bad debt deduction with respect to the underlying Claim or Interest.  In general, for purposes of the discussion below, subject to other matters discussed herein such as the market discount rules, if the asset giving rise to a Holder's Claim, or a Holder's Interest, was held as a capital asset, gain or loss recognized by a Holder upon exchange of that Claim or Interest generally would be long-term capital gain or loss if the U.S. Holder held such asset or Interest for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations. If property is received by a Holder upon an exchange, a Holder's tax basis in the property received should equal the fair market value of such property. A U.S. Holder's holding period for the property received on the Effective Date would begin on the day following the Effective Date.

2.      **Satisfaction of Claims or Interests**

In general, subject to the other discussions below, the satisfaction of Claims or Interests by the Debtors is expected to result in the following U.S. federal income tax consequences for U.S. Holders.

(a)      <u>DIP Claims</u>

71

Under the Plan, Holders of Allowed DIP Claims shall be treated as follows:

(i)  *DIP Replacement Loan Claims*.  In full and final satisfaction, settlement, release, and discharge of and in exchange for each and every DIP Replacement Loan Claim, on the Effective Date, each Holder of a DIP Replacement Loan Claim shall be paid in full in Cash from the proceeds of the Exit Facilities and Plan Sponsor Contribution, with such payments to be distributed to the DIP Agent on the Effective Date for the ratable benefit of the Holders of DIP Replacement Loan Claims.

(ii)  *DIP New Money Loan Claims*.  In full and final satisfaction, settlement, release, and discharge of and in exchange for each and every DIP New Money Loan Claim, on the Effective Date, each Holder of DIP New Money Loan Claims shall be paid in full in Cash from the proceeds of the Exit Facilities and Plan Sponsor Contribution (after satisfying the DIP Replacement Loan Claims), with such payments to be distributed to the DIP Agent on the Effective Date for the ratable benefit of the Holders of DIP New Money Loan Claims.

(iii)  *DIP Liens, etc*.  Upon the Effective Date, and upon receipt by the DIP Agent of Cash in the full amount of the DIP Claims, all Liens and security interests granted to secure the DIP Facility shall be deemed discharged, cancelled, and released and shall be of no further force and effect.  To the extent that the DIP Lenders or the DIP Agent have filed or recorded publicly any Liens and/or security interests to secure the Debtors' obligations under the DIP Facility, the DIP Lenders or the DIP Agent, as the case may be, shall take any commercially reasonable steps requested by the Debtors or the Reorganized Debtors, at the expense of the Reorganized Debtors, that are necessary to cancel and/or extinguish such publicly-filed Liens and/or security interests.

A U.S. Holder of a DIP Claim who receives cash should recognize taxable gain or loss equal to the difference between (a) amount of cash received and (b) such Holder's adjusted tax basis in its DIP Facility Claim surrendered.

The execution of the applicable New Corporate Governance Documents should not result in any adverse U.S. Federal income tax implications.

(b)    Class 1 – Other Priority Claims

Under the Plan, Holders of Allowed Class 1 Claims will receive (a) payment of the Allowed Class 1  Claim in full in cash or (b) such other treatment permitted by section 1129(a)(9) of the Bankruptcy Code.  A U.S. Holder of a Class 1 Claim who receives cash should recognize taxable gain or loss (which capital gain or loss would be long-term capital gain or loss to the extent that the Holder has held the debt instrument underlying its Claim for more than one year) equal to the difference between (a) the amount of cash received (other than amounts attributable to interest, discussed below) and (b) such Holder's adjusted tax basis in its holdings of the Class 1 Claim surrendered.  To the extent that a portion of the cash received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder should recognize ordinary interest income.  See "Accrued but Unpaid Interest" below.

(c)      Class 2 – Other Secured Claims

Under the Plan, Holders of Class 2 Claims will receive, at the election of the Debtors, with the consent of the Plan Sponsor, or the Reorganized Debtors, as applicable: (i) payment in full in cash, including the payment of interest allowable under section 506(b) of the Bankruptcy Code, if any; (ii) reinstatement pursuant to section 1124(2) of the Bankruptcy Code; or (iii) the collateral securing any such Allowed Other Secured Claim.

In general, a U.S. Holder of a Class 2 Claim who receives cash should recognize taxable gain or loss (which capital gain or loss would be long-term capital gain or loss to the extent that the Holder has held the debt instrument underlying its Claim for more than one year) equal to the difference between (a) the amount of cash received (other than amounts attributable to interest, discussed below) and (b) such Holder's adjusted tax basis in its Class 2 Claim surrendered.   To the extent that a portion of the Cash received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder should recognize ordinary interest income.  See "Accrued but Unpaid Interest" below.

If the Claim is reinstated, the Holder of such Claim should not recognize gain or loss except if such Claim is modified (including, for example, a modification regarding the collateral securing such Claim, if any), and the modification constitutes a "significant modification" of Class 2 Claim within the meaning of the Treasury Regulations promulgated under Tax Code section 1001.

A U.S. Holder who exchanges its Claim for the collateral securing such Claim, the exchange should be treated as a taxable exchange under Section 1001 of the Tax Code.  The Holder should recognize capital gain or loss (which capital gain or loss would be long-term capital gain or loss if the Holder has held the debt instrument underlying its Claim for more than one year) equal to the difference between (i) the fair market value of the collateral received (or, as the case may be, other property of Debtors), and (ii) the Holder's adjusted tax basis in the debt instrument constituting its Claim.  To the extent that a portion of the collateral received (or, as the case may be, other property of Debtors) in the exchange is allocable to accrued interest that has not already been taken into income by the Holder, the Holder should recognize ordinary interest income.  See "Accrued but Unpaid Interest" below.  If, on the Effective Date, the Holder receives the collateral (rather than Cash) in exchange for its Claim, the Holder's tax basis in the collateral should be equal to the fair market value of the collateral on the Effective Date, and the Holder's holding period in the collateral should begin on the day following the Effective Date.

(d)      Class 3-A – Unsecured Notes Claims

Except to the extent that a Holder of an Allowed Class 3-A Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class 3-A Claim, or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 3-A Claim shall receive cash in an amount equal to 100% of such Allowed Claim, plus post-Petition Date interest (if any) for the period between the Petition Date and the Effective Date at the Federal judgment rate or such other rate as minimally necessary (only if payment of interest is required) to leave such Allowed Class 3-A Claim Unimpaired.

A U.S. Holder of a Class 3-A Claim who receives cash and post-Petition Date interest (if any) should recognize taxable gain or loss (which capital gain or loss would be long-term capital gain or loss to the extent that the Holder has held the debt instrument underlying its Claim for more than one year equal to (a) the amount of cash received and (b) such Holder's adjusted tax basis in its Class 3-A Claim surrendered. To the extent that a portion of the cash received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder should recognize ordinary interest income.  See "Accrued but Unpaid Interest" below.

(e)    <u>Class 3-B – General Unsecured Claims</u>

Except as otherwise provided in and subject to <u>Article 9.5</u> of the Plan, and except to the extent that a Holder of an Allowed Class 3-B Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class 3-B Claim, each Holder of an Allowed Class 3-B Claim shall receive the following treatment: (a) in the case of Allowed Class 3-B Claims that are not due and payable as of the Effective Date, each such Claim shall be reinstated (in accordance with section 1124(2) of the Bankruptcy Code) and paid in the ordinary course of business pursuant to the respective terms relating to such Claim; or (b) in the case of Allowed Class 3-B Claims that are due and payable as of the Effective Date, each such Claim shall be paid in full in Cash in an amount equal to 100% of the Allowed amount of such Claim, plus post-Petition Date interest at three percent (3%) per annum accrued for the period between the Petition Date and the Effective Date, only if the Creditors' Committee: (i) supports (and does not directly or indirectly oppose, challenge or object to) confirmation of the Plan, approval of the Disclosure Statement, approval of the Plan Support Agreement and approval of related Debtor motions and (ii) does not (directly or indirectly) advocate for or support any alternative plan or plan process, or any formal or informal opposition, challenge or objection to confirmation of the Plan, approval of the Disclosure Statement, approval of the Plan Support Agreement or approval of directly related Debtor motions.

In the event the conditions in the foregoing clauses "(i)" and "(ii)" are not satisfied, then instead of receiving the treatment provided for in the foregoing clause "(b)" each applicable holder of an allowed Class 3-B Claim shall receive Cash in an amount equal to 100% of the Allowed amount of such Claim, plus post-Petition Date Interest (if any) at the Federal judgment rate or such other rate as necessary to leave such Allowed Claim unimpaired, for the period between the Petition Date and the Effective Date.  Notwithstanding the foregoing, the Creditors' Committee shall not be deemed to have violated this provision by providing to the Debtors and/or the Plan Sponsor comments, or requesting changes, to any document, agreement or filing.

All payments and distributions on account of Allowed Class 3-B Claims shall be made as set forth above on the later of (i) the Initial Distribution Date or (ii) if a Class 3-B Claim is a Disputed Claim, the first Periodic Distribution Date occurring after the later of (y) 30 days after the date when a Class 3-B Claim becomes an Allowed Class 3-B Claim or (z) 30 days after the date when a Class 3-B Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the Holder of such Class 3-B Claim.

74

If the Class 3-B Claim is reinstated, the Holder of such Claim should not recognize gain or loss except if such Claim is modified (including, for example, a modification regarding the collateral securing such Claim, if any), and the modification constitutes a "significant modification" of Class 3-B Claim within the meaning of the Treasury Regulations promulgated under Tax Code section 1001.

A U.S. Holder of a Class 3-B Claim who receives cash and post-Petition Date interest (if any) should recognize taxable gain or loss (which capital gain or loss would be long-term capital gain or loss to the extent that the Holder has held the debt instrument underlying its Claim for more than one year equal to (a) the amount of cash received and (b) such Holder's adjusted tax basis in its Class 3-B Claim surrendered. To the extent that a portion of the cash received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder should recognize ordinary interest income.  See "Accrued but Unpaid Interest" below.

(f)    Class 4 – Intercompany Claims

On the Effective Date, all net Allowed Class 4 Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among the Debtors and/or any Affiliates of the Debtors shall, at the election of the Debtors, with the consent of the Plan Sponsor, or the Reorganized Debtors, as applicable, be either (i) Reinstated, or (ii) released, waived, and discharged.

If the Class 4 Claim is reinstated, the Holder of such Claim should not recognize gain or loss except if such Claim is modified (including, for example, a modification regarding the collateral securing such Claim, if any), and the modification constitutes a "significant modification" of Class 4 Claim within the meaning of the Treasury Regulations promulgated under Tax Code section 1001.

If Class 4 Claim is released, waived, or discharged, in general and subject to any applicable rules regarding consolidated groups and other rules, Holders should recognize a taxable loss equal to the amount of their adjusted tax basis in such Claim.  Generally, the cancellation of Intercompany claims should not result in net income as any COD for one member of the consolidated group should be equal to a worthless debt for another member of the consolidated group.

(g)    Class 5 – Intercompany Interests

On the Effective Date, all Class 5 Interests held by the Debtors shall be reinstated.

The Holder of Class 5 Claims should not recognize gain or loss except if such Claim is modified (including, for example, a modification regarding the collateral securing such Claim, if any), and the modification constitutes a "significant modification" of Class 5 Claim within the meaning of the Treasury Regulations promulgated under Tax Code section 1001.

(h)    Class 6 – Existing Optima Equity Interests

On the Effective Date, Allowed Class 6 Existing Optima Equity Interests shall be Reinstated and Unimpaired and shall not be discharged, canceled, released, extinguished or otherwise altered as a result of or by the Plan Support Agreement or the Plan, and the Plan Sponsor as Holder of all Existing Optima Equity Interests shall continue on the Effective Date to hold all Existing Optima Equity Interests without interruption and there shall be no change in ownership percentages amongst the three ultimate owners.

The retention of the equity interest is not a taxable event and because the ownership percentages have not changed there will be no diminution of the NOLs.  The execution of the applicable New Corporate Governance Documents should not result in any adverse U.S. Federal income tax implications.

### 3.    Accrued but Unpaid Interest

In general, to the extent a Holder of a Claim or Interest receives consideration in satisfaction of interest accrued during the holding period of such instrument, such amount will be taxable to the Holder as interest income (if not previously included in the Holder's gross income).  Conversely, such a Holder should generally recognize a deductible loss to the extent that any accrued interest claimed or amortized OID was previously included in its gross income and is not paid in full.

The extent to which property received by a Holder of a Claim or Interest will be attributable to accrued but unpaid interest is unclear.  Pursuant to the Plan, all Distributions in respect of any Allowed Claim will be allocated first to the principal amount of such Allowed Claim, and thereafter to accrued but unpaid interest, if any.  Certain legislative history indicates that an allocation of consideration between principal and interest provided for in a chapter 11 plan is binding for U.S. federal income tax purposes.  There is no assurance, however, that such allocation will be respected by the IRS for U.S. federal income tax purposes.  If a distribution with respect to a Claim is allocated entirely to the principal amount of such Claim, a Holder may be entitled to claim a loss to the extent of any accrued but unpaid interest on the Claim that was previously included in the Holder's gross income.

Each Holder of an Allowed Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of previously included unpaid interest and OID for tax purposes.

### 4.    Market Discount

Holders of Claims who receive consideration in exchange for their Claims may be affected by the "market discount" provisions of Tax Code sections 1276 through 1278.  Under these provisions, some or all of the gain realized by a Holder may be treated as ordinary income (instead of capital gain) to the extent of the amount of accrued "market discount" on such Allowed Claims.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original

issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price as defined in Tax Code section 1278, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation is not a "market discount bond" if the excess is less than a statutory de minimis amount (equal to 0.25% of the debt obligation's stated redemption price at maturity or revised issue price, in the case of a debt obligation issued with original issue discount, multiplied by the number of complete years remaining until maturity at the time of the acquisition).

Any gain recognized by a Holder on the taxable disposition of Allowed Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

### C.    U.S. Federal Income Tax Consequences to Non-U.S. Holders of Claims and Interests

**Non-U.S. Holders should consult with their own tax advisors to determine the effect of U.S. federal, state, and local tax laws, as well as any other applicable non-U.S. tax laws and/or treaties, with regard to their participation in the transactions contemplated by the Plan and their ownership of Claims or Interests.  Non-U.S. Holders are urged to consult their tax advisors regarding the U.S. federal income consequences of owning and disposing of Litigation Trust Units.**

### 1.    Gain Recognition upon Consummation of the Plan

Subject to the assumptions and intentions of the Debtors described above under "U.S. Federal Income Tax Consequences to U.S. Holders of Claims and Interests," any gain realized by a Non-U.S. Holder on the exchange of its Claim or Interest generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the U.S. for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non- U.S. Holder of a trade or business in the U.S. (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the U.S.).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.

If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the U.S. in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such

Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such Non-U.S. Holder is a corporation, it may be subject to a branch profits tax ("**BPT**") equal to 30% (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.  However, a BPT may not apply if the Non-U.S. Holder qualifies for the "exit exemption" (i.e., after the Exchange, the Holder has no other U.S. business assets and neither the Holder nor a related party reinvests the proceeds in the U.S. for a period of three years following the Exchange).

### 2.    Payments Attributable to Interest

Payments to a Non-U.S. Holder that are attributable to interest (including OID), or to accrued but untaxed interest, generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, applicable or successor IRS Form W-8) establishing that the Non-U.S. Holder is not a U.S. person.  Interest income will also include any gain from the sale, redemption, retirement or other taxable disposition of the Claim that is treated as interest income. Interest income, however, may be subject to U.S. income or withholding tax if:

i.    the Non-U.S. Holder actually or constructively owns 10% or more of the total combined voting power of classes of New Common Stock entitled to vote;

ii.    the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to New Common Stock (each within the meaning of the Tax Code);

iii.    the Non-U.S. Holder is a bank receiving interest described in Tax Code section 881(c)(3)(A); or

iv.    such interest is effectively connected with the conduct by the Non- U.S. Holder of a trade or business within the U.S. (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a BPT with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.. Holder that does not qualify for exemption from withholding tax with respect to interest (including OID) or accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on

payments that are attributable to such interest or accrued but untaxed interest.  For purposes of providing a properly executed any applicable or successor IRS Form W-8, special procedures are provided under applicable Treasury regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

### 3.    Sale, Redemption, or Repurchase of Existing Optima Common Stock

Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of any Existing Optima Common Stock, unless:

i.      such Non-U.S. Holder is an individual who is present in the U.S. for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the U.S.;

ii.     such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such  gain  is attributable to  a  permanent establishment maintained by such Non-U.S. Holder in the U.S.); or

iii.    Reorganized Optima is or has been during a specified testing period a U.S. real property holding corporation ("**USRPHC**"), whose real estate assets exceed 50% of the sum of its (A) U.S. real property interest, (B) interest in real property located outside the U.S. and (C) other assets other than (A) and (B) that are used or held for use in its trade or business.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of any Existing Optima Common Stock. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a BPT with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30%  (or  at a reduced rate or  exemption from tax under an applicable income tax treaty). However, a BPT may not apply if the Non-U.S. Holder qualifies for the "exit exemption" (i.e., after the Exchange, the Holder has no other U.S. business assets and neither the Holder nor a related party reinvests the proceeds in the U.S. for a period of three years following the Exchange). Reorganized Optima does not believe that it is a USRPHC.

### 4.    FATCA

Under the Foreign Account Tax Compliance Act ("**FATCA**"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S.-source payments of

fixed or determinable, annual or periodical income (including dividends, if any, on Common Stock and interest on the Claim), and also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends (which would include Common Stock and the Claim).

FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax. FATCA withholding rules apply to U.S.-source payments on obligations issued after July 1, 2014, and to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S.-source interest or dividends that occurs after December 31, 2018. Although administrative guidance and Treasury regulations have been issued, the exact scope of these rules remains unclear and potentially subject to material changes. A Non-U.S. Holder can avoid FATCA withholding if it adheres to certain procedures and requirements imposed by the Code and applicable IRS rules and certifies such compliance to payers of pass-through payments. These rules vary dramatically depending upon whether the non-U.S. person is characterized as an FFI or a non-financial foreign entity. In addition, certain non-U.S. persons are "deemed compliant" with FATCA if they meet certain criteria and certify certain facts to the IRS. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such Non-U.S. Holder's ownership of New Common Stock and New Preferred Stock.

FATCA obligations may vary depending on whether the non-U.S. person subject to FATCA regulations is a resident of a country with which the U.S. has signed a bilateral Intergovernmental Agreement ("**IGA**"). IGAs are signed to facilitate implementation of FATCA and enhance broader international tax transparency. Under IGAs, respective countries implement FATCA regulations into their local law, and would require residents of such country to first determine if they are Financial Institutions ("**FIs**"), and the extent to which they need to perform FATCA obligations. General FATCA regulations would apply to residents of countries that have not entered into an IGA with the U.S.

### D.    Information Reporting and Backup Withholding

Certain payments, including certain payments of Claims pursuant to the Plan, payments of interest, and the proceeds from the sale or other taxable disposition of the Claims and Interests may be subject to information reporting to the IRS. Moreover, such reportable payments may be subject to backup withholding unless the taxpayer: (i) comes within certain exempt categories (which generally include corporations) or (ii) provides a correct taxpayer identification number and otherwise complies with applicable backup withholding provisions. In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against a Holder's U.S. federal income tax liability, provided that the required information is furnished to the IRS on a timely basis. Holders are urged to consult their tax advisors regarding these regulations and whether the

transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

E.    **Importance of Obtaining Your Own Professional Tax Assistance**

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ASSOCIATED WITH THE PLAN ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

X.    **CONFIRMATION OF THE PLAN**

A.    **Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold the Confirmation Hearing. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

Notice of the Confirmation Hearing will be provided to all Holders of Claims against and Interests in the Debtors and other parties in interest (the "**Confirmation Notice**"). The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof. Objections to Confirmation of the Plan must be made in writing, specifying in detail the name and address of the person or entity objecting, the grounds for the objection, and the nature and amount of the Claim or Interest held by the objector. Objections must be filed with the Bankruptcy Court, together with proof of service, and served upon the parties so designated in the Confirmation Notice, on or before the time and date designated in the Confirmation Notice as being the last date for serving and filing objections to Confirmation of the Plan. Objections to Confirmation of the Plan are governed by Bankruptcy Rule 9014 and the local rules of the Bankruptcy Court.

The Plan may be modified if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest. The Confirmation Order shall approve all provisions, terms, and conditions of the Plan, unless such provisions, terms or conditions are otherwise satisfied or waived pursuant to the Plan provisions described in Article V – "The Plan."

B.    **Requirements for Confirmation of the Plan - Consensual Confirmation**

In order to confirm the Plan, Section 1129 of the Bankruptcy Code requires that the Bankruptcy Court make a series of determinations concerning the Plan, including, without limitation: (a) that the Plan has classified Claims and Interests in a permissible manner; (b) that

the contents of the Plan comply with the requirements of the Bankruptcy Code; (c) that the Debtors have proposed the Plan in good faith; and (d) that the Debtors have made disclosures concerning the Plan which are adequate and include information concerning all payments made or promised in connection with the Plan and the Chapter 11 Cases. The Debtors believe that all of these conditions have been or will be met.

The Bankruptcy Code requires (unless the "cramdown" provisions of the Bankruptcy Code (as discussed below) are utilized or all Classes of Claims and Interests are Unimpaired), as a condition precedent to Confirmation, that the Plan be accepted by the requisite votes of each Class of Claims and Interests voting as separate Classes. Therefore, the Bankruptcy Court must find, in order to confirm the Plan, that the Plan has been duly accepted. In addition, the Bankruptcy Court must find that the Plan is feasible and that the Plan is in the "best interest" of all Holders of Claims against and Interests in the Debtors. Thus, even if Holders of Claims against or Interests in the Debtors were to accept the Plan by the requisite number of votes or all Classes of such Holders are all Unimpaired, the Bankruptcy Court would be required to make independent findings respecting the Plan's feasibility and whether the Plan is in the best interest of Holders of Claims against and Interests in the Debtors before it can confirm the Plan.

### 1.    The Best Interest Test

Whether or not the Plan is accepted by each Impaired Class of Claims or Interests entitled to vote on the Plan or all Classes of Claims and Interests are Unimpaired, in order to confirm the Plan the Bankruptcy Court must, pursuant to Section 1129(a)(7) of the Bankruptcy Code, independently determine that the Plan is in the best interest of each Holder of an Impaired Claim or Interest that has not accepted the Plan. This requirement is satisfied if the Plan provides each non-accepting Holder of a Claim or Interest in such Impaired Class a recovery on account of such Holder's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution each such Holder would receive in a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code.

To determine the value that Holders of Impaired Claims and Interests would receive if the Debtors were liquidated under Chapter 7, the Bankruptcy Court must determine the aggregate dollar amount that would be generated from the liquidation of the Debtors' assets if the Debtors' Chapter 11 Cases were converted to a Chapter 7 liquidation case and the Debtors' assets were liquidated by a Chapter 7 trustee (the "**Liquidation Value**"). The Liquidation Value would consist of the net proceeds from the disposition of the Debtors' assets, augmented by cash held by the Debtors and reduced by certain increased costs and Claims that arise in a Chapter 7 liquidation case that do not arise in a Chapter 11 reorganization case.

The Liquidation Value would be reduced by: (a) the allowed claims of secured creditors to the extent of the value of their collateral, and (b) the costs, fees, and expenses of the liquidation under Chapter 7, which would include: (i) the compensation of a trustee and its counsel and other professionals retained, (ii) disposition expenses, (iii) all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for attorneys, financial advisors, investment bankers, brokers, auctioneers and accountants and the costs and expenses of members of any statutory committee of unsecured creditors appointed by the United

States Trustee pursuant to Section 1102 of the Bankruptcy Code and any other such appointed committee) that are allowed in a Chapter 7 case, (iv) litigation costs, and (v) Claims arising from the operation of the Debtors during the pendency of the Chapter 11 Cases and the Chapter 7 case. The liquidation itself would trigger certain Claims and would accelerate other priority payments which would otherwise be paid in the ordinary course.  These Claims would be paid in full out of the liquidation proceeds before the balance would be made available to pay most other Claims or to make any distribution in respect of Interests.  Liquidation would also involve the rejection of additional executory contracts and unexpired leases of the Debtors and substantial additional rejection damage Claims.

(a)    <b>Estimated Liquidation Value</b>

Conway MacKenzie Management Services, LLC performed an assessment of the potential liquidation value of the Debtors as described herein based on information provided by the Debtors, conversations with the management of the Debtors, and an analysis of relevant market factors and conditions.  Underlying the liquidation assessment are a number of estimates and assumptions that are inherently subject to significant uncertainties and contingencies, many of which are beyond the control of the Debtors.  Accordingly, there can be no assurance that the values assumed in the assessment would be realized if the Debtors were in fact liquidated.  A copy of the Debtors' liquidation analysis is annexed hereto as **Exhibit D**.

(b)    <b>Comparison of Liquidation Values with Recoveries under Plan</b>

It is not possible to predict with certainty the outcome of liquidation of the Debtors' assets or the timing of any distribution to creditors due to various factors as more fully set forth in the liquidation analysis annexed hereto as **Exhibit D**.  However, based on such liquidation analysis, the Debtors believe that the expected distributions under Chapter 7 of the Bankruptcy Code would result in lower distributions for Holders of Claims and Interests than that provided for in the Plan, and no Holder of a Claim or Interest would obtain a greater recovery on its Claim or Interest in a Chapter 7 liquidation case than it would obtain under the Plan.

**2.    Feasibility**

Even if the Plan is accepted by each Class of Claims and Interests voting on the Plan, and even if the Bankruptcy Court determines that the Plan satisfies the best interest test, the Bankruptcy Code requires that, in order for the Plan to be confirmed by the Bankruptcy Court, it must be demonstrated that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors, unless such liquidation or reorganization is proposed in the Plan.

The Debtors have analyzed their ability to meet their obligations under the Plan, and believe the Plan is feasible.

**C.    Requirements for Confirmation of the Plan - Non-Consensual Confirmation**

Pursuant to Section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan despite the non-acceptance of the plan by one or more impaired classes.  This

83

procedure is commonly referred to as a "cramdown."   Section 1129(b) of the Bankruptcy Code provides that upon request of the proponent of the Plan, the Bankruptcy Court shall confirm the Plan despite the lack of acceptance by an Impaired Class or Classes if the Bankruptcy Court finds that (a) the Plan does not discriminate unfairly with respect to each non-accepting Impaired Class, (b) the Plan is "fair and equitable" with respect to each non-accepting Impaired Class, (c) at least one Impaired Class has accepted the Plan (without counting acceptances by insiders), and (d) the Plan satisfies the requirements set forth in Bankruptcy Code Section 1129(a) other than Section 1129(a)(8).

### 1.    The Plan is Fair and Equitable

The Bankruptcy Code establishes different "fair and equitable" tests for Holders of secured claims, unsecured claims and equity interests.  As to a dissenting class, the test sets different standards, depending on the type of claims or interests in such class.

#### (a)    Secured Claims

With respect to a Class of Secured Claims that does not accept the Plan, the Debtors must demonstrate to the Bankruptcy Court that either (a) the Holders of such Claims are retaining the liens securing such Claims and that each Holder of a Claim of such Class will receive on account of such Claim deferred cash payments totaling at least the Allowed amount of such Claim, of a value, as of the Effective Date, of at least the value of such Holder's interest in such property, (b) the Holders of such Claims will realize the indubitable equivalent of such Claims under the Plan, or (c) the Holders of such Claims will retain their Liens on the proceeds received by the Debtors with respect to the sale of such property.

#### (b)    Unsecured Claims

With respect to a Class of unsecured Claims that does not accept the Plan, the Debtors must demonstrate to the Bankruptcy Court that either (a) each Holder of an unsecured Claim of the dissenting class receives or retains under the Plan property of a value equal to the Allowed amount of its unsecured Claim, or (b) the Holders of Claims or Interests that are junior to the Claims of the Holders of such unsecured Claims will not receive or retain any property under the Plan.

#### (c)    Equity Interests

With respect to a class of equity Interests that does not accept the Plan, the Debtors must demonstrate to the Bankruptcy Court that (a) each Holder of an Interest of the dissenting Class receives or retains on account of such Interest property of a value equal to the greatest of the Allowed amount of any fixed liquidation preference to which such Holder is entitled, any fixed redemption price to which such Holder is entitled or the value of such Interest, or (b) the Holders of any equity Interest that is junior to the Interests of the Holders of such Class of equity Interest will not receive or retain any property under the Plan.

The Debtors believe the Plan is fair and equitable with respect to each Class.

### 2.    No Unfair Discrimination

A chapter 11 plan "does not discriminate unfairly" with respect to a nonaccepting class if the value of the cash and/or securities to be distributed to the nonaccepting class is equal or otherwise fair when compared to the value of distributions to other classes whose legal rights are the same as those of the nonaccepting class. The Debtors believe that the Plan does not unfairly discriminate against any Class.

## XI.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION THE PLAN

### A.   Alternative Plans

If the Plan is not confirmed, the Debtors (or, if the period during which the Debtors have the exclusive right to file a plan of reorganization has expired or is terminated by the Bankruptcy Court, any other party in interest) could attempt to formulate a different plan of reorganization. Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of its assets.

Although alternative plans of reorganization are possible, the present Plan is the result of a thorough assessment of restructuring alternatives undertaken in consultation with key stakeholders. Accordingly, the Debtors believe the prospect of an alternative plan of reorganization that delivers greater value to economic stakeholders is remote.

### B.   Liquidation under Chapter 7 or Chapter 11

If the Plan is not confirmed by the Bankruptcy Court and consummated and an alternative plan of reorganization cannot be confirmed, then the alternatives include liquidation of the Debtors' assets under Chapter 7 or 11 of the Bankruptcy Code.

If a plan of reorganization is not confirmed (and in certain other circumstances), the Debtors' Chapter 11 Cases may be converted to cases under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to administer the Debtors' estates and to liquidate the assets of the Debtors for distribution to Holders of Claims and Interests in accordance with the priorities established by the Bankruptcy Code. (The Bankruptcy Code generally provides that a senior Class must be paid in full before any Class junior to it may receive any distribution). It is also possible to liquidate a debtor's assets under Chapter 11 of the Bankruptcy Code. A discussion of the potential effects that a liquidation would have on the recovery of Holders of Claims and Interests is set forth in the Liquidation Analysis contained in **Exhibit D**. As set forth therein, the Holders of Unsecured Claims are projected to receive no distribution on account of their claims in the event of a liquidation of the Debtors under Chapter 7.

In a liquidation, the unencumbered assets of the Debtors would be sold in exchange for cash, securities, or other property, which would then be distributed to creditors. However, the Debtors believe that a liquidation under Chapter 7 would result in no distributions other than to secured, priority, and administrative claimants due to, among other things, (i) the limited number and value of the Debtors' unencumbered assets, (ii) failure to realize the greater going concern value of the Debtors' assets and the erosion in value of assets in a Chapter 7 case due to the expeditious liquidation required and the "forced sale" atmosphere that would prevail, (iii) additional administrative expenses involved in the appointment of a trustee and professional

advisors to such trustee, and (iv) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations. In addition, liquidation is likely to result in substantial litigation and delays in ultimate distributions to creditors.

## XII.   THE SOLICITATION AND VOTING PROCEDURES

Pursuant to section 1126(f) of the Bankruptcy Code, Holders of Claims against the Debtors and Holders of Interests in the Debtors in a Class that is Unimpaired are conclusively presumed to have accepted the Plan.  The Plan provides that each Class of Claims against the Debtors is Unimpaired, and that each Class of Interests in the Debtors is Unimpaired. Accordingly, all Holders of Claims against the Debtors and all Holders of Interests in the Debtors are not entitled to vote on the Plan.  All such Holders are deemed to accept the Plan.

Nonetheless, all parties are encouraged to carefully review the Plan attached as **Exhibit A**, and described in Article V – "The Plan" herein.  All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and conditions of the Plan.

## XIII.   RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that Confirmation and consummation of the Plan are preferable to all other alternatives. Consequently, the Debtors urge all Holders of Claims against the Debtors and of Interests in the Debtors to support the Plan.

Dated:  May 24, 2017                 Respectfully submitted,

OPTIMA SPECIALTY STEEL, INC.

_____
Name: Michael S. Correra
Title:  Chief Restructuring Officer

MICHIGAN SEAMLESS TUBE LLC

_____
Name: Michael S. Correra
Title:  Chief Restructuring Officer

NIAGARA LASALLE CORPORATION

_____
Name: Michael S. Correra
Title:  Chief Restructuring Officer

KES ACQUISITION COMPANY d/b/a
    KENTUCKY ELECTRIC STEEL

_____
Name: Michael S. Correra
Title:  Chief Restructuring Officer

THE COREY STEEL COMPANY

_____
Name: Michael S. Correra
Title:  Chief Restructuring Officer

[SIGNATURE PAGE – DISCLOSURE STATEMENT]