**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| OPTIMA SPECIALTY STEEL, INC., *et al.*,[1] | Case No. 16-12789 (KJC) |
| Debtors. | (Jointly Administered) |
| | Requested Hearing Date: June 29, 2017 at 1:30 p.m.<br>Requested Objection Deadline: At the hearing. |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE
DEBTORS TO (A) ENTER INTO EXIT FINANCING COMMITMENT
LETTER AND RELATED FEE LETTER, (B) INCUR AND PAY
CERTAIN FEES, INDEMNITIES, COSTS AND EXPENSES IN
CONNECTION THEREWITH AND (C) FILE THE
FEE LETTER UNDER SEAL**

Optima Specialty Steel, Inc. ("**Optima**") and its above-captioned subsidiaries, as chapter

11 debtors and debtors-in-possession (collectively, with Optima, the "**Debtors**"), hereby move

for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Proposed**

**Order**"), authorizing the Debtors to:

(a)  enter into (i) a commitment letter, substantially in the form attached hereto as
**Exhibit B** (including all attachments thereto, the "**Commitment Letter**"), relating to
proposed exit financing facility (the "**Exit Facility**") consisting of a $115 million
unitranche term loan facility (to include an additional $15 million in the form of delayed
draw loans), and (ii) a fee letter relating to such proposed exit financing, substantially in
the form attached hereto as **Exhibit C** (the "**Fee Letter**," and together with the
Commitment Letter, the "**Exit Financing Commitment Documents**");

(b)  perform their obligations under the Exit Financing Commitment Documents,
including, without limitation, their obligations to incur and pay fees, indemnification
obligations, costs and expenses as provided in the Exit Financing Commitment
Documents; and

---

[1]  The Debtors in these Chapter 11 Cases (as defined below), along with the business addresses and the last four (4)
digits of each Debtor's federal tax identification number, if applicable, are:  Optima Specialty Steel, Inc., 200 S.
Biscayne Blvd., Suite 5500, Miami, FL 33131-2310 (0641); Michigan Seamless Tube LLC, 400 McMunn Street,
South Lyon, MI 48178 (3850); Niagara LaSalle Corporation, 1412 150th Street, Hammond, IN 46327 (0059); KES
Acquisition Company d/b/a Kentucky Electric Steel, 2704 South Big Run Road, Ashland, KY 41102 (2858); and
The Corey Steel Company, 2800 South 61st Court, Cicero, IL 60804 (0255).

(c)  file the Fee Letter under seal.

In support of this Motion, the Debtors respectfully state as follows:

**Preliminary Statement**

1.      The Commitment Letter obligates GSO Capital Partners LP (together with its affiliates and funds and accounts managed or sub-advised by any of them, "**GSO**"), upon the terms and conditions therein, to provide the exit financing required by the *Second Amended Joint Chapter 11 Plan of Reorganization of Optima Specialty Steel, Inc. and Its Affiliated Debtors and Debtors in Possession* [Docket No. 849] (as amended, modified, or supplemented from time to time, the "**Plan**").  The Plan provides for a comprehensive reorganization of the Debtors that will (i) leave all creditors unimpaired, paying fixed, undisputed and liquidated claims in full in cash and reinstating contingent, disputed or unliquidated claims,[2] (ii) leave unimpaired the equity interests held by Optima Acquisitions, LLC ("**OA**") as the sole 100% shareholder of the Debtors, (iii) permit the Debtors to emerge from these Chapter 11 Cases much sooner than anticipated, and (iv) substantially deleverage the capital structure of the Debtors, benefiting all of their constituencies, including vendors, suppliers, employees, and pensioners.  The Plan is supported by OA, the official committee of unsecured creditors (the "**Creditors' Committee**") in these chapter 11 cases (the "**Chapter 11 Cases**"), DDJ Capital Management, LLC, and other of the Debtors' constituencies.

2.      Pursuant to this Court's final order, dated May 12, 2017 [Docket No. 743], approving the Plan Support Agreement (the "**PSA**") between the Debtors and OA as plan sponsor (in such capacity, the "**Plan Sponsor**"), the Debtors are required to confirm the Plan by June 30, 2017 and to consummate the Plan by July 31, 2017.  Unless waived or cured, failure to

---

[2]  Under the Plan, the Reorganized Debtors (as defined herein) will retain all defenses, counterclaims and other rights with respect to any contingent, disputed or unliquidated claims.

comply with these milestones constitutes an event of default under the PSA.  In accordance with these and other milestones in the PSA, the Debtors have obtained approval of their *Disclosure Statement Relating to the Joint Chapter 11 Plan of Reorganization of Optima Specialty Steel, Inc. and Its Affiliated Debtors and Debtors in Possession* [Docket No. 779], and a hearing to consider confirmation of the Plan is scheduled for June 29, 2017.

3.      In order to confirm and consummate the Plan within the time provided by the milestones in the PSA, the Debtors engaged in extensive discussions with a number of potential lenders and, as a result of those efforts, were able to obtain the Commitment Letter for exit financing from the Commitment Parties,[3] the material terms of which are embodied in the Exit Financing Commitment Documents and are summarized later in this Motion.  The Debtors, in their business judgment, respectfully submit that the Exit Financing Commitment Documents contain reasonable terms and conditions, are the product of thorough marketing and arm's length negotiations with GSO, and, upon becoming effective, will ensure the Debtors have sufficient financing to emerge from these Chapter 11 Cases pursuant to the Plan.

4.      The borrowing obligations under the Exit Facility and the majority of the fees payable under the Exit Financing Commitment Documents will be binding upon the Debtors, as reorganized pursuant to the Plan (the "**Reorganized Debtors**"), at or after closing in connection with consummation of the Plan—and, hence, neither the loan obligations nor the majority of such fees will become payable by the Debtors before emergence. Indeed, before emergence, the Debtors' only definitive obligations under the Exit Financing Commitment Documents are to provide the Commitment Parties with (a) certain customary indemnities, (b) reimbursement for

---

[3] "**Commitment Parties**" means GSO and the funds and accounts managed or subadvised by GSO or its affiliates, including, without limitation, GSO / Blackstone Debt Funds Management LLC and its sub-advised entities, FS Investment Corporation, FS Investment Corporation II, FS Investment Corporation III and FS Investment Corporation IV.

reasonable and documented fees and expenses, (c) exclusivity, and (d) the Alternate Transaction Fee (as defined below). The Commitment Letters provide for payment by the Reorganized Debtors, as is customary in exit financing commitment letters, of: (i) an Alternate Transaction Fee (as defined below) in the event of an Alternate Transaction (as defined below) (the Alternate Transaction Fee, together with the indemnification obligations and fees/expenses referred to in the immediately preceding sentence, collectively, the "**Pre-Emergence Exit Facility Obligations**"); and (ii) certain Upfront Fees (as defined below) in respect of the Exit Facility upon and after emergence from these Chapter 11 Cases (the Upfront Fees, together with the indemnification obligations and fees/expenses from the preceding sentence, collectively, the "**Exit Facility Fees**").

5.     The Commitment Parties have already committed substantial resources to completing their due diligence process and negotiating the Exit Financing Commitment Documents, and they will continue to incur expenses and professional fees in connection with negotiating, finalizing and documenting the definitive transaction documentation relating to the Exit Facility before the Debtors' emergence.  Accordingly, given the significant efforts that will need to be expended before the Debtors' emergence, and as is customary in chapter 11 cases of this nature, the Commitment Parties have requested that the Debtors obtain immediate approval of the Exit Financing Commitment Documents, and authorization by this Court for the Debtors to enter into and incur the obligations set forth therein . Such relief will ensure that the Debtors are able to expeditiously obtain the exit financing contemplated by the Plan within the time-frame required under the PSA. Accordingly, for the foregoing reasons and those set forth below, the Debtors submit that entering into the Exit Financing Commitment Documents, including incurring and paying the Pre-Emergence Exit Facility Obligations, as applicable, and affording

such obligations administrative expense priority under section 503(b) of the Bankruptcy Code, is reasonable, appropriate, in the best interests of the Debtors' estates, and should be approved.

## Background

### A.    Status of the Case

6.    On December 15, 2016 (the "**Petition Date**"), each of the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under the Bankruptcy Code.

7.    The Debtors are in possession of their properties and are operating and managing their businesses as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.    No request has been made for the appointment of a trustee or examiner.

9.    The United States Trustee for the District of Delaware appointed the Creditors' Committee on January 4, 2017.

### B.    General Background of the Debtors

10.    The Debtors are leading independent manufacturers of specialty steel products. These steel products include (i) special bar quality and merchant bar quality hot rolled steel bars, (ii) value-added precision-tolerance, cold drawn seamless tubes, and (iii) high quality engineered cold finished steel bars.  The Debtors' products are utilized across a diversified range of end markets, including transportation (e.g. automotive), energy (e.g. oil and gas shale extraction), agriculture, power generation, yellow goods/construction equipment, railroad car, industrial chain manufacturing, and trailer support beam flanges.

11.    All of the Debtors' manufacturing facilities are located in the United States, and each of the Debtors' operating units has operated in the steel industry for more than 50 years.  In the aggregate, the Debtors have more than one thousand customers in the United States.  These

customers span many industries including transportation, energy, agriculture and power generation.  The Debtors collectively employ approximately 900 people.

12.    Although the Debtors' business is fundamentally sound, it has been affected by a period of macroeconomic and industry distress.  These and other factors rendered the Debtors incapable of repaying their long-term indebtedness at maturity.  Accordingly, the Debtors sought protection under Chapter 11 of the Bankruptcy Code to provide "breathing room" during which the Debtors could assess their strategic options, address operational issues and consider restructuring proposals.  The Debtors intend to continue their operations in the ordinary course of business.

**C.    The Debtors' Proposed Exit Financing**

13.    The Debtors and their advisors, in consultation with the Plan Sponsor, considered the funding, liquidity and optimal debt structure that will be necessary to consummate the Plan. Ultimately, the Debtors and their advisors, in consultation with the Plan Sponsor, determined the Debtors would require aggregate debt financing of $115 million to consummate the Plan and provide sufficient liquidity to fund the Debtors' operations after emergence from these Chapter 11 Cases, all in the form of the Exit Facility more fully described below.

14.    The Exit Facility is the result of extensive, good-faith, and arm's length negotiations between the Debtors and the Commitment Parties. The Debtors have determined that the Exit Facility represents the Debtors' best and most viable opportunity to obtain the liquidity required to fund the transactions contemplated by the Plan and  to ensure the Debtors' emergence from these Chapter 11 Cases.

15.    As more fully set forth in the Commitment Letter, it is contemplated that on the effective date of the Plan (the "**Effective Date**"), the Reorganized Debtors will enter into a Senior Secured Unitranche Credit Facility, in an initial aggregate principal amount of $115.0

million (and which shall include commitments with respect to an additional $15 million in the form of delayed draw loans) having the terms set forth on the term sheet attached to the Commitment Letter as Exhibit B (the "**Exit Facility Term Sheet**")

16.     As noted in the Exit Facility Term Sheet, the Reorganized Debtors intend to use the proceeds of the Exit Facility to fund distributions under the Plan, to pay the fees and expenses associated with the Exit Facility, and to fund the Reorganized Debtors' post-emergence working capital needs.

17.     The Commitment Parties' commitment to fund the Exit Facility is contingent on the Debtors obtaining approval to execute, deliver and perform their obligations under the Exit Financing Commitment Documents, including, without limitation, their obligations to incur and pay fees, indemnities, costs and expenses in connection with the Exit Facility, on the terms and conditions set forth in the Exit Financing Commitment Documents.

**D.     The Exit Facility**

18.     The following summarizes the key terms of the Exit Facility:[4]

| Provision | Summary of Provision |
|---|---|
| Borrower: | Optima Specialty Steel, Inc. |
| Guarantors: | All present and future direct and indirect subsidiaries of the Borrower. |
| Agent: | Virtus Group, LP, or another entity mutually acceptable to GSO and the Borrower. |
| Lenders: | GSO Capital Partners LP or its affiliates, including, without limitation, GSO / Blackstone Debt Funds Management LLC and its sub-advised entities, FS Investment Corporation, FS |

---

[4] This summary of the Exit Facility Term Sheet is provided for the benefit of the Court and other parties in interest. To the extent that there are any conflicts between this summary and the Exit Financing Commitment Documents, the terms of the Exit Financing Commitment Documents shall govern. Capitalized terms used in the following summary and not otherwise defined therein shall have the meanings set forth in the applicable Exit Financing Commitment Documents.

| Provision | Summary of Provision |
|---|---|
| | Investment Corporation II, FS Investment Corporation III and FS Investment Corporation IV, and a syndicate of financial institutions acceptable to GSO and reasonably acceptable to the Borrower. |
| Credit Facility: | (i)  $115 million unitranche term loan facility; and<br>(ii) $15 million delayed draw facility, available until the earlier of December 31, 2017 or the Borrower enters into a Revolving Credit Facility. |
| Maturity: | Six (6) years after the Closing Date. |
| Interest: | LIBOR plus 8.75% per annum cash interest, subject to a 1.00% LIBOR floor, payable quarterly in arrears. |
| Collateral: | All obligations under the Credit Facility will be secured by a first priority security interest in and lien on substantially all of the assets of the Loan Parties, which includes the Borrower and Guarantor; provided that, in the event the Borrower enters into the Revolving Credit Facility, the intercreditor agreement shall provide (i) a first priority security interest in and lien on all real and personal property of the Loan Parties, including, without limitation, all equipment, general intangibles, goods, documents, contracts, trademarks, patents, copyrights, intercompany obligations, stock and membership interests, securities, notes, and all real estate owned or leased by the Loan Parties (but excluding bank accounts (excluding identifiable proceeds of term loan collateral), accounts receivable and inventory), together with a pledge of all stock of any direct subsidiary of any Loan Party, and (ii) a second priority security interest in and lien on the bank accounts (excluding identifiable proceeds of term loan collateral), receivables and inventory of the Loan Parties securing the Revolving Credit Facility. For the avoidance of doubt, the Revolving Credit Facility, if any, will also be secured by a second priority lien on the assets of the Loan Parties (other than bank accounts (excluding identifiable proceeds of term loan collateral), receivables and inventory) securing the Credit Facility. |
| Mandatory Prepayments: | The Borrower shall be required to prepay the Loans (i) in an amount equal to 100% of the net cash proceeds from equity (subject to customary carve outs but to include proceeds from any equity cures) or debt issuances not otherwise permitted under the credit agreement or the sale or disposition of assets, insurance and condemnation proceeds and other Extraordinary |

| Provision | Summary of Provision |
|---|---|
| | Receipts (in each case with exceptions to be agreed) and (ii) upon the occurrence of the Revolving Credit Facility in an amount equal to the outstanding principal balance of the Delayed Draw Loans (together with any accrued interest thereon). |
| Excess Cash Flow Sweep: | Commencing with the fiscal year ending December 31, 2018, the Borrower shall pay 50% of excess cash flow (EBITDA, less the following amounts: (x) cash taxes and reasonable reserves in respect thereof, (y) cash interest charges and (z) to the extent financed with the use of internally generated cash or proceeds from the Revolving Credit Facility, capital expenditures and principal payments of debt, in any such case, subject to other adjustments to be mutually agreed). |
| Board Observation Rights: | GSO shall be granted customary board observation rights. |
| Conditions to Closing: | The conditions to the funding of the Credit Facility shall be limited to the satisfaction (or waiver by GSO) of the following:<br><br>• Negotiation, execution and delivery of definitive documentation for the Credit Facility, each to be in form and substance consistent with this Term Sheet and otherwise reasonably acceptable to GSO.<br>• Delivery of customary closing (including direction letter and funds flow) and corporate documents, solvency (after giving effect to the Transactions) and other officer certificates, legal opinions, lien searches and security interest filings, each to be in form and substance consistent with this Term Sheet and otherwise reasonably acceptable to GSO.<br>• Payment in full of all fees and expenses related to the Credit Facility to the extent due and payable pursuant to the Commitment Letter, the Fee Letter and the Financing Documentation; provided fees and expenses due and payable pursuant to the Commitment Letter, the Fee Letter and the Financing Documentation and invoiced at least two business days prior to the Closing Date shall be paid on the Closing Date.<br>• Evidence reasonably satisfactory to GSO that the total funded debt on the Closing Date after giving effect to all transactions contemplated hereunder does not exceed 4.5x pro forma EBITDA (based on the most recently ended 12 month period).<br>• Duly executed copies of the documents evidencing the Revolving Credit Facility, along with an intercreditor |

| Provision | Summary of Provision |
|---|---|
| | agreement each to be in form and substance consistent with the Exit Facility Term Sheet and otherwise reasonably acceptable to GSO.<br>• An order of the Bankruptcy Court in form and substance reasonably satisfactory to GSO shall have been entered in the Borrower's bankruptcy case confirming the Plan and approving the Credit Facility, and such order shall not have been vacated, reversed, modified, amended or stayed.<br>• All conditions precedent to the occurrence of the effective date under the Plan shall have been satisfied or waived (with the consent of GSO to the extent material or adversely affecting the interests of the Lenders (in their capacities as such)) and such effective date shall have occurred.<br>• GSO shall have received evidence reasonably satisfactory to the GSO demonstrating the satisfaction of any required transaction under the Plan. |
| Representations and Warranties: | Customary for transactions of this type. |
| Covenants: | Customary for transactions of this type (with customary qualifications and mutually agreeable exceptions to the covenants), including, without limitation, financial covenants providing for the maintenance of a total leverage ratio (total funded net debt/EBITDA) less than or equal to 5.00 to 1.00, with step-downs to be determined. |
| Events of Default: | Customary for transactions of this type (with customary notice, cure periods and materiality qualifications, as applicable). |

**E.    Fees, Indemnities, Costs and Expenses, and Exclusivity Obligation to Be Incurred Under the Exit Financing Commitment Documents**

19.    Entry into the Exit Financing Commitment Documents obligates the Debtors or the Reorganized Debtors, as applicable, to incur and pay certain fees, indemnities, costs and expenses in connection with the Exit Facility, in each case, as set forth in the Exit Financing Commitment Documents. In this Motion, the Debtors seek authority to incur and pay or reimburse all of the fees, indemnities, costs and expenses set forth in the Exit Financing

Commitment Documents as and when such amounts are incurred and become due and payable, which include, without limitation, the following:[5]

(a) <u>Indemnification</u>: As more fully set forth in the Commitment Letter, Optima agrees to indemnify and hold harmless the Indemnified Parties from and against certain actions, suits, losses, claims, damages, penalties, liabilities and reasonable and documented out-of-pocket expenses of any kind or nature (including legal expenses), joint or several, to which such Indemnified Party may become subject or that may be incurred or asserted or awarded against such Indemnified Party, and will reimburse each Indemnified Party for all reasonable and documented out-of-pocket expenses on written demand (together with reasonable back-up documentation supporting such reimbursement request) as they are incurred in connection with any of the foregoing, subject to certain qualifications.

(b) <u>Costs and Expenses</u>: As more fully set forth in the Commitment Letter, Optima agrees to pay all of GSO's reasonable and documented fees, costs and expenses arising in connection with the negotiation, preparation, execution, delivery or administration of the Commitment Letter, the Fee Letter and the definitive documentation for the Transactions, subject to certain qualifications.

(c) <u>Term Loan Facility Fee</u>: The Exit Financing Commitment Documents provide that GSO will be entitled to an upfront structuring fee (the "**Upfront Term Structuring Fee**") in an amount equal to a specific percentage of the aggregate amount of the commitments in respect of the Senior Facility. The Upfront Term Structuring Fee will be due and payable in full on, and subject to the occurrence of, the Closing Date.

(d) <u>Delayed Draw Facility Fee</u>: The Exit Financing Commitment Documents provide that GSO will be entitled to an upfront structuring fee (the "**Delayed Draw Structuring Fee**," together with the Upfront Term Structuring Fee, the "**Upfront Fee**") in an amount equal to a specific percentage of the aggregate amount of Delayed Draw Loans when made, which Delayed Draw Structuring Fee shall be due and payable in full to GSO on each date a Delayed Draw Loan is made.

(e) <u>Alternate Transaction Fee</u>: The Exit Financing Commitment Documents provide that GSO will be entitled to a fee (the "**Alternate Transaction Fee**") in an amount equal to a specified percentage of the Upfront Term Structuring Fee, payable to it on the closing date of the Exit Facility, in certain circumstances relating to the consummation of an alternate exit financing transaction (such transaction, as defined in the Fee Letter, an "**Alternate Transaction**").

---

[5]  This summary of the obligations arising under the Exit Financing Commitment Documents is provided for the benefit of the Court and other parties in interest. To the extent that there are any conflicts between this summary and the Exit Financing Commitment Documents, the terms of the Exit Financing Commitment Documents shall govern. Capitalized terms used in the following summary and not otherwise defined therein shall have the meanings set forth in the applicable Exit Financing Commitment Documents.

20.     In addition to the obligations noted above, the Exit Financing Commitment Documents obligate the Debtors not to, directly or indirectly, solicit, participate in any negotiations or discussions with, or provide or afford access to information to any third party with respect to, or otherwise effect, facilitate, encourage or accept any offers for the funding of the Exit Facility or any alternative equity or debt financing arrangements in lieu of all or a portion of the Exit Facility (other than the Equity Contribution and the Revolving Credit Facility (each term as defined in the Commitment Letter)), as more fully set forth in the Commitment Letter.

## **Relief Requested**

21.     The Debtors request the entry of an order, substantially in the form of the Proposed Order, among other things:

(a)     approving the Exit Financing Commitment Documents;

(b)     authorizing the Debtors to enter into the Exit Financing Commitment Documents;

(c)     authorizing the Debtors to incur and pay the Pre-Emergence Exit Facility Obligations in connection with the Exit Financing Commitment Documents;

(d)     authorizing the Reorganized Debtors, as of the Effective Date and with respect to consummation of the Exit Facility, to incur and pay the Exit Facility Fees in connection with the Exit Financing Commitment Documents;

(e)     authorizing the Debtors to file the Fee Letter under seal;

(f)     directing that the Fee Letter remain under seal and confidential and not be made available to anyone, without the written consent of the Debtors and the Commitment Parties, except (i) as otherwise provided in the Commitment Letter, and (ii) without limiting the foregoing, that copies of the unredacted Fee Letter may be disclosed to (A) the Court, (B) the Office of the U.S. Trustee, (C) the professional advisors of the Creditors' Committee (but not the members of such committee), and (D) such other persons or entities determined by the Commitment Parties in their sole discretion, in each case on a confidential basis (collectively, the "**Limited Notice Parties**"); and

(g)     finding that service of this Motion and the exhibits hereto, without transmittal of the Fee Letter, to parties entitled to receive notice in these Chapter 11

Cases (other than the Limited Notice Parties), constitutes sufficient notice under the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

### Basis for Relief

**A.      The Pre-Emergence Exit Facility Obligations Should Constitute Allowed Administrative Expenses Pursuant to Section 503(b) of the Bankruptcy Code**

22.      As noted above, the Exit Financing Commitment Documents obligate the Debtors to incur and undertake certain payment obligations before the Effective Date, and such Pre-Emergence Exit Facility Obligations constitute "necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A).

23.      Without the incurrence of and undertaking to pay the Pre-Emergence Exit Facility Obligations (or the commitment of the Reorganized Debtors to incur and pay the Exit Facility Fees), the Debtors would be unable to secure the Commitment Parties' commitment to provide the Exit Facility. This would jeopardize the Debtors' ability to consummate the Plan and emerge from these Chapter 11 Cases, thereby impairing the value of their businesses to the detriment of all stakeholders. For this reason, all of the Pre-Emergence Exit Facility Obligations should be awarded administrative expense status under section 503(b)(1) of the Bankruptcy Code.

24.      The Alternate Transaction Fee, like all other fees, expenses and indemnities provided in the Commitment Letter and the Fee Letter, was a necessary inducement to GSO's agreement to enter into the Exit Financing Commitment Documents, and was the subject of extensive, good faith, and arm's length negotiation between the Debtors and GSO.   The Alternative Transaction Fee represents fair and reasonable compensation for GSO's agreements under the Commitment Letter and the time and effort spent by GSO in attempting to structure and arrange the Exit Facility, in the event that the Debtors determine to pursue an alternative financing arrangement in place of the Exit Facility. The Alternate Transaction Fee as set forth in the Fee Letter falls well within the range of reasonableness and is comparable to other financing

break-up fees regularly approved in this District. *See, e.g., In re W.R. Grace & Co.*, No. 01-01139 (KJC) (Bankr. D. Del. Jan. 28, 2014) (approving break-up fee of less than 1% of proposed amount of exit financing); *In re Visteon Corporation*, No. 09-11786 (CSS) (Bankr. D. Del. Aug. 31, 2010) (approving break-up fee of approximately 2.1% of total exit financing commitment); *In re NewPage Corporation*, No. 11-12804 (KG) (Bankr. D. Del. Nov. 6, 2012) (approving break-up fee of less than 3% of exit financing commitment). The Debtors believe that the Alternate Transaction Fee, expressed as a percentage of the principal amount of the Exit Facility, is reasonable and adequately compensates GSO for its agreements under the Commitment Letter and its time and effort spent in structuring and arranging the Exit Facility in the event that the Debtors pursue an alternative financing path.

25.    The Exit Financing Commitment Documents represent the best financing available to the Debtors under current market conditions and are critical to the consummation of the Plan. Importantly, if approved, the Exit Financing Commitment Documents will ensure that the Debtors have the necessary financing in place to consummate the Plan and emerge expeditiously from these Chapter 11 Cases with sufficient working capital to operate their businesses. The ability to lock in a commitment for their exit financing provides a tremendous benefit to the Debtors and their estates, creditors and other stakeholders.

**B.      Entering into the Exit Financing Commitment Documents and Incurring and Paying Fees, Indemnities, Costs and Expenses (As and When Applicable) Thereunder Is a Sound Exercise of the Debtors' Business Judgment**

26.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Further section 105(a) of the Bankruptcy Code provides "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). A court generally should approve a

non-ordinary course transaction if the proposed use of estate assets is within the debtor's reasonable business judgment. *See, e.g.*, *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (stating that the court generally defers to the trustee's judgment so long as there is a legitimate business justification); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (noting that courts have applied the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)); *In re Del. & Hudson R.R. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (same).

27.    Once the debtor has articulated a valid business purpose for use of estate property, a presumption arises that the debtor's decision is made on an informed basis, in good faith, and in the honest belief that the action is in the best interests of the company. *See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) ("Parties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity.") (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)), appeal dismissed, 3 F.3d 49 (2d Cir. 1993); *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

28.    The Debtors have satisfied the business judgment standard. The Debtors require exit financing to fund certain distributions pursuant to the Plan and to fund their post-emergence working capital needs. The Exit Facility that will be provided by the Commitment Parties was the subject of extensive, good faith, and arm's length negotiations among the parties, and constitutes the only viable option presently available for exit financing.

29.    The Debtors' entry into the Exit Financing Commitment Documents, the payment of the fees, indemnities, costs and expenses thereunder, and this Court's approval thereof, are

conditions to the Commitment Parties' commitment to provide the Exit Facility.[6] The Debtors, in consultation with their advisors, further believe that the terms of the Exit Facility and the Exit Financing Commitment Documents, including, without limitation, payment of the fees, indemnities, costs and expenses thereunder, are fair and reasonable.[7]

30.    Courts in this jurisdiction have routinely approved relief similar to the Debtors' request to pay fees, indemnities, costs and expenses in connection with exit financing. *See*, *e.g.*, *In re Trump Entertainment Resorts, Inc.*, No. 14-12103 (KG) (Bankr. D. Del. Mar. 4, 2015) (authorizing debtors to enter into exit financing commitment letter and pay fees and expenses and provide indemnities thereunder); *In re GSE Envtl., Inc.*, No. 14-11126 (MFW) (Bankr. D. Del. July 11, 2014) (approving entry into and payment of fees and expenses under exit financing commitment letter); *In re Overseas Shipholding Grp., Inc.*, No. 12-20000 (PJW) (Bankr. D. Del. May 27, 2014); *In re W.R. Grace & Co.*, No. 01-01139 (KJC) (Bankr. D. Del. Jan. 28, 2014) (authorizing debtor to enter into exit financing engagement letter and pay fees, reimburse expenses, and provide indemnities thereunder); *In re Flying J, Inc.*, No. 08-13384 (MFW) (Bankr. D. Del. Oct. 15, 2009) (same); *In re Dura Automotive Sys., Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. Nov. 9, 2007) (same).

**C.    Ample Authority Exists to Allow the Debtors to File the Fee Letter under Seal**

31.    Section 107(b) of the Bankruptcy Code provides bankruptcy courts with authority to issue orders that will protect entities from potential harm that may result from the disclosure of

---

[6]  The Commitment Parties have already committed substantial resources to completing their diligence process and negotiating the Exit Financing Commitment Documents, and will continue to incur expenses and professional fees in connection with negotiating, finalizing and documenting the Exit Facilities prior to the Debtors' emergence from these Chapter 11 Cases.

[7]  Additionally, those fees and/or premiums that become payable upon or after closing of the Exit Facilities (the Exit Facility Fees) will be paid by the Reorganized Debtors in connection with the consummation of the Plan, and hence the Debtors will not be required to pay such fees and/or premiums before the Effective Date.

certain confidential information.  On request of a party in interest, the bankruptcy court shall, and

on the bankruptcy court's own motion, the bankruptcy court may:

> (1) protect an entity with respect to a trade secret or confidential research, development, or commercial information; or (2) protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title.

11 U.S.C. § 107(b). Bankruptcy Rule 9018 defines the procedures by which a party may move

for relief under section 107(b) of the Bankruptcy Code:

> On motion or on its own initiative, with or without notice, the court may make any order which justice requires (1) to protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information . . . .

Fed. R. Bankr. P. 9018. Additionally, Local Rule 9018-1(b) provides, in relevant part, that "[a]ny

party who seeks to file documents under seal must file a motion to that effect with the Clerk."

Local Rule 9018(1)(b).

32.     Confidential commercial information is information that, if disclosed, would

result in "unfair advantage to competitors by providing them information as to the commercial

operations of the debtor." *In re Alterra Healthcare Corp.*, 353 B.R. 66, 75 (Bankr. D. Del. 2006)

(citing *Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.)*, 21

F.3d 24, 27 (2d Cir. 1994)). Commercial information, however, need not rise to the level of a

trade secret to be protected under section 107(b) of the Bankruptcy Code. *Orion Pictures*, 21

F.3d at 28 (holding that a license agreement authorizing a licensee to "reproduce, manufacture,

distribute, and sell videocassettes of three films" contained confidential commercial information

and that protection of such information under section 107(b) was justified); *In re Barney's Inc.*,

201 B.R. 703, 708-09 (Bankr. S.D.N.Y. 1996) (concluding that for a retailer, confidential

commercial "information might include, without limitation, pricing formulae, short and long

term marketing strategies and the terms of agreements with suppliers").

33.     Unlike its counterpart in Rule 26(c) of the Federal Rules of Civil Procedure, section 107(b) of the Bankruptcy Code does not require an entity seeking such protection to demonstrate "good cause." *See*, *e.g.*, *Orion Pictures*, 21 F.3d at 28; *Phar Mor, Inc. v. Defendants Named Under Seal (In re Phar Mor, Inc.)*, 191 B.R. 675, 679 (Bankr. N.D. Ohio 1995). Rather, once the bankruptcy court determines that a party in interest is seeking protection of information that falls within one of the categories enumerated in section 107(b) of the Bankruptcy Code, "the court is required to protect a requesting interested party and has no discretion to deny the application." *Orion Pictures*, 21 F.3d at 27.

34.     Under the plain language of section 107(b) of the Bankruptcy Code and Bankruptcy Rule 9018, and in light of the Court's broad equitable powers under section 105(a) of the Bankruptcy Code to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," the Debtors seek authorization to file the Fee Letter under seal. The Fee Letter contains detailed fee information that is indisputably "confidential" and "commercial" in nature, and that alone justifies its protection from public disclosure. *Video Software Dealers Assoc.*, 21 F.3d at 28. Indeed, the fees set forth in the Fee Letter represent the negotiated price of the services being provided by the Commitment Parties and, as such, constitute the most confidential commercial information of financial institutions, like the Commitment Parties, that are engaged in the business of arranging financings. In accordance with custom and practice in the finance industry, such proprietary pricing information is generally not made publicly available. Given the highly competitive nature of the investment banking and finance lending industries, disclosure of such pricing information would give competitors an unfair strategic advantage and thereby impair the ability of financial institutions to bid and compete for other financings. Ultimately, such disclosure, if required in bankruptcy

cases, would discourage the participation of financial institutions in debtor-in-possession and exit financings, to the detriment of all parties in interest.

35.    Courts in this District and elsewhere have ordered fee letters to be filed under seal before, including on facts almost identical to those at hand. *See*, *e.g.*, *In re NewPage Corporation*, No. 11-12804 (KG) (Bankr. D. Del. Nov. 6, 2011) (granting the debtors' request to file fee letters under seal); *In re Harry & David Holdings, Inc.*, No. 11-10884 (MFW) (Bankr. D. Del. May 10, 2011) (same); *In re Appleseed's Intermediate Holdings LLC*, No. 11-10160 (KG) (Bankr. D. Del. March 29, 2011) (same); *In re Visteon Corporation*, No. 09-11786 (CSS) (Bankr. D. Del. Aug. 31, 2010)(same); *In re Tribune Co.*, 08-13141 (KJC) (Bankr. D. Del. Dec. 10, 2008) (same).

36.    Accordingly, for the foregoing reasons, and as required under the Exit Financing Commitment Documents, the Debtors respectfully request the Court allow the Debtors to file the Fee Letter under seal and limit its disclosure solely to the Limited Notice Parties. The Limited Notice Parties have the greatest interest in the Fee Letter, and hence providing notice and disclosure to these entities will subject the Fee Letter to sufficient scrutiny, while at the same time, minimizing the harmful impact of broader disclosure on the Commitment Parties and the Debtors.

### Waiver of Bankruptcy Rule 6004(h)

37.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Bankruptcy Rule 6004(h). A court may waive the stay period, however, "when there is a sufficient business need to close the transaction." *In re Boscov's, Inc.*, 2008 WL 4975882 at *2 (Bankr. D. Del. Nov. 21, 2008).

38.     There is no reason to delay the effectiveness of the Proposed Order. Working in good faith with the Debtors, the Commitment Parties have already incurred significant diligence and professional expenses with respect to negotiating the Exit Financing Commitment Documents. Furthermore, the Commitment Parties will incur further pre-Effective Date expenses and professional fees in finalizing the documentation for the Exit Facility — all of which is necessary to allow the Debtors to emerge as expeditiously as possible from these Chapter 11 Cases. Thus, it is important that the Exit Financing Commitment Documents become effective immediately to give the Commitment Parties the certainty that they can move forward with their processes with the assurance that such Commitment Parties will be compensated for incurring the related costs. Immediate approval of the Exit Financing Commitment Documents will also allow the parties to focus on finalizing the definitive documentation for the Exit Facility, which will help to ensure the Debtors' expeditious exit from these Chapter 11 Cases. Accordingly, waiver of the 14-day stay period under Bankruptcy Rule 6004(h) is appropriate.

## Notice

39.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known:  (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the Creditors' Committee; (c) counsel to the DIP Lenders; (d) counsel for the Secured Noteholder Group; and (e) those parties requesting notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

40.     No prior request for the relief sought in this Motion has been made to this or any other court.

## <u>Conclusion</u>

WHEREFORE the Debtors respectfully request that the Court grant the Debtors the relief

requested herein, and such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
      June 27, 2017

GREENBERG TRAURIG, LLP

*/s/ Dennis A. Meloro*
Dennis A. Meloro (DE Bar No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 661-7000
Facsimile:  (302) 661-7360
Email: melorod@gtlaw.com

-and-

Paul J. Keenan Jr. (admitted *pro hac vice*)
John R. Dodd (admitted *pro hac vice*)
Greenberg Traurig, P.A.
333 S.E. 2nd Avenue, Suite 4400
Miami, FL 33131
Telephone: (305) 579-0500
Facsimile:  (305) 579-0717
Email: keenanp@gtlaw.com
      doddj@gtlaw.com

*Counsel for the Debtors*
*and Debtors-in-Possession*